**23-938**

IN THE

# United States Court of Appeals

## FOR THE NINTH CIRCUIT

◆◆◆

LAURA AKAHOSHI, Former Chief Compliance Officer,

*Petitioner,*

—v.—

OFFICE OF THE COMPTROLLER OF THE CURRENCY,

*Respondent.*

ON APPEAL FROM THE OFFICE OF THE COMPTROLLER OF THE CURRENCY

## BRIEF FOR PETITIONER

JUSTIN S. WEDDLE
JULIA I. CATANIA
BRIAN WITTHUHN
WEDDLE LAW PLLC
37 West 20th Street, Suite 1206
New York, New York 10011
(212) 997-5518
jweddle@weddlelaw.com

*Attorneys for Petitioner*

February 16, 2024

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ........................................................................ 1

ISSUES PRESENTED FOR REVIEW ................................................................. 2

STATEMENT OF THE CASE ............................................................................. 4

I.  Factual Background .................................................................................... 5

    A.  The Terminated Crowe Consulting Project .................................. 6

    B.  The BSA/AML Examination Beginning in November 2012 ......... 9

    C.  Ms. Akahoshi's Temporary Re-Assignment to RNA to Address the OCC's Draft Findings ............................................................ 12

        1.  The Bank's March 15, 2013 Response to the OCC's Draft Findings ................................................................... 12

        2.  Ms. Akahoshi's Three Emails Challenged by the OCC ......... 14

    D.  The Crowe Documents Had No Effect on the OCC Examination, and the OCC Determined for Years that No Violation of Law Occurred ....................................................................................... 19

II.  Procedural Background: The Administrative Proceeding ............... 21

    A.  Agency Prejudgment Prior to the Notice ................................... 21

    B.  Agency Proceedings Before ALJs ............................................... 22

        1.  The Notice Against Ms. Akahoshi ......................................... 22

        2.  OCC Administrative Forum Delays ....................................... 23

        3.  Litigation Before ALJ Whang ............................................... 24

        4.  The ALJ's Recommended Decision ....................................... 25

    C.  Agency Proceedings After the ALJ's Issuance of a Recommended Decision ............................................................... 26

        1.  Exceptions to the Acting Comptroller ................................. 26

        2.  The Acting Comptroller Requests Supplemental Briefing to Address Issues Ignored by Enforcement Counsel................. 26

        3.  Additional Prejudgment While the Parties' Exceptions Were Pending ...................................................................... 27

        4.  The Final Decision Terminating the Action........................... 27

i

     5.  Equal Access to Justice Act Application.................................. 28

    D.  Proceedings in this Court ............................................... 29

SUMMARY OF THE ARGUMENT ...................................................... 29

ARGUMENT ...................................................................... 32

I.  The Administrative Proceeding is Void *Ab Initio* ............................ 33

    A.  Because Brickman's Appointment Is Unconstitutional, the Notice Is Void .................................................................... 34

    B.  Because Brickman's Appointment Violates Statute, the Notice Is Void .................................................................... 39

    C.  The Proceedings Were Unconstitutionally Initiated and Presided Over by Persons Insulated from Presidential Removal .............. 40

II.  The Administrative Proceeding Violated Ms. Akahoshi's Right to an Article III Court and Jury .................................................. 40

III.  The Administrative Proceeding Violated Due Process of Law ......... 43

    A.  The Applicable Law..................................................... 43

    B.  The OCC Improperly Blocked Disclosure of Exculpatory and Impeachment Material in Violation of Due Process ................... 45

    C.  The OCC Impermissibly Prejudged its Action Against Ms. Akahoshi .............................................................. 47

    D.  The OCC Sought to Punish Ms. Akahoshi Based on the Results of a Separate Proceeding in Violation of Due Process.................... 51

IV.  The Action Was Time-Barred.............................................. 52

    A.  Section 1818 Enforcement Actions Must Begin Within Five Years of the Alleged Misconduct.............................................. 52

        1.  Section 2462 Sets a Fixed, Five-Year Limitations Period..... 52

        2.  Section 1818 Actions "First Accrue" When the Alleged Conduct Occurs..................................................... 53

    B.  The OCC's Re-Accrual Theory Is Wrong....................... 55

V.  The Section 481 Predicate Fails............................................ 57

    A.  Section 481 Does Not Regulate Bank Officers.......................... 58

B. The OCC's Simultaneous Invention and Prosecution of a Section 481 Offense is Unlawful ................................................................ 60

VI. Ms. Akahoshi Was Entitled to Summary Disposition Declaring the Action to Be Meritless ........................................................................ 62

A. There Was No False Statement or Concealment ........................ 62

    1. Statements that Call for a Follow-Up Are Not False or Concealing ................................................................................ 63

    2. Ms. Akahoshi Did Not Make False Statements or Conceal Anything, and Any Issue Was Resolved with a Simple Follow-Up Call ...................................................................................... 66

    3. The OCC Received Exactly What It Wanted on the Timeframe It Established ............................................................................ 69

B. Crowe Documents Were Immaterial ........................................... 70

CONCLUSION ................................................................................. 73

TABLE OF AUTHORITIES

## Cases

*Antoniu v. SEC,*
    877 F.2d 721 (8th Cir. 1989) ................................................................ 43

*Atlas Roofing Co. v. Occupational Safety & Health Rev. Comm'n,*
    430 U.S. 442 (1977) ............................................................................... 41

*Blanton v. OCC,*
    909 F.3d 1162 (D.C. Cir. 2018) ........................................................... 53

*Brady v. Maryland,*
    373 U.S. 83 (1963) ................................................................................. 45

*Bronston v. United States,*
    409 U.S. 352 (1973) ............................................................................... 65

*Buckley v. Valeo,*
    424 U.S. 1 (1976) ................................................................................... 38

*Calcutt v. FDIC,*
    37 F.4th 293 (6th Cir. 2022) ................................................................ 26

*Ching v. Mayorkas,*
    725 F.3d 1149 (9th Cir. 2013) ............................................................. 43

*Collins v. Yellen,*
    141 S. Ct. 1761 (2021) .......................................................................... 37

*Corales v. Bennett,*
    567 F.3d 554 (9th Cir. 2009) ............................................................... 43

*De la Fuente v. FDIC,*
    332 F.3d 1208 (9th Cir. 2003) ....................................................... 53, 54

*Decker Coal Co. v. Pehringer,*
    8 F.4th 1123 (9th Cir. 2021) ................................................................ 37

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,*
    561 U.S. 477 (2010) ......................................................................... 35, 39

*FTC v. Warner Commc'ns Inc.,*
    742 F.2d 1156 (9th Cir. 1984) ............................................................. 46

*Gabelli v. SEC,*
    568 U.S. 442 (2013) .................................................................. 53, 56

*Giglio v. United States,*
    405 U.S. 150 (1972) ......................................................................... 45

*In re Murchison,*
    349 U.S. 133 (1955) ......................................................................... 43

*Jarkesy v. SEC,*
    34 F.4th 446 (5th Cir. 2022) ................................... 26, 40, 41

*Kungys v. United States,*
    485 U.S. 759 (1988) ......................................................................... 70

*Lucia v. SEC,*
    585 U.S. 237 (2018) .................................................................. 36, 38

*Marbury v. Madison,*
    5 U.S. 137 (1803) ............................................................................. 38

*Marshall v. Jerrico, Inc.,*
    446 U.S. 238 (1980) ......................................................................... 44

*Noel Canning v. NLRB,*
    705 F.3d 490 (D.C. Cir. 2013) ....................................................... 37

*Nozzi v. Housing Auth. of City of Los Angeles,*
    806 F.3d 1178 (9th Cir. 2015) ....................................................... 42

*Parklane Hosiery Co. v. Shore,*
    439 U.S. 322 (1979) ......................................................................... 51

*Proffitt v. FDIC,*
    200 F.3d 855 (D.C. Cir. 2000) ....................................................... 55

*Reading Co. v. Koons,*
    271 U.S. 58 (1926) .................................................................... 56, 57

*Ryder v. United States,*
    515 U.S. 177 (1995) ......................................................................... 36

*Seila Law LLC v. CFPB,*
    140 S. Ct. 2183 (2020) .............................................................. 35, 37

*Stivers v. Pierce,*
    71 F.3d 732 (9th Cir. 1995) ........................................................... 44

*United States v. AMC Entm't*,
    549 F.3d 760 (9th Cir. 2008) ............................................ 60

*United States v. Arthrex*,
    141 S. Ct. 1970 (2021).................................................... 34

*United States v. Bonds*,
    784 F.3d 582 (9th Cir. 2015) .................................. 65, 69, 71

*United States v. Camper*,
    384 F.3d 1073 (9th Cir. 2004) ......................................... 65

*United States v. Fortenberry*,
    89 F.4th 702 (9th Cir. 2023) ........................................... 56

*United States v. Halbert*,
    640 F.2d 1000 (9th Cir. 1981) ......................................... 51

*United States v. Henderson*,
    318 F. Supp. 3d 1221 (E.D. Wa. 2018)............................ 64

*United States v. Jiang*,
    476 F.3d 1026 (9th Cir. 2007) .................................. 63, 65

*United States v. Rahman*,
    805 F.3d 822 (7th Cir. 2015) ........................................... 65

*United States v. Saffarinia*,
    424 F. Supp. 3d 46 (D.D.C. 2020)................................... 64

*United States v. White Eagle*,
    721 F.3d 1108 (9th Cir. 2012) .................................. 64, 69

*Vazques v. Jan-Pro Franchising Int'l*,
    986 F.3d 1106 (9th Cir. 2021) ......................................... 51

## Constitutional Provisions

U.S. Const. art. II, § 2, cl. 2 ................................................ 34

U.S. Const. art. III............................................................. 41

U.S. Const. amend. V ......................................................... 41

U.S. Const. amend. VII ...................................................... 41

**Statutes**

5 U.S.C. § 101 ................................................................. 36

5 U.S.C. § 1202 ............................................................... 40

5 U.S.C. § 7521 ............................................................... 40

12 U.S.C. § 4 .................................................................. 39

12 U.S.C. § 481 ............................................................... 58

12 U.S.C. § 1813 .............................................................. 59

12 U.S.C. § 1818(e) ...................................................... 51, 54

12 U.S.C. § 1818(i) ....................................................... 51, 54

28 U.S.C. § 2462 .......................................................... 52, 56

**Other Authorities**

*SEC v. Jarkesy*, No. 22-859, Oral Argument Tr. at 26-27 (U.S. Nov. 29, 2023) ............................................................................ 42

## JURISDICTIONAL STATEMENT

On April 5, 2023, the Acting Comptroller of the Office of the Comptroller of the Currency (the "OCC") issued a Final Decision dismissing the agency's administrative enforcement proceeding, brought pursuant to 12 U.S.C. § 1818, against petitioner Laura Akahoshi, which sought an order prohibiting her from working in the banking industry and a $50,000 fine. 1-ER-2–21.[1] The Final Decision also made factual and legal findings against her, which (together with the Notice of Charges and proceedings) aggrieve her and were unlawful. On May 5, 2023, Ms. Akahoshi petitioned for review under 12 U.S.C. § 1818(h) and Fed. R. App. P. 15. DE 1.1. This Court has jurisdiction under 12 U.S.C. § 1818(h)(2), ADD-27, and 5 U.S.C. Chapter 7, ADD-5–6. Venue is proper in this Court because the home office of Rabobank, N.A. was in California, within the Ninth Circuit. *See* 12 U.S.C. § 1818(h)(2).

---

[1] "ER" refers to the Excerpts of the Record; "DE" refers to the docket entries before this Court; and "ADD" refers to the statutory addendum to this brief.

1

## ISSUES PRESENTED FOR REVIEW

1. Should the Notice of Charges, proceedings, and Final Decision be set aside as unlawful and void *ab initio* because the Notice was issued by a person wielding executive powers without proper appointment in violation of the Constitution and an applicable statute limiting OCC appointments, and because that person and the presiding ALJ were unconstitutionally insulated from Presidential removal?

2. Should the Notice, proceedings, and Final Decision be set aside as unlawful because the administrative in-house forum unconstitutionally deprived Ms. Akahoshi of her right to an Article III court and jury by seeking to deprive her of her property and liberty based on false statements and concealment theories grounded in the common law?

3. Should the Notice, proceedings, and Final Decision be set aside as unlawful because the OCC violated Ms. Akahoshi's right to due process by suppressing exculpatory evidence, prejudging the action against her, and improperly seeking to bind her to a non-party's statements made in a negotiated guilty plea in a separate matter?

4.　　　Should the Notice, proceedings, and Final Decision be set aside as time-barred from inception because the OCC did not initiate the matter until more than five years after Ms. Akahoshi's alleged conduct?

5.　　　Should the portions of the Notice, proceedings, and Final Decision relating to a purported violation of 12 U.S.C. Section 481 be set aside because that Section does not impose duties on bank officers, and it violates due process for the OCC simultaneously to invent and prosecute a Section 481 violation?

6.　　　Should the Notice, proceedings, and Final Decision be set aside as meritless because there was no falsity, concealment, or materiality to Ms. Akahoshi's statements, which were true, delivered to the OCC exactly what the OCC wanted on the timeframe the OCC established, and had no effect on the OCC's examination?

## STATEMENT OF THE CASE

Ms. Akahoshi is entitled to relief from the Acting Comptroller's Final Decision and the entirety of the defective proceedings upon which it rested because all proceedings and the Notice of Charges ("Notice") that initiated them were unconstitutional, unlawful, untimely, and meritless. The Acting Comptroller's Final Decision and the administrative action adversely affected and aggrieved Ms. Akahoshi by forcing her to endure an unconstitutional and invalid agency process and making legal and factual determinations against her.

The OCC never should have brought this enforcement action: it was a false statements case without false statements; a concealment case without concealment; and a case about failing to disclose documents that were disclosed on the exact timeframe to which the OCC agreed. Moreover, the action was void from inception; did not involve a violation of law; was time-barred; violated Ms. Akahoshi's rights to due process, a jury trial, and an Article III adjudication; and long before the case reached the Acting Comptroller, he prejudged it.

After the passage of nearly six years (and more than a decade since the conduct at issue occurred), Ms. Akahoshi has finally been afforded

4

federal court review. This Court should set aside the Final Decision, the Notice, and all intervening proceedings as void *ab initio*, unlawful, time-barred, and meritless.

## I. FACTUAL BACKGROUND

This case involves four written communications—emails and their attachments—between Ms. Akahoshi, on behalf of Rabobank, N.A. ("the bank" or "RNA"), and the OCC, which occurred on March 15, 22, 25, and April 18, 2013, amid the OCC's examination of the bank's Bank Secrecy Act/Anti-Money Laundering ("BSA/AML") program. That examination had not gone well—by February 8, 2013, the OCC had reached the preliminary view that all four pillars of the bank's program were broken—and by the end of February the bank had relieved Lynn Sullivan, its Chief Compliance Officer ("CCO"), of her duties and Ms. Akahoshi had been dispatched from her position with the bank's Dutch parent company to assist. Three of the communications related to documents from a tailored project Sullivan commissioned that was conducted by a third-party consultant, Crowe Horwath LLP ("Crowe"). The OCC alleged that, in the four communications, Ms. Akahoshi concealed and lied to the OCC about draft documents created by Crowe.

A few things are clear from the outset. There is no possible dispute about the words that were used in the communications, nor that the bank produced the documents in question before a deadline agreed-to by the OCC; that Ms. Akahoshi was not involved in the Crowe engagement or board decision to suspend the project; that the communications occurred years before the action was brought on April 16, 2018; and that all of the relevant conduct was well known to the OCC in 2013. And, armed with that knowledge, the OCC issued report after report finding *no violation of law* relating to the bank's communications *for five years*.

## A.  The Terminated Crowe Consulting Project

Ms. Akahoshi was not working at RNA or even on the same continent when the bank's CCO, Sullivan (with the approval of the bank's CEO, John Ryan, and GC, Daniel Weiss) engaged Crowe as a consultant. Crowe conducted its brief work on the consulting project in January and February 2013, and the bank suspended Crowe's work in the first week of February 2013—all while Ms. Akahoshi was not working at the bank. Ms. Akahoshi had previously served as the CCO of RNA (and as an OCC examiner before that) but had been promoted from that position and assigned to a senior compliance position in the Netherlands with the

6

bank's Dutch parent company, Coöperatieve Rabobank U.A., leaving RNA in July 2012.

Sullivan hired Crowe to support her preconceived view of the bank's program—a view she repeatedly relayed to OCC examiners, who were onsite at the bank starting in November 2012 for RNA's BSA/AML examination—and her belief that the bank's program needed a Sullivan-supervised and Crowe-executed expansion, relocation, and overhaul. 2-ER-477–87 (Sullivan).

On February 5, 2013, Crowe presented a bullet-point-format PowerPoint deck to RNA executive management and the Compliance Committee of the Board of Directors, which was based on a draft document, in narrative format, that Crowe titled the Program Assessment and Roadmap ("PAR").[2] Reflecting Sullivan's views, Crowe proposed an extensive re-training and re-vamping of the program and proposed to perform this remediation for $700,000. Sullivan testified that Crowe's review of RNA's BSA/AML program was not an audit or a risk assessment, and Sullivan expressly directed Crowe not to "rate" the

---

[2] Throughout the proceedings, the OCC conflated various drafts of the deck and the PAR and other documents by referring to them collectively as "the Crowe Report."

program. 2-ER-492, 504–05 (Sullivan). Thus, Crowe's February 5, 2013 PowerPoint deck did not contain draft findings of deficiencies at the bank, 5-ER-1009–72, and draft versions of the PAR, upon which the deck was based, expressly stated that Crowe's work was *not* an "audit," *see, e.g.*, 4-ER-832 ("This review did not include an audit of procedures or reporting figures, nor did our review test or attest to the operating effectiveness of established controls."); 2-ER-501 (Sullivan) ("It was not an audit").

At the February 5 meeting—which Ms. Akahoshi did not attend—RNA's leadership concluded that Crowe's presentation was deeply flawed and reflected Crowe's fundamental misunderstanding of the bank and its processes. As a result, Crowe did not complete its presentation of the PowerPoint deck, only getting through about one third of it. 5-ER-1009; 2-ER-399–400 (Ryan). Thereafter, RNA leadership directed Crowe to terminate the custom project Sullivan had requested, and instead to conduct a formal BSA/AML risk assessment, which has a standard methodology established by the Federal Financial Institutions Examination Council. Thus, Crowe's January 2013 project was never completed by Crowe or reviewed (let alone accepted) by the bank.

## B. The BSA/AML Examination Beginning in November 2012

For the bank, Crowe's defective draft consulting work paled in significance to the OCC's regular examinations of the bank's operations, including its BSA/AML program. Those examinations occurred each year, involved onsite reviews of documents, personnel interviews, and transaction testing, all conducted by commissioned national bank examiners. Those examinations had for years found RNA's BSA/AML function to be adequate.

The OCC's BSA/AML examination of RNA that began in November 2012 was different. It was marred by significant turnover of the OCC staff assigned its BSA/AML examination team, and exhibited no awareness of the OCC's prior work, or the considered judgment of the retired OCC examiners.

From the start, the OCC was informed about specific issues with the bank's program. The bank produced to the OCC its high-risk customer lists and lists of non-resident alien customers, Suspicious Activity Reports ("SARs"), subpoenas, and the bank's Compliance Committee reports and minutes. 2-ER-448–51 (Omi); 3-ER-618–25. And, the OCC's "FinCEN Memo" identified as issues for examination high-

9

cash activity, border-cash activity, specific high-risk customers, the adequacy of customer due diligence and enhanced due diligence for these customers, and the adequacy of monitoring of foreign and non-resident alien accounts. 2-ER-453–55 (Omi); 3-ER-626–30. At the kick-off of the onsite portion of the examination, the bank flagged issues relating to staff quality, the need for training, inadequate investigation of law enforcement inquiries, and time pressure regarding SAR investigations and filings. 3-ER-631–34. Also, at the kick-off meeting with the OCC, Sullivan and Ann-Marie Wood, the bank's vice president in charge of AML monitoring, specifically noted their concerns regarding high-cash activity at the border. 2-ER-493–96 (Sullivan); 3-ER-631–34; 5-ER-1003–08 (Wood).[3]

By January 2, 2013—before Crowe even began work—the OCC examiners circulated a draft "conclusion memorandum" relating to BSA/AML that likewise identified the following issues: SAR identification and monitoring needed improvement; a "major breakdown"

_____

[3] Crowe's later-prepared draft documents echoed Sullivan's expressed views, since Sullivan was Crowe's major source of information and directed the content of Crowe's' drafts in significant respects. *See, e.g.*, 3-ER-579; 3-ER-584.

in the BSA program; weaknesses in training and monitoring of training; deficiencies in the audit program; inadequate monitoring of suspicious activity; staff lacked necessary experience; staffing quantity was inadequate; and GVPO (the commercially-available transaction monitoring software the bank used) needed tuning. 2-ER-456–68 (Omi); 3-ER-638–70. The responsible bank examiner—Tommy Wong, who retired effective December 31, 2012—judged that the severity of these issues did not constitute violations of law, but rather several "matters requiring attention." 3-ER-667–70.

Tommy Wong was not the only person who left mid-examination. Both the examiner-in-charge ("EIC"), Robert Tornborg, and the supervising Assistant Deputy Comptroller ("ADC"), Brian Quade, left the OCC at the end of December 2012, and were replaced, respectively, by Brian Eagan and Tom Jorn, who both started in January 2013. 3-ER-740–41; 2-ER-432 (Eagan).

The new team judged the flagged issues to be more severe than the outgoing OCC personnel, and on February 8, 2013, the OCC presented a letter to RNA with draft examination findings stating that all four pillars

of the BSA/AML program were broken based on the same issues identified by Tommy Wong in his conclusion memo. 3-ER-671–87.

### C. Ms. Akahoshi's Temporary Re-Assignment to RNA to Address the OCC's Draft Findings

The bank asked Ms. Akahoshi to attend the February 8, 2013 meeting with the OCC, and then, in light of the unexpectedly grave draft findings, enlisted her help in addressing them. This assignment was intended to be brief, but by late February 2013, it became clear that it would be a multi-month, arduous task of remediation and reporting to the OCC.

#### 1. The Bank's March 15, 2013 Response to the OCC's Draft Findings

The bank's opportunity to respond to the OCC's draft findings required a written submission by March 15, 2013. The bank assigned Ms. Akahoshi, together with GC Weiss and outside counsel at DLA Piper, to the team tasked with investigating the OCC's findings and preparing a response. 2-ER-394–98 (Ryan); 3-ER-586–617; 3-ER-742–53. This required Ms. Akahoshi simultaneously to transition away from her Netherlands-based work and get up to speed on RNA's BSA/AML

condition, while traveling back and forth between Roseville, California and Utrecht, Netherlands.

On March 15, 2013, after an extraordinary effort by that team, the bank submitted its response to the OCC's draft findings. The bank accepted certain findings and proposed remedial measures, but pushed back on those that it and its counsel concluded were unfounded, lacked appropriate context, or were less severe than the OCC asserted. 3-ER-586–617. In the same time period, the bank made Ms. Akahoshi Acting COO and placed Sullivan on paid leave because of bank management's conclusion that she mishandled the OCC examination and compounded the BSA/AML problems at the bank. For example, Sullivan, while still serving as CCO, had stopped processing, reviewing, and investigating SARs, exacerbating a backlog that formed under her leadership. Thus, Ms. Akahoshi took a single week and returned to the Netherlands to quickly transition her Netherlands work to others and move back to RNA, which included terminating her housing and moving her family (including her dogs) to the United States.

Eagan—EIC in 2013—testified that because the bank's March 15, 2013 letter took issue with certain facts and conclusions set forth in the

13

OCC's draft supervisory letter, the bank established a disagreement that *mandated* an OCC follow-up examination. 2-ER-443 (Eagan) ("[W]e had a bank disputing our findings. So we had to reconcile that.").

### 2. Ms. Akahoshi's Three Emails Challenged by the OCC

On March 21, 2013, while Ms. Akahoshi was in the Netherlands attending to her emergency transition to California, OCC Examiner Shirley Omi sent her an email asking for "a copy of the assessment report of the Bank's BSA program that [Crowe] was engaged to perform in January 2013." Unbeknownst to Ms. Akahoshi, the request was prompted by Sullivan's decision—after the bank placed her on leave—to adopt the posture of a "whistleblower" and email newly-assigned ADC Jorn about the BSA/AML deficiencies she perceived and the suspended Crowe project she had commissioned. 4-ER-870.[4]

---

[4] The OCC's new team members' view that the Crowe engagement revealed or constituted new information was wrong and resulted from staff departures and a failure to review already-gathered information. Apart from the OCC's January 2, 2013 draft conclusion memos from the outgoing team of examiners that identified all the issues discussed in the Crowe project, the bank had provided to the OCC throughout its examination all minutes of the bank's Compliance Committee of the Board, including minutes of a January 14, 2013 meeting expressly discussing and describing Crowe's work. 5-ER-938–41 (Ryan); 5-ER-942. And, Sullivan specifically mentioned Crowe's work, including at the February 8, 2013 meeting with the OCC. 2-ER-497–98, 538 (Sullivan).

Ms. Akahoshi, from the Netherlands, emailed RNA's GC and CEO, stating: "I think the right answer is that Crowe did not perform an assessment. That while they were engaged to perform a market study/peer benchmark for management and the board, the project was shelved before any report could be issued." 4-ER-881. Unlike Ms. Akahoshi's second- or third-hand understanding of Crowe's work, GC Weiss and CEO Ryan were knowledgeable about the Crowe engagement, and both had participated in various aspects of it, including the February 5 PowerPoint presentation to RNA leadership.

Weiss responded, "your statement is accurate." *Id*. Weiss and Ryan approved the response (Ryan said it was "a good response"), which Ms. Akahoshi sent the next day, on March 22. As approved, the March 22 email stated that Crowe delivered "emerging observations and [an] action plan," but had not completed an assessment, and that "the project was suspended before any report was issued." 2-ER-573–74. The March 22 email was accurate. 4-ER-883, 893–96; 2-ER-354–60; 2-ER-385–87 (Ryan).

On March 25, Omi followed up and requested what Crowe "provided management with" or "what bank management received from Crowe,

even if it was preliminary or partial." 3-ER-565. Although the email came from Omi, this request was drafted by newly-assigned ADC Jorn. 4-ER-918.

On March 25, Ms. Akahoshi had recently returned to Roseville, having arrived from the Netherlands the previous day. She again consulted with RNA's CEO and GC, Ryan and Weiss. She stated in an email to them that she assumed that the OCC had already obtained Crowe's "early assessment even though it was never issued and certainly never accepted by management." 3-ER-576. She met with Weiss and Ryan (Ryan in person and Weiss by phone) regarding the bank's response to Omi's follow-up, and then wrote a draft response as a "recap of [their] discussion." 3-ER-560. Weiss and Ryan believed that the PowerPoint deck was the operative Crowe document, because Crowe had presented it to RNA's executive leadership and the Compliance Committee of the Board. *See, e.g.*, 2-ER-388–89 (Ryan) ("[Ms. Akahoshi] was not at that February meeting, and we wanted to provide her with information of what was actually presented, to the best of our knowledge or what we could recollect, so she could appropriately respond to Shirley [Omi]."). Ryan and Weiss believed—and no documentary evidence showed

16

otherwise—that no bank employee had a copy of the PowerPoint presentation.

The response went to Omi a few hours after Omi sent her March 25, 2013 email. Consistent with Ryan and Weiss's beliefs, the response indicated that Crowe had presented the February 5 PowerPoint deck to the highest levels of bank leadership, but that Crowe had not provided the deck to the bank. The email also detailed that the bank had been "very critical" of Crowe's draft work from the January 2013 engagement, that it was seriously flawed and based on inaccurate information, and that Crowe had proposed a lengthy and costly "remediation plan." 3-ER-563. All of these things were true, 2-ER-439–40 (Eagan); 4-ER-883, 896–97; 2-ER-470–73 (Omi), and discovery revealed no evidence whatsoever that Ms. Akahoshi believed otherwise.

A couple of weeks later, the OCC decided to follow-up. On April 8 and 10, 2013, ADC Jorn spoke by telephone with CEO Ryan to ask for Crowe documents, regardless of whether they were provided to the bank or officially accepted, and regardless of the bank's criticisms of the work, which Ryan reiterated on the calls. 2-ER-391–93, 403–14 (Ryan); 2-ER-549–57 (Jorn handwritten notes of calls). Ryan readily agreed to provide

the PowerPoint deck that Jorn requested, as well as the underlying draft PAR document, and Jorn agreed that the bank could take until April 19 to produce the documents together with a cover letter addressing the bank's concerns. 2-ER-391–93, 403–14 (Ryan); 2-ER-549–57.

On April 18, in keeping with the OCC's timeframe, the bank sent to the OCC a cover letter, the February 5, 2013 draft PowerPoint deck (which Ryan obtained from Crowe after his calls with Jorn), a draft version of the PAR, dated January 31, 2013, and other documents. 4-ER-755–869. Ms. Akahoshi transmitted the bank's submission and its attachments by email; her short cover email was accurate. 2-ER-441 (Eagan).

Ms. Akahoshi helped GC Weiss draft the cover letter, along with approximately six other individuals—all executive management from RNA and its Dutch parent, as well as Terry Schwakopf, an RNA board member with extensive regulatory and compliance experience. 2-ER-416–17 (Ryan). All these people reviewed, edited, commented on, and approved the cover letter. Ryan signed the cover letter himself. *Id.*

The cover letter included a brief description of the distribution of Crowe's PowerPoint deck and the draft PAR dated January 31, 2013,

18

even though the OCC nowhere requested such a description and did nothing with it. 2-ER-438, 444–46 (Eagan) ("I wouldn't say that by not cataloging it, it had any impact on our examination."); 2-ER-415 (Ryan); 2-ER-469 (Omi). Documentary evidence established that someone else— *not* Ms. Akahoshi—drafted that portion of the cover letter. 4-ER-874–79 (redline edits to cover letter); 5-ER-1100 (Ryan).

When that letter and its attachments were delivered on time, the OCC got what it had asked for. 2-ER-441–42 (Eagan).

### D. The Crowe Documents Had No Effect on the OCC Examination, and the OCC Determined for Years that No Violation of Law Occurred

Neither Crowe's draft, inaccurate work product from the January 2013 engagement nor the contents of the April 18 cover letter (the relevant portion of which Ms. Akahoshi did not write) had any effect whatsoever on the OCC's ongoing BSA/AML examination of the bank, as ALJ Whang conceded. 1-ER-89 ("[T]he examination itself was to all appearances unaffected in the end by Respondent's actions."); *id.* ("[T]here has been no indication that the Crowe Report or its associated materials contained meaningful new information, not already possessed by or known to examiners, that resulted in the agency wasting resources

or pursuing dead ends in the time between it was first requested on March 21, 2013 and it was provided on April 18, 2013.").

The OCC conducted a follow-up examination in May 2013, and in November 2013 issued its final Report of Examination. 3-ER-688–739. While that final report listed violations of law by the bank, it cited no violation of law by the bank or any individual relating to the bank's communications regarding the Crowe engagement or the production of Crowe documents. The Report of Examination did not ignore the Crowe documents, however—it specifically mentioned them in the context of identifying a weakness in the formal risk assessment that Crowe performed for the bank after April 2013. 3-ER-734. EIC Eagan admitted that the OCC lists violations of law where they exist, 5-ER-1104 (Eagan), so its decision not to include, either in its 2013 Final Report or in multiple subsequent reports, a violation of law relating to the communications regarding Crowe reflect its repeated conclusion that those communications violated no law.

In sum, the OCC received exactly what it wanted on the timeframe it established, what it received was inconsequential and immaterial to

the BSA/AML examination, and for years and years the OCC found no violation of law by Ms. Akahoshi relating to the Crowe documents.

## II. PROCEDURAL BACKGROUND: THE ADMINISTRATIVE PROCEEDING

### A. Agency Prejudgment Prior to the Notice

Even before the OCC brought the Notice against Ms. Akahoshi, the agency pronounced her guilty. In February 2018, RNA negotiated a settlement of a yearslong Department of Justice ("DOJ") investigation into the bank's BSA/AML program that resulted in a guilty plea by the bank to a felony violation of 18 U.S.C. § 1517.[5] The OCC brought a tag-along claim against the bank to obtain a $50 million cut of the funds RNA forfeited to DOJ, which were expressly forfeited as a result of money laundering and structuring violations. 5-ER-994. The bank simultaneously settled with the OCC by entering into a Consent Order. 2-ER-284–96; 5-ER-994.

In the Consent Order, the OCC issued "Comptroller's Findings," which found, *inter alia*, that the bank "concealed" documents "requested by OCC officials and examiners" that were "relevant," and that "former

---

[5] After investigating the matter, in September 2018, the DOJ made the considered decision not to bring any charges against Ms. Akahoshi, Mr. Weiss, or Mr. Ryan.

senior officers" "participated in efforts to preclude the OCC from obtaining" requested information. 2-ER-285–86. At the same time, the agency published a press release stating that senior officers had "participated in efforts to preclude the OCC from obtaining requested information and the bank concealed documents from OCC officials, in violation of 12 U.S.C. § 481." 2-ER-282.

## B. Agency Proceedings Before ALJs

### 1. The Notice Against Ms. Akahoshi

On April 16, 2018, Michael R. Brickman—who was never properly appointed as an officer in accordance with the Constitution or statute— issued the Notice on behalf of the OCC. 2-ER-352 (served on April 17, 2018). The Notice sought a $50,000 civil money penalty and a prohibition order barring Ms. Akahoshi from the banking industry for life, under 12 U.S.C. §§ 1818(e) and (i). *Id.*

The Notice alleged three misconduct predicates based on the 2013 email communications described above: (1) a federal felony violation of 18 U.S.C. § 1001 for making false statements; (2) unsafe or unsound banking practices under Section 1818; and (3) a direct violation of 12 U.S.C. § 481 by Ms. Akahoshi. 2-ER-347 ¶ 40, 349–50 ¶¶ 48(a), 50(a).

The Notice further alleged that the purported misconduct caused the following "effects": RNA suffered financial loss; Ms. Akahoshi received financial gain or other benefit; and the acts were part of a pattern of misconduct. 2-ER-349–50 ¶¶ 48(b), 50(b). According to the Notice, Ms. Akahoshi acted "recklessly," with "personal dishonesty," and with "a willful or continuing disregard for the safety or soundness of the Bank." 2-ER-349–50 ¶¶ 48(c), 50(a). Throughout the litigation of this matter, the OCC continually changed its theories from those articulated in the Notice.

## 2.  OCC Administrative Forum Delays

Shortly after bringing the enforcement action, the OCC stayed the action and delayed any progress on it for over eighteen months. Approximately three months of this delay was occasioned by a stay pending the DOJ's criminal investigation; the investigation ended in September 2018 when the DOJ declined to prosecute Ms. Akahoshi (or anyone else). The remaining fifteen-month delay resulted from an ALJ's failure to decide fully-briefed motions (three months) and the OCC's failure to replace an ALJ upon his retirement (twelve months). On

23

January 6, 2020, the Acting Comptroller reassigned the proceeding to newly-appointed ALJ Whang.

### 3. Litigation Before ALJ Whang

Between January 2020 and August 5, 2021, the parties engaged in litigation before ALJ Whang. That litigation included objections to the Notice, the administrative forum, and reassignment of ALJ Whang; a motion to dismiss for failure to state a claim and untimeliness; discovery issues; an objection to the OCC's reliance on "secret law"—in clear violation of the OCC's own rules, 12 U.S.C. § 1818(u), and the Freedom of Information Act, 5 U.S.C. § 552(a)(2); objections to the agency's prejudgment and other due process issues; and eight depositions.

In the course of that litigation, among other things, the ALJ denied any discovery on appointments and removal issues but directed that Ms. Akahoshi's defenses relating to the invalidity of the tribunal were preserved for appeal and should not be further briefed, 1-ER-263; permitted and afforded deference to Enforcement Counsel's proposed expert testimony by non-lawyer OCC examiners on matters of law and the ultimate issues in the case, while refusing reciprocal deference to Ms. Akahoshi's opinions, as a former OCC examiner, on the same topics;

24

permitted Enforcement Counsel use the "deliberative process" privilege to block discovery of OCC opinions inconsistent with its case; and precluded any discovery relating to the criminal investigation or RNA's negotiated, simultaneous settlements with DOJ and the OCC on the grounds that, among other things, the bank's guilty plea was "irrelevant," 1-ER-268.

### 4.  The ALJ's Recommended Decision

After the parties submitted cross-motions for summary disposition, on August 5, 2021, ALJ Whang granted summary disposition to the OCC on liability. 1-ER-95–165. The parties then submitted briefs relating to penalties. Ms. Akahoshi's submission pointed out that the OCC's own conduct—both programmatic and specific—was degrees of magnitude worse than anything Ms. Akahoshi was alleged to have done, including: the agency's violation of the Constitution and its own organizing laws; witness coaching during depositions; and the submission of Deputy Comptroller Karen Boehler's post-deposition, demonstrably false declaration contradicting her earlier sworn testimony; and Boehler's failure to turn over her own hand-written notes of RNA meetings until months after the ALJ-ordered deadline for discovery.

On February 10, 2022, ALJ Whang issued her recommended decision, incorporating her prior orders in the case, and recommending a lifetime prohibition order and $30,000 penalty. 1-ER-90–91.

## C. Agency Proceedings After the ALJ's Issuance of a Recommended Decision

### 1. Exceptions to the Acting Comptroller

On April 18, 2022, the parties submitted exceptions to the recommended decision for the Acting Comptroller's review. Ms. Akahoshi's exceptions explained in detail the numerous factual and legal defects of the proceeding against her that largely mirrored this appeal.

Enforcement Counsel filed exceptions asking for the Acting Comptroller to increase the penalty amount to $50,000.

### 2. The Acting Comptroller Requests Supplemental Briefing to Address Issues Ignored by Enforcement Counsel

After submission of the exceptions, two federal courts of appeals issued decisions that reinforced Ms. Akahoshi's arguments in multiple respects—*Jarkesy v. SEC*, 34 F.4th 446 (5th Cir. 2022), and *Calcutt v. FDIC*, 37 F.4th 293 (6th Cir. 2022). In July 2022, the Acting Comptroller requested supplemental briefing on the following: whether the

administrative action unconstitutionally deprived Ms. Akahoshi of a jury trial; the appropriate causation standard for "effects" of alleged misconduct under Section 1818; and the due process violation caused by the OCC's exclusive reliance on RNA's negotiated guilty plea to argue that Ms. Akahoshi's conduct caused loss to the bank. 1-ER-22–23.

### 3. Additional Prejudgment While the Parties' Exceptions Were Pending

In late July 2022, while Ms. Akahoshi's exceptions were pending before Acting Comptroller Hsu, the OCC issued a Consent Order against CEO Ryan containing "Comptroller's Findings" that prejudged almost every material allegation against Ms. Akahoshi, as well as Ms. Akahoshi's constitutional and statutory challenges to Brickman's issuance of the Notice. 1-ER-274–80. Brickman issued the Ryan Consent Order, purportedly as Acting Comptroller Hsu's "duly authorized representative." 1-ER-280.

### 4. The Final Decision Terminating the Action

On April 5, 2023, Acting Comptroller Hsu issued a Final Decision Terminating Enforcement Action based on the passage of time.[6] The

---

[6] The Acting Comptroller incorrectly asserted that there was a "multi-year delay resulting from the DOJ investigation into the Bank," *see* 1-

Acting Comptroller inserted twenty pages of commentary maligning Ms. Akahoshi (referring to her conduct, *inter alia*, as "deeply troubling" and involving a "possible lack of candor") and making declarations of law, such as asserting that Section 481 imposes duties on individual bankers and stating that the draft Crowe documents were material (or that materiality was not required). *See, e.g.*, 1-ER-11, 21. Indeed, the Acting Comptroller repeatedly asserted his "reluctance" to dismiss the action.

### 5. Equal Access to Justice Act Application

On May 5, 2023, Ms. Akahoshi made an administrative application for recovery of attorneys' fees, expert fees, and costs pursuant to the Equal Access to Justice Act ("EAJA"). Enforcement Counsel opposed the application, claiming that Ms. Akahoshi was *not* a "prevailing party," citing the Acting Comptroller's statements about the wrongfulness of Ms. Akahoshi's conduct.

On July 13, 2023, the Acting Comptroller *sua sponte* issued an order staying the EAJA proceedings in light of this appeal, stating that until

---

ER-20, rather than correctly describing the main causes of the delay: the OCC brought the Notice late, and then its tribunal defects and structural failures caused fifteen months of delay.

this Court issues a final judgment, there is no "final disposition" or "final judgment," and the EAJA application is therefore premature. 5-ER-1098.

### D. Proceedings in this Court

Ms. Akahoshi timely filed her Petition for Review of Agency Action. DE 1.1. On June 22, 2023, the OCC moved to dismiss the appeal, arguing that Ms. Akahoshi lacked standing and that the appeal should be dismissed because Ms. Akahoshi *prevailed* before the agency.

Ms. Akahoshi opposed, noting not only the total lack of merit of the OCC's arguments, but also that the OCC's actions here are not a "one-off situation" but instead are part of the OCC's playbook—to litigate relentlessly against an administrative respondent only to abruptly drop the charges or issue a decision dismissing the proceeding to avoid judicial review. DE 14.1. This Court denied the motion without prejudice to the OCC reasserting its arguments in its answering brief. DE 16.1 (Bade, Lee, and VanDyke, JJ.).

### SUMMARY OF THE ARGUMENT

The OCC's Notice was void *ab initio*, and it and all proceedings should be set aside because the Notice was unconstitutionally issued by Brickman, a person who has never been properly appointed as an officer

under the Appointments Clause, despite having wielded the paradigmatic officer power of initiating the enforcement action. Brickman's designation—by the Comptroller—as one of approximately thirty-six Deputy Comptrollers also violates the OCC's organizing statute, which permits only four Deputy Comptrollers and requires that the Secretary of the Treasury appoint them. And, both Brickman and the presiding ALJ were unconstitutionally insulated from Presidential removal.

The Notice, proceedings, and Final Decision are also void because, in a quasi-criminal government enforcement action—grounded in the common law—that sought to deprive Ms. Akahoshi of her property and liberty, the OCC denied her right to an Article III adjudication and a jury.

The proceedings and the Final Decision should be set aside as violative of Ms. Akahoshi's due process rights. The OCC suppressed exculpatory and impeachment evidence; before her matter was adjudicated by the Acting Comptroller, he impermissibly prejudged both the facts and the law against her; and the OCC sought to punish her based on the results of a separate proceeding.

30

The Notice, proceedings, and Final Decision should be set aside because the action was time-barred from inception. The applicable statute of limitations, as well as binding caselaw of the Supreme Court and this Court, requires that enforcement actions be brought within five years of the purported misconduct, but the OCC waited longer than that period based on an extra-statutory, perpetually-renewing statute of limitations theory that violates this Court's precedent and every principle underlying statutes of limitations.

The Notice, proceedings, and Final Decision's claim that Ms. Akahoshi violated 12 U.S.C. Section 481 should be set aside because the statute imposed no duty on Ms. Akahoshi, and it was a violation of Ms. Akahoshi's due process rights for the OCC simultaneously to invent and enforce a Section 481 violation against her.

The Notice, proceedings, and Final Decision should be set aside as meritless, because under this Court's binding authority, there was no falsity, concealment, or materiality to Ms. Akahoshi's emails or the Crowe documents she produced to the OCC within the timeframe the OCC established for that production.

31

The OCC's dismissal was a transparent attempt to prevent Article III review of the OCC's unconstitutional, unlawful, time-barred, and meritless action that destroyed the career and harmed the reputation of a dedicated compliance professional. The Court should set it aside as void *ab initio*, unconstitutional, time-barred, and meritless.

## ARGUMENT

This Court should set aside the OCC's enforcement action pursuant to the applicable statutes providing for this Court's review. This Court has jurisdiction to review the OCC's "final agency action," as well as all "preliminary, procedural, or intermediate agency action" as part of that review, 12 U.S.C § 1818(h), ADD-27; 5 U.S.C. § 704, ADD-5, and is directed to "decide all relevant questions of law [and] interpret constitutional and statutory provisions." 12 U.S.C. § 1818(h)(2), ADD-27, 5 U.S.C. § 706, ADD-6. Furthermore, the "reviewing court *shall*":

> hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law; (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title

32

or otherwise reviewed on the record of an agency hearing provided by statute; or (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

5 U.S.C. § 706 (emphasis added).

As set forth below, the OCC's Notice, proceedings, and Final Decision ticks each of these boxes and this Court should set them aside.

## I. THE ADMINISTRATIVE PROCEEDING IS VOID *AB INITIO*

Issuing the Notice against Ms. Akahoshi in the name of the OCC was a significant exercise of executive power that can only validly be performed by a person properly appointed as an officer in accordance with the Constitution. But the OCC vested that power in Brickman, a non-officer appointed not by the head of a department (i.e., the Secretary of the Treasury), but by the Comptroller. Brickman's appointment not only violated the Constitution but also Congress's express limitation on OCC bureaucratic sprawl—Congress limited the OCC to four Deputy Comptrollers, all of whom must be appointed by the Secretary. Including Brickman, the OCC has appointed for itself no fewer than *thirty-six* people holding some variation of the title "deputy comptroller" and wielding significant executive power. Because the Notice was issued by

33

Brickman, rather than a properly appointed constitutional officer, it is void *ab initio*, and this Court should set aside the Notice and the OCC's enforcement action.

## A. Because Brickman's Appointment Is Unconstitutional, the Notice Is Void

Brickman's wielding of significant executive power by bringing an enforcement action against Ms. Akahoshi with devastating effect on her career and reputation was void *ab initio*.

The Constitution's Appointments Clause provides:

> [The President] shall nominate, and by and with the advice and consent of the Senate, shall appoint . . . all other officers of the United States, whose appointments are not herein otherwise provided for, and which shall be established by law: but the Congress may by law vest the appointment of such inferior officers, as they think proper, in the President alone, in the courts of law, or in the heads of departments.

U.S. Const. art. II, § 2, cl. 2, ADD-1. Officers must be properly appointed because "thousands of officers wield executive power on behalf of the President in the name of the United States. That power acquires its legitimacy and accountability to the public through 'a clear and effective chain of command' down from the President, on whom all the people vote." *United States v. Arthrex*, 141 S. Ct. 1970, 1979 (2021) (quoting *Free*

34

*Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 498 (2010)). The Appointments Clause is the Framers' remedy for the recognition that "diffusion of power carries with it a diffusion of accountability." *Id.* at 1981 (quoting *Free Enter. Fund*, 561 U.S. at 497).

Clear Supreme Court precedent establishes that initiating a regulatory enforcement action is a quintessential "officer" function that can only validly be performed by a constitutionally appointed officer. *See Free Enter. Fund*, 561 U.S. at 485-86 (noting parties' agreement that members of PCAOB are officers of the United States for constitutional purposes . . . because they can initiate "formal investigations and disciplinary proceedings"); *see also Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2200-01 (2020) (holding that Congress "vested the CFPB with potent enforcement powers" because it "has the authority to conduct investigations, issue subpoenas and civil investigative demands, initiate administrative adjudications" and seek "civil penalties . . . for each day that a violation occurs").

Despite Brickman's title of "Deputy Comptroller," he was not a properly appointed constitutional officer. Brickman was *not* appointed by the head of the department—here the Secretary of the Treasury, *see* 5

35

U.S.C. § 101—but instead by the Comptroller. *See* Press Release, Michael Brickman Named Deputy Comptroller for Thrift Supervision, OCC NR 201562 (Apr. 27, 2015) ("Comptroller . . . Curry today designated Michael Brickman").[7] Thus, Brickman "lacked Constitutional authority to do his job." *Lucia v. SEC*, 585 U.S. 237, 243 (2018).

The result is that the Notice is void *ab initio*, and the Notice and all proceedings that followed it should be set aside. *First*, the Supreme Court has long held that "'one who makes a timely challenge to the constitutional validity of the appointment of an officer . . .' is entitled to relief." *Lucia*, 585 U.S. at 243 (quoting *Ryder v. United States*, 515 U.S. 177, 182-83 (1995)); *see also Ryder*, 515 U.S. at 186 ("correcting Appointments Clause violations in cases such as this one provides a suitable incentive to make such challenges."). Ms. Akahoshi challenged Brickman's appointment throughout the proceedings. *See, e.g.*, 2-ER-324–38 (Answer).

*Second*, the Supreme Court, in a case related to removal protection (an issue closely related to the Appointments Clause) held "that a litigant

---

[7] The ALJ admitted that Brickman was not properly appointed as an officer: "the individual who signed the Notice on behalf of the OCC . . . Brickman, is a mere employee." *See* 5-ER-1102–03.

challenging governmental action as void on the basis of the separation of powers" need only show an injury from the action. *See Seila Law*, 140 S. Ct. at 2196. In *Seila Law*, the Supreme Court found just such a "concrete injury" where the petitioner was "compelled to comply with the civil investigative demand and to provide documents it would prefer to withhold." *Id*. Ms. Akahoshi has suffered a great deal more. The Notice alleged that she violated various laws and has embroiled her in *years* of burdensome litigation.

*Third*, the only appropriate remedy when an official acts without legal authority is for the Court to declare his actions void *ab initio*. *See Collins v. Yellen*, 141 S. Ct. 1761, 1788 (2021) (stating action is void where government actor "lacked the authority to carry out the functions of the office"); *Noel Canning v. NLRB*, 705 F.3d 490, 493 (D.C. Cir. 2013) (stating that the actions of an official who suffers from an invalid appointment is "void *ab initio*."), *aff'd*, 573 U.S. 513 (2014). [8]

---

[8] *Decker Coal Co. v. Pehringer*, 8 F.4th 1123 (9th Cir. 2021), is not to the contrary. In *Decker Coal*, the Court declined to declare a proceeding void where the ALJ's *initial* appointment was defective, but the ALJ was properly appointed *before* adjudicating the claim. *Id*. at 1137.

*Fourth*, constitutional appointments requirements cannot be trumped by any statute. *See Marbury v. Madison*, 5 U.S. 137 (1803). Congress's authorization permitting the Comptroller to delegate his authority, *see* 12 U.S.C. § 4a, does not permit non-constitutionally appointed individuals—even those to whom authority was delegated according to statute—to perform officer functions. Were it otherwise, the Appointments Clause could be defeated or circumvented merely through a delegation-authorizing statute or regulation. *See Buckley v. Valeo*, 424 U.S. 1, 136-37 (1976) (stating that Congress may not "usurp the power of appointment by indirection"). Indeed, no one questioned in *Buckley* that the members of the Federal Election Commission held their positions according to statute, but the Supreme Court held that, regardless, the Commission could not validly exercise officer functions—especially its "enforcement power"—because its members had not been constitutionally appointed pursuant to the Appointments Clause. *Id.* at 111; *cf. Lucia*, 585 U.S. at 241 (holding that ALJs were unconstitutionally-appointed even though the SEC invoked statutory delegation authority as empowering those ALJs).

38

Brickman's actions in initiating the administrative enforcement action against Ms. Akahoshi is a paradigmatic "officer" action, and Brickman's lack of a valid officer appointment renders the Notice void *ab initio*. The administrative proceeding must be set aside.

## B. Because Brickman's Appointment Violates Statute, the Notice Is Void

Brickman's appointment as a Deputy Comptroller also violated statute. Congress decreed that "[t]he Secretary of the Treasury shall appoint no more than four Deputy Comptrollers of the Currency." 12 U.S.C. § 4, ADD-7. Remarkably, the OCC appears to have about twenty-eight Deputy Comptrollers, as well as approximately eight "Senior Deputy Comptrollers." *See* OCC Leadership, OFFICE OF THE COMPTROLLER OF THE CURRENCY.[9] There is no indication that these persons are appointed by the Secretary, as the statute requires (as does the Appointments Clause). *See Free Enter. Fund*, 561 U.S. at 497. Clearly Brickman was not so appointed and is not among the "no more than four" Deputy Comptrollers Congress authorized. Thus, Brickman is a pretender to the title and his actions—exceeding the clear restrictions set

---

[9]     Available     at     https://www.occ.treas.gov/about/who-we-are/leadership/index-leadership.html.

by Congress—are *ultra vires* and void. The Court should set the Notice, and all proceedings that followed it, aside.

## C. The Proceedings Were Unconstitutionally Initiated and Presided Over by Persons Insulated from Presidential Removal

This Court should follow the Fifth Circuit and find that both Brickman and the ALJs used by the OCC to preside over this matter are unconstitutionally insulated from removal by the President. *See Jarkesy*, 34 F.4th at 463 ("Two layers of for-cause protection impede [Presidential] control; Supreme Court precedent forbids such impediment.");[10] *see also* 5 U.S.C. § 7521(a)-(b); 5 U.S.C. § 1202(d). The OCC should concede on appeal that Brickman enjoys multiple levels of removal protection, since it cannot be disputed and the ALJ improperly blocked any discovery into that matter. *See supra* Section II(B)(3).

## II. THE ADMINISTRATIVE PROCEEDING VIOLATED MS. AKAHOSHI'S RIGHT TO AN ARTICLE III COURT AND JURY

Adjudicating Ms. Akahoshi's matter in an in-house proceeding violated her rights to due process and to an Article III court adjudication

---

[10] The Supreme Court granted certiorari to review *Jarkesy*, and heard argument on November 29, 2023, *see SEC v. Jarkesy*, No. 22-859.

with a jury. *See* U.S. Const. art. III, amend. V, VII, ADD-2–4; *see also infra* Section III.

The OCC's concealment and false statements case against Ms. Akahoshi is grounded in the common law of fraud—and was quasi-criminal—because it attempted to impose a money penalty and a lifetime ban from banking, which infringe on her rights to property and liberty. For these reasons, this Court should find, as the Fifth Circuit did in *Jarkesy v. SEC*, that the Seventh Amendment jury-trial right applies to the OCC's enforcement action against Ms. Akahoshi. *See* 34 F.4th 446, 453-54 (2022) (finding jury trial attached where SEC brought action for civil penalties, a traditional remedy at law, and noting that "Congress cannot circumvent the Seventh Amendment jury-trial right simply by passing a statute that assigns 'traditional legal claims' to an administrative tribunal.").

The notion that the "public rights" doctrine permits the OCC (i.e., the federal government) to attempt to take Ms. Akahoshi's liberty and property without any Article III protection is based on a misreading of *Atlas Roofing Co. v. Occupational Safety & Health Rev. Comm'n*, 430 U.S. 442 (1977). *Atlas Roofing* held that causes of action "created" to "enforce

41

public rights created by statutes within the power of Congress to enact," may be adjudicated in in-house administrative forums, *id.* at 450-55, but the action against Ms. Akahoshi is not a "public right" because concealment and false statements causes of action were not newly-created by Congress. Instead, the action involves core private rights—Ms. Akahoshi's rights to work in her chosen profession and to her personal property, *see Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 571-72 (1972). The tautology that if the government brings an action, it automatically involves a "public right" is plainly wrong. Indeed, at the *Jarkesy* argument, Justice Kavanaugh stated:

> [I]t does seem odd . . . that a private suit triggers the Article III right to a federal court and a jury, . . . but a government suit against you for money is somehow exempt . . . simply because the government attaches . . . the public rights label to it.

*SEC v. Jarkesy*, No. 22-859, Oral Argument Tr. at 26-27 (U.S. Nov. 29, 2023).

Forcing Ms. Akahoshi into a non-independent, non-Article III proceeding is anathema to our constitutional system, and all orders requiring it should be set aside.

42

## III. THE ADMINISTRATIVE PROCEEDING VIOLATED DUE PROCESS OF LAW

The OCC suppressed impeachment and exculpatory material vital to Ms. Akahoshi's defense; prejudged the action against Ms. Akahoshi in formal enforcement orders and press releases; and improperly sought to punish her based on the bank's negotiated criminal settlement. Each of these violated Ms. Akahoshi's due process rights and "interfere[d] with the rights implicit in the concept of ordered liberty." *Corales v. Bennett*, 567 F.3d 554, 568 (9th Cir. 2009). This Court should set aside the proceedings.

### A. The Applicable Law

"A fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison*, 349 U.S. 133, 136 (1955). It is also a "fundamental premise that principles of due process apply to administrative adjudications." *Antoniu v. SEC*, 877 F.2d 721, 724 (8th Cir. 1989) (citing *Amos Treat & Co. v. SEC*, 306 F.2d 260, 264 (D.C. Cir. 1962)); *see also Ching v. Mayorkas*, 725 F.3d 1149 (9th Cir. 2013) (upholding due process requirements in agency process denying immigration status). "Because of its inherent differences from the judicial process, administrative proceedings *in particular* must be carefully assessed to determine what

43

process is due given the specific circumstances involved. And we must do so on a case by case basis." *Mayorkas*, 725 F.3d at 1157 (emphasis added).

The Supreme Court has explained:

'Liberty' and 'property' are . . . are among the great constitutional concepts . . . They relate to the whole domain of social and economic fact . . . The Court has also made clear that the property interests protected by procedural due process extend well beyond actual ownership of real estate, chattels, or money. . . . Without doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life . . . according to the dictates of his own conscience, and generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness by free men.

*Roth*, 408 U.S. at 571-72 (internal punctuation and citations omitted).

Moreover, it is irrefutable that "the Due Process Clause entitles a person to an impartial and disinterested tribunal." *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980). A tribunal that has prejudged the facts and law of an action prior to its adjudication is biased in violation of due process. *See Stivers v. Pierce*, 71 F.3d 732, 748 (9th Cir. 1995) ("Whether actual or apparent, bias on the part of a single member of a tribunal taints the proceedings and violates due process.").

44

### B.  The OCC Improperly Blocked Disclosure of Exculpatory and Impeachment Material in Violation of Due Process

Ms. Akahoshi's defense that she did not commit a violation of law or an unsafe or unsound practice relied, in part, on the fact that the OCC was fully aware of, and considered her activity related to, the Crowe documents in real-time, in March and April of 2013, and repeatedly decided not to take any action against her in every supervisory cycle until 2018.

Thus, Ms. Akahoshi sought contrary (and therefore exculpatory) opinions to those reflected in the Notice, as well as other opinions within the OCC that resulted in the agency deciding to cite no violation of law by Ms. Akahoshi (or anyone else at the bank) for five years after the events at issue. This material was squarely required to be produced under *Brady v. Maryland*, 373 U.S. 83 (1963) ("A prosecution that withholds [exculpatory] evidence . . . casts the prosecutor in the role of an architect of a proceeding that does not comport with the standards of justice."), and its progeny, *Giglio v. United States*, 405 U.S. 150 (1972). The due process requirements of *Brady* apply to administrative proceedings. *See EEOC v. Los Alamos Constructors, Inc.*, 382 F. Supp.

1373, 1383 (D.N.M. 1974); *Sperry & Hutchinson Co. v. FTC*, 256 F. Supp. 136, 142 (S.D.N.Y. 1966).

The OCC insulated itself and the evidence from scrutiny. Enforcement Counsel asserted, and the ALJ agreed, that all such contrary opinions or views were covered by the agency's deliberative process privilege. 1-ER-184–85 ("Respondent's 'need' for the privileged documents does not overcome the OCC's privilege."). Simultaneously, however, the OCC proffered and introduced the curated opinions of OCC employees—including Boehler and Eagan, who were hybrid expert/fact witnesses who participated in the decision *not* to cite a violation of law in 2013—to support its new 2018 position that Ms. Akahoshi had violated the law. This government suppression of exculpatory evidence was directly contrary to this Court's binding precedent. *See FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1162 (9th Cir. 1984) (stating that defendants' need for materials and accurate fact-finding override the government's privilege when the defendant cannot access evidence from other sources, there are allegations that the agency acted in bad faith or engaged in misconduct, and the information sought is fact-based).

In addition, the OCC further cloaked the available evidence by determining that only the time period spanning 2012 to 2013 formed the "relevant" timeframe. *See* 1-ER-268. In this way, the OCC sought to ensure that nothing about the intervening five years would see the light of day, even as it used RNA's 2018 DOJ and OCC settlements as the basis for asserting bank-loss-causation and to extend the statute of limitations. *See infra* Parts III(D) and IV.

The Court should invalidate the proceeding and set it aside as a violation of due process.

## C. The OCC Impermissibly Prejudged its Action Against Ms. Akahoshi

The OCC—through the Comptroller and Acting Comptroller—has repeatedly prejudged the proceeding against Ms. Akahoshi in a manner destroying any appearance of impartiality of the administrative forum and foreordaining the outcome the ALJ was required to reach. The OCC's prejudgment began before it issued the Notice and spanned nearly the entire proceeding.

On February 6, 2018, the OCC entered a Consent Order for a Civil Penalty against RNA. The RNA Consent Order contained official "Comptroller Findings," which included findings that the bank

47

"concealed from the OCC documents requested by OCC officials" and that former senior bank officers (i.e., Ms. Akahoshi and others) "participated in efforts to preclude the OCC from obtaining the requested information." 2-ER-285–86. It also found that the documents were material, stating that they "were relevant to the OCC's evaluation of the Bank's BSA/AML compliance program," and made conclusions of law, finding that the conduct "result[ed] in a violation of 12 U.S.C. § 481." *Id*. The OCC also issued a press release publicizing its judgment that former senior bank officers attempted to "preclude the OCC from obtaining requested information and the bank concealed requested documents from OCC officials, in violation of 12 U.S.C. § 481." 2-ER-282.

On July 10, 2019, while Ms. Akahoshi's matter was pending before the ALJ, the OCC entered a Consent Order against GC Weiss, related to the same allegations in the Notice. The OCC issued a press release publicizing the Consent Order, which referred to "the violation of 12 USC 481" as a proven, foregone legal and factual conclusion. 2-ER-281.

On July 27, 2022, while Ms. Akahoshi's exceptions to the recommended decision were pending before the Acting Comptroller, which included her objections to the prejudgment of her matter through

the RNA and Weiss Consent Orders, the OCC again prejudged the matter in its Consent Order against CEO Ryan. *See* 2-ER-274–80. The OCC's extensive "Comptroller's Findings" included that: the "Crowe Report" was "a material audit report"; Crowe-related conduct caused RNA to pay a $500,000 fine for its guilty plea and a $50 million OCC penalty "for failure to prove [sic] unfettered access to Bank documents in violation of 12 U.S.C. § 481"; and that Ryan's conduct—the same alleged against Ms. Akahoshi—constituted "violations of law and unsafe or unsound practices" that "caused the Bank to suffer financial loss or other damage and demonstrated continuing disregard for the safety or soundness of the Bank." 2-ER-275. Moreover, Brickman executed the Ryan Consent Order "for issuance by the OCC" as Acting Comptroller Hsu's "duly authorized representative." 2-ER-280.

These Consent Orders and press releases expressly prejudged nearly every issue in Ms. Akahoshi's case—they determined misconduct, bank-loss-causation, materiality of the Crowe documents, and the central allegation that violations of law occurred, including, significantly, that a (highly contested) violation of Section 481 occurred. By all appearances, the OCC specifically *designed* these prejudging statements to bolster its

49

action against Ms. Akahoshi—in the Ryan Consent Order, for instance, the OCC adopted the demonstrably false, disproven claim that Crowe performed a "material audit," which not only asserts materiality but also that Crowe conducted an "audit," which was categorically disproven in prior discovery. *Compare* 2-ER-275 *with* 2-ER-475–92, 499–536 (Sullivan). *See* 2-ER-501 (Sullivan) ("It was not an audit, correct. It was not independent, either"). And, by having Brickman execute the Ryan Consent Order and unflinchingly refer to himself as Acting Comptroller Hsu's "duly authorized representative," the OCC prejudged Ms. Akahoshi's arguments that Brickman may not validly wield officer powers because he has not been appointed in accordance with the Constitution or statute. 2-ER-279.

Unsurprisingly, the Final Decision echoed those predetermined findings as to Section 481, materiality, that the bank had the "Crowe Report" in its "possession," and that Ms. Akahoshi waited "nearly a month" to provide it, among others, even as it dismissed the action against Ms. Akahoshi. 1-ER-12. Any reasonable observer would conclude that the OCC prejudged the facts and law of Ms. Akahoshi's matter. Accordingly, the administrative proceeding should be set aside as a

50

violation of Ms. Akahoshi's right to due process. *See Stivers*, 71 F.3d at 748.

### D. The OCC Sought to Punish Ms. Akahoshi Based on the Results of a Separate Proceeding in Violation of Due Process

To impose a prohibition order and second-tier civil money penalty on Ms. Akahoshi, the OCC had to prove that she proximately caused bank loss. *See* 12 U.S.C. § 1818(e)(1)(B)(i), ADD-20; *see also* 12 U.S.C. § 1818(i)(2)(B)(ii)(II), ADD-28–29. The *only* evidence the OCC offered on these issues—which the ALJ found sufficient—was RNA's negotiated settlement in a separate action, resolving the DOJ investigation into the bank's BSA/AML practices.

Not only is a non-party's negotiated settlement inadmissible as a matter of law, *see United States v. Halbert*, 640 F.2d 1000, 1004 (9th Cir. 1981), its preclusive use also violates due process of law, *see Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 327 n.7 (1979) ("It is a violation of due process for a judgment to be binding on a litigant who was not a party or a privy and therefore has never had an opportunity to be heard."); *Vazques v. Jan-Pro Franchising Int'l*, 986 F.3d 1106, 1116 (9th Cir. 2021) (stating it is "[f]oundational to due process," that "each individual should

51

have his day in court before being subject to its judgment."). The due process violation is further compounded by the fact that the OCC blocked all discovery related to the bank's plea agreement and criminal case as "irrelevant to the OCC's case," "beyond the scope of the Notice [of Charges]," and "bear[ing] no relation to the allegations of misconduct in the notice." 2-ER-322–23; *see* 1-ER-268; *supra* Part II(B)(3). Absent this misuse of RNA's negotiated agreement, Ms. Akahoshi would have been entitled to a decision in her favor on the merits, and this Court should therefore set aside the proceeding.

## IV. THE ACTION WAS TIME-BARRED

The Notice was filed more than five years after any purported misconduct by Ms. Akahoshi. The Court should set aside the Final Decision and dismiss the Notice and all proceedings as time-barred from inception.

### A. Section 1818 Enforcement Actions Must Begin Within Five Years of the Alleged Misconduct

#### 1. Section 2462 Sets a Fixed, Five-Year Limitations Period

The five-year limitations period contained in 28 U.S.C. § 2462, ADD-45, governs administrative enforcement actions under 12 U.S.C. § 1818 for an industry bar or civil money penalty. *De la Fuente v. FDIC*,

332 F.3d 1208, 1219 (9th Cir. 2003) (prohibition order); *Blanton v. OCC*, 909 F.3d 1162, 1171 (D.C. Cir. 2018) (money penalty).

The "most natural reading of [Section 2462]" is that "a claim based on fraud accrues—and the five-year clock begins to tick—when a defendant's allegedly fraudulent conduct occurs." *Gabelli v. SEC*, 568 U.S. 442, 448 (2013). "This reading sets a fixed date when exposure to the specified Government enforcement efforts ends, advancing 'the basic policies of all limitations provisions: repose, elimination of stale claims, and certainty about a plaintiff's opportunity for recovery and a defendant's potential liabilities.'" *Id.* (quoting *Rotella v. Wood*, 528 U.S. 549, 555 (2000)). The Supreme Court therefore directed courts to exercise "great caution" to guard against non-legislative rules that extend the five-year limitations period, "otherwise the court[s] would make the law instead of administering it." *Id.* at 454 (quoting *Amy v. Watertown (No. 2)*, 130 U.S. 320, 324 (1889)).

## 2. Section 1818 Actions "First Accrue" When the Alleged Conduct Occurs

"[T]he 'standard rule' is that a claim accrues 'when the plaintiff has a complete and present cause of action.'" *Gabelli*, 568 U.S. at 448 (quoting *Wallace v. Kato*, 549 U.S. 384, 388 (2007)). When misconduct occurs, the

OCC can immediately pursue a punitive enforcement action seeking money penalties without reference to any bank loss or other "effects" caused by that conduct. *See* 12 U.S.C. § 1818(i)(2)(A), ADD-28. The OCC can also immediately bring an action seeking a higher tier of money penalties or an industry bar by alleging effects that occur simultaneously with the misconduct or based on potential bank loss or prejudice to depositors. *Id.* § 1818(e)(1)(B), ADD-20, (i)(2)(B), (C), ADD-28–29. Moreover, the statute of limitations permits the OCC to wait up to five years after the misconduct occurs to bring an action, encompassing penalties for later-occurring effects or losses.

Binding authority of this Court confirms that the five-year statute of limitations applicable to a Section 1818 action begins to run when the alleged misconduct occurs. In *De la Fuente v. FDIC*, the FDIC sought a prohibition order against De la Fuente, alleging that he had engaged in unsafe or unsound practices that resulted in all three effects under Section 1818(e)(1)(B). 332 F.3d at 1222-23. In applying the statute of limitations, this Court affirmed liability only as to *acts* that occurred less than five years before the enforcement action was commenced and did

54

*not* look to the later-occurring *effects* of earlier acts to determine when the action first accrued. *Id*. at 1219.

## B. The OCC's Re-Accrual Theory Is Wrong

Instead of applying the relevant statutes and the rule of *De la Fuente*, the OCC devised for itself an extralegal exception to the statute of limitations, according to which Section 1818 enforcement actions "first accrue" over and over again.[11] Under that theory, if the OCC chooses to plead a statutory effect that purportedly occurred as a result of prior misconduct, then the limitations period does not start until that *effect* occurs. Worse still, the OCC claims that the statute of limitations does not begin to run upon the "first" accrual of such an effect, but rather that each time an effect materializes—whether one year after the violation, five years, ten years, or so on—the clock starts running anew. 2-ER-318–20.

The OCC's effects-date theory violates the principle that the statute of limitations should "set[] a fixed date when exposure to the specified

---

[11] The OCC relied on a two-judge majority opinion in a D.C. Circuit case that has always been contrary to this Court's *De La Fuente* decision and is no longer good law after *Gabelli*. *See Proffitt v. FDIC*, 200 F.3d 855 (D.C. Cir. 2000).

Government enforcement efforts ends." *Gabelli*, 568 U.S. at 448; *Reading Co. v. Koons*, 271 U.S. 58, 65 (1926). To the contrary, it leads to multiple, widely divergent limitations periods all for the same conduct. In this case, for example, the OCC contrived a literal matrix of limitations periods— some of which began to run more than five years apart from each other— supposedly all applicable to this proceeding against Ms. Akahoshi. *See* 2-ER-312–14.

The OCC's theory also defies Congress's clear command that the agency must commence such actions "within five years from the date when the claim *first* accrued." 28 U.S.C. § 2462 (emphasis added). As applied here, the OCC believes that its action against Ms. Akahoshi "first accrued" at least *twenty-four* times. 2-ER-312–14; *cf. United States v. Fortenberry*, 89 F.4th 702, 705-11 (9th Cir. 2023) (holding that Section 1001 "false statement offense is complete when the statement is made"; materiality is an "intrinsic" element of the statement that does not make false statement a "continuing offense").

The OCC's theory is also invalid because it permits the OCC to engineer its own extension of the statute of limitations. In this case, the "effect" claimed as the basis for enhanced penalties were DOJ and OCC

enforcement actions against the bank. In other words, the OCC maintains that the limitations period did not begin until the government *chose to react to the alleged conduct*. That violates the fundamental rule that the party bringing suit should not control when its cause of action accrues (and thus when repose attaches for its adversary). Otherwise, the limitations period becomes meaningless. *Reading Co.*, 271 U.S. at 65 ("If the persons who are the designated beneficiaries of the right of action created may choose their own time . . . for setting the statute running, the [limitations period] might as well have been omitted from the statute.").

The entire proceeding should be set aside as untimely from inception.

## V. THE SECTION 481 PREDICATE FAILS

The OCC charged a violation of law that does not exist. Section 481 of Title 12 of the United States Code does not regulate the conduct of bank officers; it empowers the OCC to conduct bank examinations. Charging a respondent with a "Section 481 violation"—based on the OCC's *open speculation* about what such a "violation" entails—also constitutes a paradigmatic due process violation. The Court should reject

the OCC's attempt simultaneously to invent and enforce a new duty and set aside the Notice and all subsequent proceedings predicated on the purported violation of Section 481.

## A. Section 481 Does Not Regulate Bank Officers

Section 481 did not impose a duty on Ms. Akahoshi that she could have violated. As its title states, Section 481 empowers the Comptroller to "appoint[]" bank examiners, conduct "examination[s] of member banks," and "report[]" on the conditions of regulated financial institutions based on those examinations. 12 U.S.C. § 481, ADD-8–9 ("The examiner . . . of any national bank shall have power to make a thorough examination of all the affairs of the bank. . . ."). Those provisions outline OCC authority; they do not place an actionable requirement on bank officers or create an offense punishable by administrative prosecution. In only one context, Section 481 discusses the duties of banks as opposed to the authority of the OCC—a bank affiliate must not "refuse" the OCC's examination authority and if it does, "the national bank with which it is affiliated shall be subject to a penalty." 12 U.S.C. § 481. This confirms that individual bank officers, such as Ms. Akahoshi, are incapable of incurring liability under Section 481.

58

*First*, the provision describes non-compliant behavior by "affiliates," not individual bank officers. *See* 12 U.S.C. § 221a(b) (defining affiliate as "corporation, business trust, association, or other similar organization"). Bank officers fall under the term "institution-affiliated party"—as defined in 12 U.S.C. § 1813(u)(1)—which is nowhere referenced in Section 481. *Second*, when an "affiliate" of a national bank refuses to allow examinations or provide information, Congress decided that *the national bank*, not individuals, should be penalized.

While the Final Decision directly (and incorrectly) declares that Section 481 includes liability for bankers, 1-ER-12, 18, the ALJ used a different method to try to salvage the defective Notice, claiming that Ms. Akahoshi "caused" a violation by the bank, 1-ER-58–59. The ALJ's theory cannot salvage the made-up Section 481 obligation. The OCC opted not to charge Ms. Akahoshi with abetting *the bank*'s violation of Section 481; it alleged that she directly violated the statute. *E.g.*, 2-ER-347 ¶ 40. In any event, such a finding would reverse the doctrine of *respondeat superior* and, instead, hold an inferior employee responsible for company misconduct.

Nor does the OCC's reliance on "unsafe and unsound practices" under Section 1818 excuse the invented Section 481 violation, since the "unsafe and unsound practices" predicate is coextensive with the purported Section 481 violation. *See* 2-ER-342–49. There is even less fair notice of an "unsafe and unsound practice" regarding the four emails than there is of a Section 481 duty.

## B. The OCC's Simultaneous Invention and Prosecution of a Section 481 Offense is Unlawful

Even if Section 481 could be interpreted as tacitly establishing a duty on bankers, it is a violation of due process for the OCC to bring an enforcement action based on an unwritten duty that even the Acting Comptroller cannot define. The same is true in the claim of an "unsafe and unsound practice." "Due process requires that the government provide citizens and other actors with sufficient notice as to what behavior complies with the law." *United States v. AMC Entm't*, 549 F.3d 760, 768 (9th Cir. 2008). "Put more colloquially, 'those regulated by an administrative agency are entitled to know the rules by which the game will be played.'" *Id.* (quoting *Ala. Prof'l Hunters Ass'n v. FAA*, 177 F.3d 1030, 1035 (D.C. Cir. 1999)).

The contents and bounds of a "Section 481 violation" by an individual are nowhere contained in the statute or caselaw and remain a mystery even to the Acting Comptroller himself. The OCC admits that a "Section 481 violation" has no definition: "no caselaw [exists] that squarely addresses the elements of § 481 for the purposes of upholding a violation of §§ 1818(e) or 1818(i)." 1-ER-18. Thus, the OCC has resorted to openly *guessing* at what such a violation might entail—the Acting Comptroller speculated that "a violation of § 481 would likely require a showing that an IAP . . . had a duty to furnish OCC examiners with certain information and that the IAP subsequently breached that duty." *Id.* He nonetheless "decline[d] to define § 481's elements with more precision here." *Id.*

This Court should reject the OCC's unlawful attempt to base a punitive enforcement action on a violation of law that does not exist in the statute, and that the agency is seeking to establish (without being able to define it) in this very enforcement action. The proceeding should be set aside.

## VI. MS. AKAHOSHI WAS ENTITLED TO SUMMARY DISPOSITION DECLARING THE ACTION TO BE MERITLESS

The substantive facts here also invalidate the proceeding. Fundamentally, the OCC's allegations made no sense—that Ms. Akahoshi concealed the existence of Crowe work product in two emails that acknowledged, and were all about, Crowe's work. OCC examiners at the time never took Ms. Akahoshi's emails to mean that Crowe documents did not exist, or that the bank refused the OCC's authority to obtain them. But even if they had, there was no concealment because the OCC received the documents *on the exact timeframe to which it agreed.* And the Crowe documents were utterly immaterial: they contained no new information and had no effect on the BSA/AML examination. This Court should set aside the Final Decision and the proceedings as "unsupported by substantial evidence" and "unwarranted by the facts." 5 U.S.C. § 706.

### A. There Was No False Statement or Concealment

There is no dispute about what Ms. Akahoshi's March 22 and March 25, 2013 responses to Omi said—they are written communications, accepted by OCC examiners at that time and for years

without issue.[12] This Court's caselaw shows, as a matter of law, that those emails were neither false nor concealing, and the action should be set aside.

### 1. Statements that Call for a Follow-Up Are Not False or Concealing

More than mere non-responsiveness is required to prove a false statement or concealment within the meaning of 18 U.S.C. § 1001. This Court has held that "the government cannot sustain a materially false statement charge," even viewing evidence in the light most favorable to the government on post-conviction appeal, based on the government's "interpretation of what the individual meant—there must be clear evidence of what was said and a full appreciation of the context in which the statement was made." *United States v. Jiang*, 476 F.3d 1026, 1030 (9th Cir. 2007). Incomplete or nonresponsive answers therefore do not qualify as actionable false statements under Section 1001(a)(2): "the defendant and his questioner" must "join[] issue on a matter of material

---

[12] The OCC also alleged misconduct as to the April 18, 2013 cover letter, but as discussed, Ms. Akahoshi indisputably did not write the portion of the cover letter which allegedly contained improper statements, which were, in any event, immaterial. *See supra* Part I(C)(2).

fact to which the defendant knowingly uttered a false declaration." *Id.* at 1029.

The same applies to alleged concealment by trick under Section 1001(a)(1) (a theory not charged in the Notice). Providing a nonresponsive, partially responsive answer—or even a *passive failure to disclose*—does not "conceal" anything; rather, "an affirmative act by which a material fact is concealed is necessary to prove a violation of the concealment prong of § 1001." *United States v. Saffarinia*, 424 F. Supp. 3d 46, 60 (D.D.C. 2020); *see United States v. Henderson*, 318 F. Supp. 3d 1221, 1234 (E.D. Wa. 2018) ("Simple omissions fall short of affirmative acts." (citing *United States v. White Eagle*, 721 F.3d 1108, 1117 (9th Cir. 2012))).

For these reasons, statements that call for a follow-up—even intentionally misleading or evasive statements—are not false or concealing. *Jiang*, 476 F.3d at 1029 (statements that called for government to follow-up were not improper); *White Eagle*, 721 F.3d at 1117 (statements may have been "incomplete," "misleading," "partial," and "improper and unethical," but they did not amount to affirmative acts of concealment directed at the government); *United States v.*

64

*Rahman*, 805 F.3d 822, 838-39 (7th Cir. 2015) (true statement—even "a misleading or nonresponsive answer"—cannot sustain 1001 conviction); *Cf. United States v. Bonds*, 784 F.3d 582, 588 (9th Cir. 2015) (Smith, J., concurring) (effect of an "evasive or misleading statement" "is merely to prompt follow-up questions," so such a statement is not material).

Government employees therefore have the burden of clarifying ambiguity or following up on non-responsiveness. *See Bronston v. United States*, 409 U.S. 352, 360 (1973) ( "The burden is on the questioner to pin the witness down to the specific object of the questioner's inquiry."); *see United States v. Camper*, 384 F.3d 1073, 1076 (9th Cir. 2004); *Jiang*, 476 F.3d at 1029 (agent should have asked "the obvious and logical follow-up question"); *Rahman*, 805 F.3d at 839 (ambiguity "could have been cleared up by a single additional question or two"; "A criminal conviction is a drastic sanction when no questioner pinned Rahman down to which laptop he was referring.").

Not only courts, but also *the OCC itself* recognizes that its employees should follow-up to resolve unclear or nonresponsive information from banks rather than fire up the enforcement engines. The OCC has established procedures where examiners "encounter situations

65

where a bank resists or refuses their requests to . . . review the bank's books and records." 5-ER-946. The agency guidance requires examiners to raise such "resistance or refusal to provide access" to their supervisors so that the OCC can discuss "with bank management" "to seek a quick resolution to what could be a simple misunderstanding." 5-ER-949.

### 2. Ms. Akahoshi Did Not Make False Statements or Conceal Anything, and Any Issue Was Resolved with a Simple Follow-Up Call

As an initial matter, Ms. Akahoshi's March 22, 2013 email was a response to Omi's March 21 request for Crowe's "assessment report of the Bank's BSA program." 3-ER-565. Omi's email made clear that the OCC already understood that Crowe had been engaged and produced work product. Ms. Akahoshi's response expressly acknowledged that Crowe had produced work reviewed by bank "management and the board [of directors]," and that Crowe had delivered "emerging observations and [an] action plan" to the bank as a result of the engagement. *Id.*

Ms. Akahoshi also conveyed the bank's concern, which GC Weiss and CEO Ryan explained to her, that "Crowe had not been provided all facts necessary to understand the organization." 3-ER-564. The OCC's litigating position, adopted years after the fact, that this brief description

66

of the bank's concerns "concealed" Crowe documents—when Omi's initial inquiry assumed their existence, and Ms. Akahoshi's response specifically referred to Crowe's observations and action plan—goes beyond all reasonableness, and, indeed, OCC examiners at the time did not take it to mean that Crowe documents did not exist.

In this action (not at the time), the OCC also took the position that Ms. Akahoshi's statements that "Crowe did not complete an assessment," and that the bank had "suspended" the January 2013 Crowe engagement "before any report was issued," 3-ER-564, are false, but both statements are true. Crowe did *not* complete or issue a report, and had not (in the initial engagement) undertaken to conduct a risk assessment. According to *every* witness, including the OCC's own experts and Sullivan (the so-called "whistleblower"), a draft third-party consultant's report, which a bank has rejected, should not be considered "completed" or "issued"; such reports must go through an iterative process with bank leadership before they are finalized or issued. *See* 2-ER-354–60 (Alberts); 2-ER-363–64 (Akahoshi); 2-ER-385–87, 401–02 (Ryan); 2-ER-427–28 (Boehler); 2-ER-511 (Sullivan).

The same basic interaction played out when Omi emailed back a few days later, on March 25, 2013, to ask for what Crowe "provided management" or "a copy of what bank management received from Crowe, even if it was preliminary or partial." 3-ER-564. Omi's email specifically contemplated that *draft* rather than *final* documents existed and requested a draft that management received, which belies the OCC's *post hoc* meritless theory that Ms. Akahoshi's March 22 email denied the very existence of any Crowe documents.

The bank's response—again sent promptly by Ms. Akahoshi, as a matter of routine, following and based on her consultation with GC Weiss and CEO Ryan—acknowledged that: Crowe "had a discussion with the board and members of executive management at the February 4th [sic] meeting," i.e., with the highest levels of bank leadership, at which Crowe presented a PowerPoint deck; Crowe had "subsequent conversations" with "board members and executive management"; the bank was "very critical of the information being provided"; and the bank had particular "concerns" regarding Crowe's choices of peer banks used for "bench marking," Crowe's lack of "any testing to validate or refute assumptions," the omission of "stakeholders" from the "scope of the assessment," and

the failure to account for prior remedial action by management. 3-ER-563. The email even acknowledged that Crowe had proposed a more-than-one-year, "$700,000+" "remediation plan." *Id.*

Nothing was "concealed" by this email, which discussed Crowe's work and its perceived flaws, Crowe's presentation to, and communications with, the highest levels of bank leadership, and the "remediation plan," which obviously reflected Crowe's view that the program was far from flawless. Thus, the OCC's own EIC admitted that this email was at worst "diversionary" or a nonresponsive "detour." 2-ER-439–40 (Eagan). This admission, and the emails themselves, demonstrate that the OCC's theory of false statements and concealment were utterly without merit. *See White Eagle*, 721 F.3d at 1117; *Bonds*, 784 F.3d at 588.

### 3. The OCC Received Exactly What It Wanted on the Timeframe It Established

After the March 25 email, the OCC did what the caselaw and the agency's own procedure require—it followed up to avoid any misunderstanding. And, based on that follow-up, the bank produced exactly what the OCC wanted on the timeframe the OCC established. On April 8 and 10, 2013, Jorn spoke by phone with CEO Ryan regarding

69

Crowe documents. Ryan reiterated the bank's concerns with Crowe's work—which Ms. Akahoshi had outlined in her emails—and Jorn expressed that the OCC wanted them anyway. Ryan readily agreed; Jorn and Ryan agreed that the bank could draft a cover letter regarding Crowe documents and provide them by April 19; and the bank did in fact provide the documents, along with the cover letter, on time. When the bank provided the documents on the agreed-upon timeframe, the OCC got exactly what it had requested. 2-ER-441–42 (Eagan); 2-ER-549–57; 2-ER-391–93, 403–14 (Ryan); 4-ER-920.

The Court should set aside the proceedings and Final Decision as meritless.

## B. Crowe Documents Were Immaterial

This action was also meritless because nothing about Crowe's draft work product from the Sullivan-engagement was material. "The most common formulation" of materiality under Section 1001 "is that a concealment or misrepresentation is material if it has a natural tendency to influence, or was capable of influencing, the decision of the decisionmaking body to which it was addressed." *Kungys v. United States*, 485 U.S. 759, 770 (1988). Statements that call for a follow-up are

70

not material, even if they are "evasive or misleading," or "meant to divert or slow" the governmental function at issue. *See Bonds*, 784 F.3d at 589 (Smith, J., concurring).

The Crowe documents at issue here were utterly immaterial. The bank had already informed the OCC of the issues identified in Crowe's draft work, the OCC had identified those issues for itself as part of the BSA/AML exam that began in November 2012, and Crowe's draft work had and could have had no effect on the examination. Even before commencing the onsite examination, by October 2012, the OCC had reviewed a FinCEN memo identifying as a high-risk issue, high-cash-activity border customers (RNA had branches close to the U.S.-Mexican border in California) and had flagged the bank as having high risk characteristics. 3-ER-626–30. During the onsite examination in November 2012, Sullivan and other bank personnel alerted the OCC exam team to issues relating to staff quality, the need for training, inadequate investigation of law enforcement inquiries, and time pressure regarding SAR investigations and filings, as well as high-cash activity at the border. 3-ER-631–34; 2-ER-493–96 (Sullivan); 5-ER-1003–08 (Wood).

The OCC's December 12, 2012, draft BSA Compliance Conclusion Memo, noted, among other issues, *weeks before the Crowe engagement even began*: "a major breakdown in the BSA Program for internal controls," which the bank had self-identified; "deficiencies in the AML unit," which led to missed and late SARs; inadequate due diligence on NGO customers; and a proposed MRA for staff training. 3-ER-640.

Thus, Crowe's draft work product did not, in fact, influence the examination, nor could it have. The OCC's EIC admitted that follow-up examination was required as soon as the bank took issue with the OCC's February 8, 2013 draft findings. 2-ER-430–31 (Eagan). When the OCC returned to RNA for a further onsite examination, after receiving RNA's response to the agency's findings that all four pillars of the BSA/AML program were broken, the agency covered no new areas of inquiry based on Crowe documents. 5-ER-1073. The OCC's final report of examination made only passing reference to Crowe's draft work product from the January 2013 engagement, stating that it "mirror[ed] some of the OCC's concerns." 3-ER-734. In other words, there was nothing material about the contents of the Crowe documents or the timing (agreed-upon by the

OCC) of their delivery, and this Court should set aside the proceeding as meritless.

## CONCLUSION

For the foregoing reasons, this Court should hold unlawful and set aside the OCC's void administrative enforcement action against Ms. Akahoshi in its entirety.

Dated:      New York, New York
            February 16, 2024

By:  _____

JUSTIN S. WEDDLE
JULIA I. CATANIA
BRIAN WITTHUHN
WEDDLE LAW PLLC
37 West 20th Street
  Suite 1206
New York, NY 10011
212-997-5518
jweddle@weddlelaw.com

73

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 23-938

I am the attorney or self-represented party.

**This brief contains** | 13,894 | **words,** including | | words

manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

(●) complies with the word limit of Cir. R. 32-1.

( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

( ) is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

[ ] it is a joint brief submitted by separately represented parties.
[ ] a party or parties are filing a single brief in response to multiple briefs.
[ ] a party or parties are filing a single brief in response to a longer joint brief.

( ) complies with the length limit designated by court order dated | | .

( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Justin S. Weddle | **Date** | February 16, 2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8** | *Rev. 12/01/22*

# ADDENDUM

# TABLE OF CONTENTS

PAGE

Article II Appointments Clause ...................................... ADD-1

Article III The Judiciary............................................. ADD-2

Amendment 5 Due Process Clause ................................... ADD-3

Amendment 7 Jury Trial............................................ ADD-4

5 USC 704......................................................... ADD-5

5 USC 706......................................................... ADD-6

12 USC 4.......................................................... ADD-7

12 USC 481 ....................................................... ADD-8

12 USC 1818 ...................................................... ADD-10

18 USC 1001 ...................................................... ADD-43

28 USC 2462 ...................................................... ADD-45

# ADD-1

Section 2, Clause 2. Treaty Making Power; Appointing Power, USCA CONST Art. II §...

---

United States Code Annotated
   Constitution of the United States
      Annotated
         Article II. The President

U.S.C.A. Const. Art. II § 2, cl. 2

Section 2, Clause 2. Treaty Making Power; Appointing Power

Currentness

He shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur; and he shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S.C.A. Const. Art. II § 2, cl. 2, USCA CONST Art. II § 2, cl. 2
Current through P.L. 118-30. Some statute sections may be more current, see credits for details.

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

# ADD-2

United States Code Annotated
    Constitution of the United States
        Annotated
           Article III. The Judiciary

U.S.C.A. Const. Art. III

ARTICLE III. THE JUDICIARY

Currentness

**Section 1.** The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish. The Judges, both of the supreme and inferior Courts, shall hold their Offices during good Behaviour, and shall, at stated Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office.

**Section 2.** The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority;--to all Cases affecting Ambassadors, other public Ministers and Consuls;--to all Cases of admiralty and maritime Jurisdiction;--to Controversies to which the United States shall be a Party;--to Controversies between two or more States;--between a State and Citizens of another State;--between Citizens of different States,--between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects.[1]

[1]    This clause has been affected by the Eleventh Amendment.

In all Cases affecting Ambassadors, other public Ministers and Consuls, and those in which a State shall be Party, the supreme Court shall have original Jurisdiction. In all the other Cases before mentioned, the supreme Court shall have appellate Jurisdiction, both as to Law and Fact, with such Exceptions, and under such Regulations as the Congress shall make.

The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury; and such Trial shall be held in the State where the said Crimes shall have been committed; but when not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed.

**Section 3.** Treason against the United States, shall consist only in levying War against them, or in adhering to their Enemies, giving them Aid and Comfort. No Person shall be convicted of Treason unless on the Testimony of two Witnesses to the same overt Act, or on Confession in open Court.

The Congress shall have Power to declare the Punishment of Treason, but no Attainder of Treason shall work Corruption of Blood, or Forfeiture except during the Life of the Person attainted.

U.S.C.A. Const. Art. III, USCA CONST Art. III
Current through P.L. 118-30. Some statute sections may be more current, see credits for details.

End of Document    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

# ADD-3

United States Code Annotated
 Constitution of the United States
  Annotated
   Amendment V. Grand Jury; Double Jeopardy; Self-Incrimination; Due Process; Takings

U.S.C.A. Const. Amend. V

Amendment V. Grand Jury Indictment for Capital Crimes; Double Jeopardy;
Self-Incrimination; Due Process of Law; Takings without Just Compensation

Currentness

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

<Historical notes and references are included in the full text document for this amendment.>

<For Notes of Decisions, see separate documents for clauses of this amendment:>

<USCA Const. Amend. V--Grand Jury clause>

<USCA Const. Amend. V--Double Jeopardy clause>

<USCA Const. Amend. V--Self-Incrimination clause>

<USCA Const. Amend. V-- Due Process clause>

<USCA Const. Amend. V--Takings clause>

U.S.C.A. Const. Amend. V, USCA CONST Amend. V
Current through P.L. 118-30. Some statute sections may be more current, see credits for details.

End of Document

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

# ADD-4

Amendment VII. Civil Trials, USCA CONST Amend. VII

---

United States Code Annotated
   Constitution of the United States
      Annotated
         Amendment VII. Civil Trials

U.S.C.A. Const. Amend. VII

Amendment VII. Civil Trials

Currentness

In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law.

U.S.C.A. Const. Amend. VII, USCA CONST Amend. VII
Current through P.L. 118-30. Some statute sections may be more current, see credits for details.

---

**End of Document**        © 2024 Thomson Reuters. No claim to original U.S. Government Works.

# ADD-5

United States Code Annotated
    Title 5. Government Organization and Employees (Refs & Annos)
        Part I. The Agencies Generally
            Chapter 7. Judicial Review (Refs & Annos)

5 U.S.C.A. § 704

§ 704. Actions reviewable

Currentness

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action. Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.

**CREDIT(S)**

(Pub.L. 89-554, Sept. 6, 1966, 80 Stat. 392.)

5 U.S.C.A. § 704, 5 USCA § 704
Current through P.L. 118-30. Some statute sections may be more current, see credits for details.

    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

# ADD-6

> United States Code Annotated
>  Title 5. Government Organization and Employees (Refs & Annos)
>   Part I. The Agencies Generally
>    Chapter 7. Judicial Review (Refs & Annos)

5 U.S.C.A. § 706

§ 706. Scope of review

Currentness

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--

**(1)** compel agency action unlawfully withheld or unreasonably delayed; and

**(2)** hold unlawful and set aside agency action, findings, and conclusions found to be--

**(A)** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

**(B)** contrary to constitutional right, power, privilege, or immunity;

**(C)** in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

**(D)** without observance of procedure required by law;

**(E)** unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

**(F)** unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

## CREDIT(S)

(Pub.L. 89-554, Sept. 6, 1966, 80 Stat. 393.)

5 U.S.C.A. § 706, 5 USCA § 706

# ADD-7

---

United States Code Annotated
Title 12. Banks and Banking
Chapter 1. The Comptroller of the Currency

---

12 U.S.C.A. § 4

§ 4. Deputy Comptrollers

Currentness

The Secretary of the Treasury shall appoint no more than four Deputy Comptrollers of the Currency, one of whom shall be designated First Deputy Comptroller of the Currency, and shall fix their salaries. Each Deputy Comptroller shall take the oath of office and shall perform such duties as the Comptroller shall direct. During a vacancy in the office or during the absence or disability of the Comptroller, each Deputy Comptroller shall possess the power and perform the duties attached by law to the office of the Comptroller under such order of succession following the First Deputy Comptroller as the Comptroller shall direct.

**CREDIT(S)**

(R.S. § 327; Mar. 4, 1923, c. 252, § 209(b), 42 Stat. 1467; Pub.L. 86-251, § 1(a), Sept. 9, 1959, 73 Stat. 487; Pub.L. 92-310, Title II, § 223(b), June 6, 1972, 86 Stat. 206.)

12 U.S.C.A. § 4, 12 USCA § 4
Current through P.L. 118-30. Some statute sections may be more current, see credits for details.

---

**End of Document**
© 2024 Thomson Reuters. No claim to original U.S. Government Works.

# ADD-8

§ 481. Appointment of examiners; examination of member banks,..., 12 USCA § 481

---

United States Code Annotated
  Title 12. Banks and Banking
    Chapter 3. Federal Reserve System (Refs & Annos)
      Subchapter XV. Bank Examinations (Refs & Annos)

12 U.S.C.A. § 481

§ 481. Appointment of examiners; examination of member banks, State banks, and trust companies; reports

Effective: July 21, 2011

Currentness

The Comptroller of the Currency, with the approval of the Secretary of the Treasury, shall appoint examiners who shall examine every national bank as often as the Comptroller of the Currency shall deem necessary. The examiner making the examination of any national bank shall have power to make a thorough examination of all the affairs of the bank and in doing so he shall have power to administer oaths and to examine any of the officers and agents thereof under oath and shall make a full and detailed report of the condition of said bank to the Comptroller of the Currency: *Provided,* That in making the examination of any national bank the examiners shall include such an examination of the affairs of all its affiliates other than member banks as shall be necessary to disclose fully the relations between such bank and such affiliates and the effect of such relations upon the affairs of such bank; and in the event of the refusal to give any information required in the course of the examination of any such affiliate, or in the event of the refusal to permit such examination, all the rights, privileges, and franchises of the bank shall be subject to forfeiture in accordance with section 2 of the Federal Reserve Act, as amended (U.S.C., Title 12, secs. 141, 222-225, 281-286, and 502). The Comptroller of the Currency shall have power, and he is authorized, to publish the report of his examination of any national banking association or affiliate which shall not within one hundred and twenty days after notification of the recommendations or suggestions of the Comptroller, based on said examination, have complied with the same to his satisfaction. Ninety days' notice prior to such publicity shall be given to the bank or affiliate.

The examiner making the examination of any affiliate of a national bank shall have power to make a thorough examination of all the affairs of the affiliate, and in doing so he shall have power to administer oaths and to examine any of the officers, directors, employees, and agents thereof under oath and to make a report of his findings to the Comptroller of the Currency. If any affiliate of a national bank refuses to pay any assessments, fees, or other charges imposed by the Comptroller of the Currency pursuant to this subchapter or fails to make such payment not later than 60 days after the date on which they are imposed, the Comptroller of the Currency may impose such assessments, fees, or charges against the affiliated national bank, and such assessments, fees, or charges shall be paid by such national bank. If the affiliation is with 2 or more national banks, such assessments, fees, or charges may be imposed on, and collected from, any or all of such national banks in such proportions as the Comptroller of the Currency may prescribe. The examiners and assistant examiners making the examinations of national banking associations and affiliates thereof herein provided for and the chief examiners, reviewing examiners and other persons whose services may be required in connection with such examinations or the reports thereof, shall be employed by the Comptroller of the Currency with the approval of the Secretary of the Treasury; the employment and compensation of examiners, chief examiners, reviewing examiners, assistant examiners, and of the other employees of the office of the Comptroller of the Currency whose compensation is and shall be paid from assessments on banks or affiliates thereof or from other fees or charges imposed pursuant to this subchapter shall be set and adjusted subject to chapter 71 of Title 5 and without regard to the provisions of other laws applicable to officers or employees of the United States. The funds derived from such assessments, fees, or charges may be deposited by the Comptroller of the Currency in accordance with the provisions of section 192 of this title and shall not be construed to be Government funds or appropriated monies; and the Comptroller of the Currency is authorized and empowered to prescribe regulations governing the computation and assessment of the expenses of examinations herein provided for and the collection of such assessments from the banks and/or affiliates examined or of other fees or charges imposed pursuant to this subchapter.

# ADD-9

§ 481. Appointment of examiners; examination of member banks,..., 12 USCA § 481

Such funds shall not be subject to apportionment for the purpose of chapter 15 of Title 31 or under any other authority. If any affiliate of a national bank shall refuse to permit an examiner to make an examination of the affiliate or shall refuse to give any information required in the course of any such examination, the national bank with which it is affiliated shall be subject to a penalty of not more than $5,000 for each day that any such refusal shall continue. Such penalty may be assessed by the Comptroller of the Currency and collected in the same manner as expenses of examinations. The Comptroller of the Currency, upon the request of the Board of Governors of the Federal Reserve System, is authorized to assign examiners appointed under this subchapter to examine foreign operations of State banks which are members of the Federal Reserve System.

## CREDIT(S)

(R.S. § 5240 (pars.); Feb. 19, 1875, c. 89, 18 Stat. 329; Dec. 23, 1913, c. 6, § 21, 38 Stat. 271; June 16, 1933, c. 89, § 28, 48 Stat. 192; Aug. 23, 1935, c. 614, Title II, § 203(a), Title III, § 343, 49 Stat. 704, 722; June 30, 1948, c. 762, § 1, 62 Stat. 1163; Apr. 30, 1956, c. 228, § 1, 70 Stat. 124; Pub.L. 96-221, Title VII, § 709, Mar. 31, 1980, 94 Stat. 188; Pub.L. 100-86, Title V, § 505(b), Aug. 10, 1987, 101 Stat. 633; Pub.L. 101-73, Title IX, § 907(f), Aug. 9, 1989, 103 Stat. 470; Pub.L. 102-242, Title I, § 114(b), Dec. 19, 1991, 105 Stat. 2248; Pub.L. 111-203, Title III, § 318(a)(1), July 21, 2010, 124 Stat. 1526.)

12 U.S.C.A. § 481, 12 USCA § 481
Current through P.L. 118-30. Some statute sections may be more current, see credits for details.

End of Document        © 2024 Thomson Reuters. No claim to original U.S. Government Works.

# ADD-10

§ 1818. Termination of status as insured depository institution, 12 USCA § 1818

---

United States Code Annotated
  Title 12. Banks and Banking
    Chapter 16. Federal Deposit Insurance Corporation (Refs & Annos)

12 U.S.C.A. § 1818

§ 1818. Termination of status as insured depository institution

Effective: July 21, 2011

Currentness

**(a) Termination of insurance**

**(1) Voluntary termination**

Any insured depository institution which is not--

**(A)** a national member bank;

**(B)** a State member bank;

**(C)** a Federal branch;

**(D)** a Federal savings association; or

**(E)** an insured branch which is required to be insured under subsection (a) or (b) of section 3104 of this title,

may terminate such depository institution's status as an insured depository institution if such insured institution provides written notice to the Corporation of the institution's intent to terminate such status not less than 90 days before the effective date of such termination.

**(2) Involuntary termination**

**(A) Notice to primary regulator**

If the Board of Directors determines that--

**(i)** an insured depository institution or the directors or trustees of an insured depository institution have engaged or are engaging in unsafe or unsound practices in conducting the business of the depository institution;

---

# ADD-11

§ 1818. Termination of status as insured depository institution, 12 USCA § 1818

---

**(ii)** an insured depository institution is in an unsafe or unsound condition to continue operations as an insured institution; or

**(iii)** an insured depository institution or the directors or trustees of the insured institution have violated any applicable law, regulation, order, condition imposed in writing by the Corporation in connection with the approval of any application or other request by the insured depository institution, or written agreement entered into between the insured depository institution and the Corporation,

the Board of Directors shall notify the appropriate Federal banking agency with respect to such institution (if other than the Corporation) or the State banking supervisor of such institution (if the Corporation is the appropriate Federal banking agency) of the Board's determination and the facts and circumstances on which such determination is based for the purpose of securing the correction of such practice, condition, or violation. Such notice shall be given to the appropriate Federal banking agency not less than 30 days before the notice required by subparagraph (B), except that this period for notice to the appropriate Federal banking agency may be reduced or eliminated with the agreement of such agency.

**(B) Notice of intention to terminate insurance**

If, after giving the notice required under subparagraph (A) with respect to an insured depository institution, the Board of Directors determines that any unsafe or unsound practice or condition or any violation specified in such notice requires the termination of the insured status of the insured depository institution, the Board shall--

**(i)** serve written notice to the insured depository institution of the Board's intention to terminate the insured status of the institution;

**(ii)** provide the insured depository institution with a statement of the charges on the basis of which the determination to terminate such institution's insured status was made (or a copy of the notice under subparagraph (A)); and

**(iii)** notify the insured depository institution of the date (not less than 30 days after notice under this subparagraph) and place for a hearing before the Board of Directors (or any person designated by the Board) with respect to the termination of the institution's insured status.

**(3) Hearing; termination**

If, on the basis of the evidence presented at a hearing before the Board of Directors (or any person designated by the Board for such purpose), in which all issues shall be determined on the record pursuant to section 554 of Title 5 and the written findings of the Board of Directors (or such person) with respect to such evidence (which shall be conclusive), the Board of Directors finds that any unsafe or unsound practice or condition or any violation specified in the notice to an insured depository institution under paragraph (2)(B) or subsection (w) has been established, the Board of Directors may issue an order terminating the insured status of such depository institution effective as of a date subsequent to such finding.

**(4) Appearance; consent to termination**

---

# ADD-12

§ 1818. Termination of status as insured depository institution, 12 USCA § 1818

Unless the depository institution shall appear at the hearing by a duly authorized representative, it shall be deemed to have consented to the termination of its status as an insured depository institution and termination of such status thereupon may be ordered.

**(5) Judicial review**

Any insured depository institution whose insured status has been terminated by order of the Board of Directors under this subsection shall have the right of judicial review of such order only to the same extent as provided for the review of orders under subsection (h) of this section.

**(6) Publication of notice of termination**

The Corporation may publish notice of such termination and the depository institution shall give notice of such termination to each of its depositors at his last address of record on the books of the depository institution, in such manner and at such time as the Board of Directors may find to be necessary and may order for the protection of depositors.

**(7) Temporary insurance of deposits insured as of termination**

After the termination of the insured status of any depository institution under the provisions of this subsection, the insured deposits of each depositor in the depository institution on the date of such termination, less all subsequent withdrawals from any deposits of such depositor, shall continue for a period of at least 6 months or up to 2 years, within the discretion of the Board of Directors, to be insured, and the depository institution shall continue to pay to the Corporation assessments as in the case of an insured depository institution during such period. No additions to any such deposits and no new deposits in such depository institution made after the date of such termination shall be insured by the Corporation, and the depository institution shall not advertise or hold itself out as having insured deposits unless in the same connection it shall also state with equal prominence that such additions to deposits and new deposits made after such date are not so insured. Such depository institution shall, in all other respects, be subject to the duties and obligations of an insured depository institution for the period referred to in the 1st sentence from the date of such termination, and in the event that such depository institution shall be closed on account of inability to meet the demands of its depositors within such period, the Corporation shall have the same powers and rights with respect to such depository institution as in case of an insured depository institution.

**(8) Temporary suspension of insurance**

**(A) In general**

If the Board of Directors initiates a termination proceeding under paragraph (2), and the Board of Directors, after consultation with the appropriate Federal banking agency, finds that an insured depository institution (other than a savings association to which subparagraph (B) applies) has no tangible capital under the capital guidelines or regulations of the appropriate Federal banking agency, the Corporation may issue a temporary order suspending deposit insurance on all deposits received by the institution.

**(B) Special rule for certain savings institutions**

**(i) Certain goodwill included in tangible capital**

# ADD-13

In determining the tangible capital of a savings association for purposes of this paragraph, the Board of Directors shall include goodwill to the extent it is considered a component of capital under section 1464(t) of this title. Any savings association which would be subject to a suspension order under subparagraph (A) but for the operation of this subparagraph, shall be considered by the Corporation to be a "special supervisory association".

### (ii) Suspension order

The Corporation may issue a temporary order suspending deposit insurance on all deposits received by a special supervisory association whenever the Board of Directors determines that--

**(I)** the capital of such association, as computed utilizing applicable accounting standards, has suffered a material decline;

**(II)** that such association (or its directors or officers) is engaging in an unsafe or unsound practice in conducting the business of the association;

**(III)** that such association is in an unsafe or unsound condition to continue operating as an insured association; or

**(IV)** that such association (or its directors or officers) has violated any applicable law, rule, regulation, or order, or any condition imposed in writing by a Federal banking agency, or any written agreement including a capital improvement plan entered into with any Federal banking agency, or that the association has failed to enter into a capital improvement plan which is acceptable to the Corporation within the time period set forth in section 1464(t) of this title.

> Nothing in this paragraph limits the right of the Corporation or the Comptroller of the Currency to enforce a contractual provision which authorizes the Corporation or the Comptroller of the Currency, as a successor to the Federal Savings and Loan Insurance Corporation or the Federal Home Loan Bank Board, to require a savings association to write down or amortize goodwill at a faster rate than otherwise required under this chapter or under applicable accounting standards.

### (C) Effective period of temporary order

Any order issued under subparagraph (A) shall become effective not earlier than 10 days from the date of service upon the institution and, unless set aside, limited, or suspended by a court in proceedings authorized hereunder, such temporary order shall remain effective and enforceable until an order of the Board under paragraph (3) becomes final or until the Corporation dismisses the proceedings under paragraph (3).

### (D) Judicial review

Before the close of the 10-day period beginning on the date any temporary order has been served upon an insured depository institution under subparagraph (A), such institution may apply to the United States District Court for the District of Columbia, or the United States district court for the judicial district in which the home office of the institution is located, for an injunction setting aside, limiting, or suspending the enforcement, operation, or effectiveness of such order, and such court shall have jurisdiction to issue such injunction.

# ADD-14

**(E) Continuation of insurance for prior deposits**

The insured deposits of each depositor in such depository institution on the effective date of the order issued under this paragraph, minus all subsequent withdrawals from any deposits of such depositor, shall continue to be insured, subject to the administrative proceedings as provided in this chapter.

**(F) Publication of order**

The depository institution shall give notice of such order to each of its depositors in such manner and at such times as the Board of Directors may find to be necessary and may order for the protection of depositors.

**(G) Notice by Corporation**

If the Corporation determines that the depository institution has not substantially complied with the notice to depositors required by the Board of Directors, the Corporation may provide such notice in such manner as the Board of Directors may find to be necessary and appropriate.

**(H) Lack of notice**

Notwithstanding subparagraph (A), any deposit made after the effective date of a suspension order issued under this paragraph shall remain insured to the extent that the depositor establishes that--

**(i)** such deposit consists of additions made by automatic deposit the depositor was unable to prevent; or

**(ii)** such depositor did not have actual knowledge of the suspension of insurance.

**(9) Final decisions to terminate insurance**

Any decision by the Board of Directors to--

**(A)** issue a temporary order terminating deposit insurance; or

**(B)** issue a final order terminating deposit insurance (other than under subsection (p) or (q));

shall be made by the Board of Directors and may not be delegated.

**(10) Low- to moderate-income housing lender**

In making any determination regarding the termination of insurance of a solvent savings association, the Corporation may consider the extent of the association's low- to moderate-income housing loans.

# ADD-15

§ 1818. Termination of status as insured depository institution, 12 USCA § 1818

**(b) Cease-and-desist proceedings**

**(1)** If, in the opinion of the appropriate Federal banking agency, any insured depository institution, depository institution which has insured deposits, or any institution-affiliated party is engaging or has engaged, or the agency has reasonable cause to believe that the depository institution or any institution-affiliated party is about to engage, in an unsafe or unsound practice in conducting the business of such depository institution, or is violating or has violated, or the agency has reasonable cause to believe that the depository institution or any institution-affiliated party is about to violate, a law, rule, or regulation, or any condition imposed in writing by a Federal banking agency in connection with any action on any application, notice, or other request by the depository institution or institution-affiliated party, or any written agreement entered into with the agency, the appropriate Federal banking agency for the depository institution may issue and serve upon the depository institution or such party a notice of charges in respect thereof. The notice shall contain a statement of the facts constituting the alleged violation or violations or the unsafe or unsound practice or practices, and shall fix a time and place at which a hearing will be held to determine whether an order to cease and desist therefrom should issue against the depository institution or the institution-affiliated party. Such hearing shall be fixed for a date not earlier than thirty days nor later than sixty days after service of such notice unless an earlier or a later date is set by the agency at the request of any party so served. Unless the party or parties so served shall appear at the hearing personally or by a duly authorized representative, they shall be deemed to have consented to the issuance of the cease-and-desist order. In the event of such consent, or if upon the record made at any such hearing, the agency shall find that any violation or unsafe or unsound practice specified in the notice of charges has been established, the agency may issue and serve upon the depository institution or the institution-affiliated party an order to cease and desist from any such violation or practice. Such order may, by provisions which may be mandatory or otherwise, require the depository institution or its institution-affiliated parties to cease and desist from the same, and, further, to take affirmative action to correct the conditions resulting from any such violation or practice.

**(2)** A cease-and-desist order shall become effective at the expiration of thirty days after the service of such order upon the depository institution or other person concerned (except in the case of a cease-and-desist order issued upon consent, which shall become effective at the time specified therein), and shall remain effective and enforceable as provided therein, except to such extent as it is stayed, modified, terminated, or set aside by action of the agency or a reviewing court.

**(3)** This subsection, subsections (c) through (s) and subsection (u) of this section, and section 1831aa of this title shall apply to any bank holding company, and to any subsidiary (other than a bank) of a bank holding company, as those terms are defined in the Bank Holding Company Act of 1956, any savings and loan holding company and any subsidiary (other than a depository institution) of a savings and loan holding company (as such terms are defined in section 1467a of this title)) [1] , any noninsured State member bank and to any organization organized and operated under section 25(a) of the Federal Reserve Act or operating under section 25 of the Federal Reserve Act, in the same manner as they apply to a State member insured bank. Nothing in this subsection or in subsection (c) of this section shall authorize any Federal banking agency, other than the Board of Governors of the Federal Reserve System, to issue a notice of charges or cease-and-desist order against a bank holding company or any subsidiary thereof (other than a bank or subsidiary of that bank) or against a savings and loan holding company or any subsidiary thereof (other than a depository institution or a subsidiary of such depository institution).

**(4)** This subsection, subsections (c) through (s) and subsection (u) of this section, and section 1831aa of this title shall apply to any foreign bank or company to which subsection (a) of section 3106 of this title applies and to any subsidiary (other than a bank) of any such foreign bank or company in the same manner as they apply to a bank holding company and any subsidiary thereof (other than a bank) under paragraph (3) of this subsection. For the purposes of this paragraph, the term "subsidiary" shall have the meaning assigned to it in section 2 of the Bank Holding Company Act of 1956.

# ADD-16

§ 1818. Termination of status as insured depository institution, 12 USCA § 1818

**(5)** This section shall apply, in the same manner as it applies to any insured depository institution for which the appropriate Federal banking agency is the Comptroller of the Currency, to any national banking association chartered by the Comptroller of the Currency, including an uninsured association.

**(6) Affirmative action to correct conditions resulting from violations or practices**

The authority to issue an order under this subsection and subsection (c) which requires an insured depository institution or any institution-affiliated party to take affirmative action to correct or remedy any conditions resulting from any violation or practice with respect to which such order is issued includes the authority to require such depository institution or such party to--

**(A)** make restitution or provide reimbursement, indemnification, or guarantee against loss if--

**(i)** such depository institution or such party was unjustly enriched in connection with such violation or practice; or

**(ii)** the violation or practice involved a reckless disregard for the law or any applicable regulations or prior order of the appropriate Federal banking agency;

**(B)** restrict the growth of the institution;

**(C)** dispose of any loan or asset involved;

**(D)** rescind agreements or contracts; and

**(E)** employ qualified officers or employees (who may be subject to approval by the appropriate Federal banking agency at the direction of such agency); and

**(F)** take such other action as the banking agency determines to be appropriate.

**(7) Authority to limit activities**

The authority to issue an order under this subsection or subsection (c) includes the authority to place limitations on the activities or functions of an insured depository institution or any institution-affiliated party.

**(8) Unsatisfactory asset quality, management, earnings, or liquidity as unsafe or unsound practice**

If an insured depository institution receives, in its most recent report of examination, a less-than-satisfactory rating for asset quality, management, earnings, or liquidity, the appropriate Federal banking agency may (if the deficiency is not corrected) deem the institution to be engaging in an unsafe or unsound practice for purposes of this subsection.

**(9) Repealed.** Pub.L. 111-203, Title III, § 363(3)(C), July 21, 2010, 124 Stat. 1551

# ADD-17

§ 1818. Termination of status as insured depository institution, 12 USCA § 1818

**(10) Standard for certain orders**

No authority under this subsection or subsection (c) to prohibit any institution-affiliated party from withdrawing, transferring, removing, dissipating, or disposing of any funds, assets, or other property may be exercised unless the appropriate Federal banking agency meets the standards of Rule 65 of the Federal Rules of Civil Procedure, without regard to the requirement of such rule that the applicant show that the injury, loss, or damage is irreparable and immediate.

**(c) Temporary cease-and-desist orders**

**(1)** Whenever the appropriate Federal banking agency shall determine that the violation or threatened violation or the unsafe or unsound practice or practices, specified in the notice of charges served upon the depository institution or any institution-affiliated party pursuant to paragraph (1) of subsection (b) of this section, or the continuation thereof, is likely to cause insolvency or significant dissipation of assets or earnings of the depository institution, or is likely to weaken the condition of the depository institution or otherwise prejudice the interests of its depositors prior to the completion of the proceedings conducted pursuant to paragraph (1) of subsection (b) of this section, the agency may issue a temporary order requiring the depository institution or such party to cease and desist from any such violation or practice and to take affirmative action to prevent or remedy such insolvency, dissipation, condition, or prejudice pending completion of such proceedings. Such order may include any requirement authorized under subsection (b)(6). Such order shall become effective upon service upon the depository institution or such institution-affiliated party and, unless set aside, limited, or suspended by a court in proceedings authorized by paragraph (2) of this subsection, shall remain effective and enforceable pending the completion of the administrative proceedings pursuant to such notice and until such time as the agency shall dismiss the charges specified in such notice, or if a cease-and-desist order is issued against the depository institution or such party, until the effective date of such order.

**(2)** Within ten days after the depository institution concerned or any institution-affiliated party has been served with a temporary cease-and-desist order, the depository institution or such party may apply to the United States district court for the judicial district in which the home office of the depository institution is located, or the United States District Court for the District of Columbia, for an injunction setting aside, limiting, or suspending the enforcement, operation, or effectiveness of such order pending the completion of the administrative proceedings pursuant to the notice of charges served upon the depository institution or such party under paragraph (1) of subsection (b) of this section, and such court shall have jurisdiction to issue such injunction.

**(3) Incomplete or inaccurate records**

**(A) Temporary order**

If a notice of charges served under subsection (b)(1) specifies, on the basis of particular facts and circumstances, that an insured depository institution's books and records are so incomplete or inaccurate that the appropriate Federal banking agency is unable, through the normal supervisory process, to determine the financial condition of that depository institution or the details or purpose of any transaction or transactions that may have a material effect on the financial condition of that depository institution, the agency may issue a temporary order requiring--

**(i)** the cessation of any activity or practice which gave rise, whether in whole or in part, to the incomplete or inaccurate state of the books or records; or

# ADD-18

**(ii)** affirmative action to restore such books or records to a complete and accurate state, until the completion of the proceedings under subsection (b)(1).

**(B) Effective period**

Any temporary order issued under subparagraph (A)--

**(i)** shall become effective upon service; and

**(ii)** unless set aside, limited, or suspended by a court in proceedings under paragraph (2), shall remain in effect and enforceable until the earlier of--

**(I)** the completion of the proceeding initiated under subsection (b)(1) in connection with the notice of charges; or

**(II)** the date the appropriate Federal banking agency determines, by examination or otherwise, that the insured depository institution's books and records are accurate and reflect the financial condition of the depository institution.

**(4) False advertising or misuse of names to indicate insured status**

**(A) Temporary order**

**(i) In general**

If a notice of charges served under subsection (b)(1) specifies on the basis of particular facts that any person engaged or is engaging in conduct described in section 1828(a)(4) of this title, the Corporation or other appropriate Federal banking agency may issue a temporary order requiring--

**(I)** the immediate cessation of any activity or practice described, which gave rise to the notice of charges; and

**(II)** affirmative action to prevent any further, or to remedy any existing, violation.

**(ii) Effect of order**

Any temporary order issued under this subparagraph shall take effect upon service.

**(B) Effective period of temporary order**

A temporary order issued under subparagraph (A) shall remain effective and enforceable, pending the completion of an administrative proceeding pursuant to subsection (b)(1) in connection with the notice of charges--

# ADD-19

§ 1818. Termination of status as insured depository institution, 12 USCA § 1818

**(i)** until such time as the Corporation or other appropriate Federal banking agency dismisses the charges specified in such notice; or

**(ii)** if a cease-and-desist order is issued against such person, until the effective date of such order.

**(C) Civil money penalties**

Any violation of section 1828(a)(4) of this title shall be subject to civil money penalties, as set forth in subsection (i), except that for any person other than an insured depository institution or an institution-affiliated party that is found to have violated this paragraph, the Corporation or other appropriate Federal banking agency shall not be required to demonstrate any loss to an insured depository institution.

**(d) Temporary cease-and-desist orders; enforcement**

In the case of violation or threatened violation of, or failure to obey, a temporary cease-and-desist order issued pursuant to paragraph (1) of subsection (c) of this section, the appropriate Federal banking agency may apply to the United States district court, or the United States court of any territory, within the jurisdiction of which the home office of the depository institution is located, for an injunction to enforce such order, and, if the court shall determine that there has been such violation or threatened violation or failure to obey, it shall be the duty of the court to issue such injunction.

**(e) Removal and prohibition authority**

**(1) Authority to issue order**

Whenever the appropriate Federal banking agency determines that--

  **(A)** any institution-affiliated party has, directly or indirectly--

  **(i)** violated--

    **(I)** any law or regulation;

    **(II)** any cease-and-desist order which has become final;

    **(III)** any condition imposed in writing by a Federal banking agency in connection with any action on any application, notice, or request by such depository institution or institution-affiliated party; or

    **(IV)** any written agreement between such depository institution and such agency;

# ADD-20

§ 1818. Termination of status as insured depository institution, 12 USCA § 1818

**(ii)** engaged or participated in any unsafe or unsound practice in connection with any insured depository institution or business institution; or

**(iii)** committed or engaged in any act, omission, or practice which constitutes a breach of such party's fiduciary duty;

**(B)** by reason of the violation, practice, or breach described in any clause of subparagraph (A)--

**(i)** such insured depository institution or business institution has suffered or will probably suffer financial loss or other damage;

**(ii)** the interests of the insured depository institution's depositors have been or could be prejudiced; or

**(iii)** such party has received financial gain or other benefit by reason of such violation, practice, or breach; and

**(C)** such violation, practice, or breach--

**(i)** involves personal dishonesty on the part of such party; or

**(ii)** demonstrates willful or continuing disregard by such party for the safety or soundness of such insured depository institution or business institution,

the appropriate Federal banking agency for the depository institution may serve upon such party a written notice of the agency's intention to remove such party from office or to prohibit any further participation by such party, in any manner, in the conduct of the affairs of any insured depository institution.

**(2) Specific violations**

**(A) In general**

Whenever the appropriate Federal banking agency determines that--

**(i)** an institution-affiliated party has committed a violation of any provision of subchapter II of chapter 53 of Title 31 and such violation was not inadvertent or unintentional;

**(ii)** an officer or director of an insured depository institution has knowledge that an institution-affiliated party of the insured depository institution has violated any such provision or any provision of law referred to in subsection (g)(1) (A)(ii);

# ADD-21

§ 1818. Termination of status as insured depository institution, 12 USCA § 1818

**(iii)** an officer or director of an insured depository institution has committed any violation of the Depository Institution Management Interlocks Act; or

**(iv)** an institution-affiliated party of a subsidiary (other than a bank) of a bank holding company or of a subsidiary (other than a savings association) of a savings and loan holding company has been convicted of any criminal offense involving dishonesty or a breach of trust or a criminal offense under section 1956, 1957, or 1960 of Title 18 or has agreed to enter into a pretrial diversion or similar program in connection with a prosecution for such an offense,

the agency may serve upon such party, officer, or director a written notice of the agency's intention to remove such party from office.

**(B) Factors to be considered**

In determining whether an officer or director should be removed as a result of the application of subparagraph (A)(ii), the agency shall consider whether the officer or director took appropriate action to stop, or to prevent the recurrence of, a violation described in such subparagraph.

**(3) Suspension order**

**(A) Suspension or prohibition authorized**

If the appropriate Federal banking agency serves written notice under paragraph (1) or (2) to any institution-affiliated party of such agency's intention to issue an order under such paragraph, the appropriate Federal banking agency may suspend such party from office or prohibit such party from further participation in any manner in the conduct of the affairs of the depository institution, if the agency--

**(i)** determines that such action is necessary for the protection of the depository institution or the interests of the depository institution's depositors; and

**(ii)** serves such party with written notice of the suspension order.

**(B) Effective period**

Any suspension order issued under subparagraph (A)--

**(i)** shall become effective upon service; and

**(ii)** unless a court issues a stay of such order under subsection (f), shall remain in effect and enforceable until--

**(I)** the date the appropriate Federal banking agency dismisses the charges contained in the notice served under paragraph (1) or (2) with respect to such party; or

# ADD-22

§ 1818. Termination of status as insured depository institution, 12 USCA § 1818

**(II)** the effective date of an order issued by the agency to such party under paragraph (1) or (2).

**(C) Copy of order**

If an appropriate Federal banking agency issues a suspension order under subparagraph (A) to any institution-affiliated party, the agency shall serve a copy of such order on any insured depository institution with which such party is associated at the time such order is issued.

**(4)** A notice of intention to remove an institution-affiliated party from office or to prohibit such party from participating in the conduct of the affairs of an insured depository institution, shall contain a statement of the facts constituting grounds therefor, and shall fix a time and place at which a hearing will be held thereon. Such hearing shall be fixed for a date not earlier than thirty days nor later than sixty days after the date of service of such notice, unless an earlier or a later date is set by the agency at the request of (A) such party, and for good cause shown, or (B) the Attorney General of the United States. Unless such party shall appear at the hearing in person or by a duly authorized representative, such party shall be deemed to have consented to the issuance of an order of such removal or prohibition. In the event of such consent, or if upon the record made at any such hearing the agency shall find that any of the grounds specified in such notice have been established, the agency may issue such orders of suspension or removal from office, or prohibition from participation in the conduct of the affairs of the depository institution, as it may deem appropriate. Any such order shall become effective at the expiration of thirty days after service upon such depository institution and such party concerned (except in the case of an order issued upon consent, which shall become effective at the time specified therein). Such order shall remain effective and enforceable except to such extent as it is stayed, modified, terminated, or set aside by action of the agency or a reviewing court.

**(5)** For the purpose of enforcing any law, rule, regulation, or cease-and-desist order in connection with an interlocking relationship, the term "officer" within the term "institution-affiliated party" as used in this subsection means an employee or officer with management functions, and the term "director" within the term "institution-affiliated party" as used in this subsection includes an advisory or honorary director, a trustee of a depository institution under the control of trustees, or any person who has a representative or nominee serving in any such capacity.

**(6) Prohibition of certain specific activities**

Any person subject to an order issued under this subsection shall not--

**(A)** participate in any manner in the conduct of the affairs of any institution or agency specified in paragraph (7)(A);

**(B)** solicit, procure, transfer, attempt to transfer, vote, or attempt to vote any proxy, consent, or authorization with respect to any voting rights in any institution described in subparagraph (A);

**(C)** violate any voting agreement previously approved by the appropriate Federal banking agency; or

**(D)** vote for a director, or serve or act as an institution-affiliated party.

# ADD-23

§ 1818. Termination of status as insured depository institution, 12 USCA § 1818

**(7) Industrywide prohibition**

**(A) In general**

Except as provided in subparagraph (B), any person who, pursuant to an order issued under this subsection or subsection (g), has been removed or suspended from office in an insured depository institution or prohibited from participating in the conduct of the affairs of an insured depository institution may not, while such order is in effect, continue or commence to hold any office in, or participate in any manner in the conduct of the affairs of--

**(i)** any insured depository institution;

**(ii)** any institution treated as an insured bank under subsection (b)(3) or (b)(4), or as a savings association under subsection (b)(9);

**(iii)** any insured credit union under the Federal Credit Union Act;

**(iv)** any institution chartered under the Farm Credit Act of 1971;

**(v)** any appropriate Federal depository institution regulatory agency; and

**(vi)** the Federal Housing Finance Agency and any Federal home loan bank.

**(B) Exception if agency provides written consent**

If, on or after the date an order is issued under this subsection which removes or suspends from office any institution-affiliated party or prohibits such party from participating in the conduct of the affairs of an insured depository institution, such party receives the written consent of--

**(i)** the agency that issued such order; and

**(ii)** the appropriate Federal financial institutions regulatory agency of the institution described in any clause of subparagraph (A) with respect to which such party proposes to become an institution-affiliated party,

subparagraph (A) shall, to the extent of such consent, cease to apply to such party with respect to the institution described in each written consent. Any agency that grants such a written consent shall report such action to the Corporation and publicly disclose such consent.

**(C) Violation of paragraph treated as violation of order**

Any violation of subparagraph (A) by any person who is subject to an order described in such subparagraph shall be treated as a violation of the order.

# ADD-24

§ 1818. Termination of status as insured depository institution, 12 USCA § 1818

**(D) "Appropriate Federal financial institutions regulatory agency" defined**

For purposes of this paragraph and subsection (j), the term "appropriate Federal financial institutions regulatory agency" means--

   **(i)** the appropriate Federal banking agency, in the case of an insured depository institution;

   **(ii)** the Farm Credit Administration, in the case of an institution chartered under the Farm Credit Act of 1971;

   **(iii)** the National Credit Union Administration Board, in the case of an insured credit union (as defined in section 101(7) of the Federal Credit Union Act); and

   **(iv)** the Secretary of the Treasury, in the case of the Federal Housing Finance Agency and any Federal home loan bank.

**(E) Consultation between agencies**

The agencies referred to in clauses (i) and (ii) of subparagraph (B) shall consult with each other before providing any written consent described in subparagraph (B).

**(F) Applicability**

This paragraph shall only apply to a person who is an individual, unless the appropriate Federal banking agency specifically finds that it should apply to a corporation, firm, or other business enterprise.

**(f) Stay of suspension and/or prohibition of institution-affiliated party**

Within ten days after any institution-affiliated party has been suspended from office and/or prohibited from participation in the conduct of the affairs of an insured depository institution under subsection (e)(3) of this section, such party may apply to the United States district court for the judicial district in which the home office of the depository institution is located, or the United States District Court for the District of Columbia, for a stay of such suspension and/or prohibition pending the completion of the administrative proceedings pursuant to the notice served upon such party under subsection (e)(1) or (e)(2) of this section, and such court shall have jurisdiction to stay such suspension and/or prohibition.

**(g) Suspension, removal, and prohibition from participation orders in the case of certain criminal offenses**

**(1) Suspension or prohibition**

   **(A) In general**

# ADD-25

§ 1818. Termination of status as insured depository institution, 12 USCA § 1818

Whenever any institution-affiliated party is the subject of any information, indictment, or complaint, involving the commission of or participation in--

(i) a crime involving dishonesty or breach of trust which is punishable by imprisonment for a term exceeding one year under State or Federal law, or

(ii) a criminal violation of section 1956, 1957, or 1960 of Title 18 or section 5322 or 5324 of Title 31,

the appropriate Federal banking agency may, if continued service or participation by such party posed, poses, or may pose a threat to the interests of the depositors of, or threatened, threatens, or may threaten to impair public confidence in, any relevant depository institution (as defined in subparagraph (E)), by written notice served upon such party, suspend such party from office or prohibit such party from further participation in any manner in the conduct of the affairs of any depository institution.

**(B) Provisions applicable to notice**

**(i) Copy**

A copy of any notice under subparagraph (A) shall also be served upon any depository institution that the subject of the notice is affiliated with at the time the notice is issued.

**(ii) Effective period**

A suspension or prohibition under subparagraph (A) shall remain in effect until the information, indictment, or complaint referred to in such subparagraph is finally disposed of or until terminated by the agency.

**(C) Removal or prohibition**

**(i) In general**

If a judgment of conviction or an agreement to enter a pretrial diversion or other similar program is entered against an institution-affiliated party in connection with a crime described in subparagraph (A)(i), at such time as such judgment is not subject to further appellate review, the appropriate Federal banking agency may, if continued service or participation by such party posed, poses, or may pose a threat to the interests of the depositors of, or threatened, threatens, or may threaten to impair public confidence in, any relevant depository institution (as defined in subparagraph (E)), issue and serve upon such party an order removing such party from office or prohibiting such party from further participation in any manner in the conduct of the affairs of any depository institution without the prior written consent of the appropriate agency.

**(ii) Required for certain offenses**

In the case of a judgment of conviction or agreement against an institution-affiliated party in connection with a violation described in subparagraph (A)(ii), the appropriate Federal banking agency shall issue and serve upon such party an order

# ADD-26

§ 1818. Termination of status as insured depository institution, 12 USCA § 1818

removing such party from office or prohibiting such party from further participation in any manner in the conduct of the affairs of any depository institution without the prior written consent of the appropriate agency.

**(D) Provisions applicable to order**

**(i) Copy**

A copy of any order under subparagraph (C) shall also be served upon any depository institution that the subject of the order is affiliated with at the time the order is issued, whereupon the institution-affiliated party who is subject to the order (if a director or an officer) shall cease to be a director or officer of such depository institution.

**(ii) Effect of acquittal**

A finding of not guilty or other disposition of the charge shall not preclude the agency from instituting proceedings after such finding or disposition to remove such party from office or to prohibit further participation in depository institution affairs, pursuant to paragraph (1), (2), or (3) of subsection (e) of this section.

**(iii) Effective period**

Any notice of suspension or order of removal issued under this paragraph shall remain effective and outstanding until the completion of any hearing or appeal authorized under paragraph (3) unless terminated by the agency.

**(E) Relevant depository institution**

For purposes of this subsection, the term "relevant depository institution" means any depository institution of which the party is or was an institution-affiliated party at the time at which--

**(i)** the information, indictment, or complaint described in subparagraph (A) was issued; or

**(ii)** the notice is issued under subparagraph (A) or the order is issued under subparagraph (C)(i).

**(2)** If at any time, because of the suspension of one or more directors pursuant to this section, there shall be on the board of directors of a national bank less than a quorum of directors not so suspended, all powers and functions vested in or exercisable by such board shall vest in and be exercisable by the director or directors on the board not so suspended, until such time as there shall be a quorum of the board of directors. In the event all of the directors of a national bank are suspended pursuant to this section, the Comptroller of the Currency shall appoint persons to serve temporarily as directors in their place and stead pending the termination of such suspensions, or until such time as those who have been suspended, cease to be directors of the bank and their respective successors take office.

**(3)** Within thirty days from service of any notice of suspension or order of removal issued pursuant to paragraph (1) of this subsection, the institution-affiliated party concerned may request in writing an opportunity to appear before the agency to show that the continued service to or participation in the conduct of the affairs of the depository institution by such party does not, or

# ADD-27

§ 1818. Termination of status as insured depository institution, 12 USCA § 1818

is not likely to, pose a threat to the interests of the bank's [2] depositors or threaten to impair public confidence in the depository institution. Upon receipt of any such request, the appropriate Federal banking agency shall fix a time (not more than thirty days after receipt of such request, unless extended at the request of such party) and place at which such party may appear, personally or through counsel, before one or more members of the agency or designated employees of the agency to submit written materials (or, at the discretion of the agency, oral testimony) and oral argument. Within sixty days of such hearing, the agency shall notify such party whether the suspension or prohibition from participation in any manner in the conduct of the affairs of the depository institution will be continued, terminated, or otherwise modified, or whether the order removing such party from office or prohibiting such party from further participation in any manner in the conduct of the affairs of the depository institution will be rescinded or otherwise modified. Such notification shall contain a statement of the basis for the agency's decision, if adverse to such party. The Federal banking agencies are authorized to prescribe such rules as may be necessary to effectuate the purposes of this subsection.

**(h) Hearings and judicial review**

**(1)** Any hearing provided for in this section (other than the hearing provided for in subsection (g)(3) of this section) shall be held in the Federal judicial district or in the territory in which the home office of the depository institution is located unless the party afforded the hearing consents to another place, and shall be conducted in accordance with the provisions of chapter 5 of Title 5. After such hearing, and within ninety days after the appropriate Federal banking agency or Board of Governors of the Federal Reserve System has notified the parties that the case has been submitted to it for final decision, it shall render its decision (which shall include findings of fact upon which its decision is predicated) and shall issue and serve upon each party to the proceeding an order or orders consistent with the provisions of this section. Judicial review of any such order shall be exclusively as provided in this subsection (h). Unless a petition for review is timely filed in a court of appeals of the United States, as hereinafter provided in paragraph (2) of this subsection, and thereafter until the record in the proceeding has been filed as so provided, the issuing agency may at any time, upon such notice and in such manner as it shall deem proper, modify, terminate, or set aside any such order. Upon such filing of the record, the agency may modify, terminate, or set aside any such order with permission of the court.

**(2)** Any party to any proceeding under paragraph (1) may obtain a review of any order served pursuant to paragraph (1) of this subsection (other than an order issued with the consent of the depository institution or the institution-affiliated party concerned, or an order issued under paragraph (1) of subsection (g) of this section) by the filing in the court of appeals of the United States for the circuit in which the home office of the depository institution is located, or in the United States Court of Appeals for the District of Columbia Circuit, within thirty days after the date of service of such order, a written petition praying that the order of the agency be modified, terminated, or set aside. A copy of such petition shall be forthwith transmitted by the clerk of the court to the agency, and thereupon the agency shall file in the court the record in the proceeding, as provided in section 2112 of Title 28. Upon the filing of such petition, such court shall have jurisdiction, which upon the filing of the record shall except as provided in the last sentence of said paragraph (1) be exclusive, to affirm, modify, terminate, or set aside, in whole or in part, the order of the agency. Review of such proceedings shall be had as provided in chapter 7 of Title 5. The judgment and decree of the court shall be final, except that the same shall be subject to review by the Supreme Court upon certiorari, as provided in section 1254 of Title 28.

**(3)** The commencement of proceedings for judicial review under paragraph (2) of this subsection shall not, unless specifically ordered by the court, operate as a stay of any order issued by the agency.

**(i) Jurisdiction and enforcement; penalty**

# ADD-28

§ 1818. Termination of status as insured depository institution, 12 USCA § 1818

**(1)** The appropriate Federal banking agency may in its discretion apply to the United States district court, or the United States court of any territory, within the jurisdiction of which the home office of the depository institution is located, for the enforcement of any effective and outstanding notice or order issued under this section or under section 1831*o* or 1831p-1 of this title, and such courts shall have jurisdiction and power to order and require compliance herewith; but except as otherwise provided in this section or under section 1831*o* or 1831p-1 of this title no court shall have jurisdiction to affect by injunction or otherwise the issuance or enforcement of any notice or order under any such section, or to review, modify, suspend, terminate, or set aside any such notice or order.

**(2) Civil money penalty**

### (A) First tier

Any insured depository institution which, and any institution-affiliated party who--

**(i)** violates any law or regulation;

**(ii)** violates any final order or temporary order issued pursuant to subsection (b), (c), (e), (g), or (s) or any final order under section 1831*o* or 1831p-1 of this title;

**(iii)** violates any condition imposed in writing by a Federal banking agency in connection with any action on any application, notice, or other request by the depository institution or institution-affiliated party; or

**(iv)** violates any written agreement between such depository institution and such agency,

shall forfeit and pay a civil penalty of not more than $5,000 for each day during which such violation continues.

### (B) Second tier

Notwithstanding subparagraph (A), any insured depository institution which, and any institution-affiliated party who--

**(i)(I)** commits any violation described in any clause of subparagraph (A);

**(II)** recklessly engages in an unsafe or unsound practice in conducting the affairs of such insured depository institution; or

**(III)** breaches any fiduciary duty;

**(ii)** which violation, practice, or breach--

**(I)** is part of a pattern of misconduct;

## ADD-29

**(II)** causes or is likely to cause more than a minimal loss to such depository institution; or

**(III)** results in pecuniary gain or other benefit to such party,

shall forfeit and pay a civil penalty of not more than $25,000 for each day during which such violation, practice, or breach continues.

**(C) Third tier**

Notwithstanding subparagraphs (A) and (B), any insured depository institution which, and any institution-affiliated party who--

**(i)** knowingly--

**(I)** commits any violation described in any clause of subparagraph (A);

**(II)** engages in any unsafe or unsound practice in conducting the affairs of such depository institution; or

**(III)** breaches any fiduciary duty; and

**(ii)** knowingly or recklessly causes a substantial loss to such depository institution or a substantial pecuniary gain or other benefit to such party by reason of such violation, practice, or breach,

shall forfeit and pay a civil penalty in an amount not to exceed the applicable maximum amount determined under subparagraph (D) for each day during which such violation, practice, or breach continues.

**(D) Maximum amounts of penalties for any violation described in subparagraph (C)**

The maximum daily amount of any civil penalty which may be assessed pursuant to subparagraph (C) for any violation, practice, or breach described in such subparagraph is--

**(i)** in the case of any person other than an insured depository institution, an amount to not exceed $1,000,000; and

**(ii)** in the case of any insured depository institution, an amount not to exceed the lesser of--

**(I)** $1,000,000; or

**(II)** 1 percent of the total assets of such institution.

# ADD-30

§ 1818. Termination of status as insured depository institution, 12 USCA § 1818

**(E) Assessment**

**(i) Written notice**

Any penalty imposed under subparagraph (A), (B), or (C) may be assessed and collected by the appropriate Federal banking agency by written notice.

**(ii) Finality of assessment**

If, with respect to any assessment under clause (i), a hearing is not requested pursuant to subparagraph (H) within the period of time allowed under such subparagraph, the assessment shall constitute a final and unappealable order.

**(F) Authority to modify or remit penalty**

Any appropriate Federal banking agency may compromise, modify, or remit any penalty which such agency may assess or had already assessed under subparagraph (A), (B), or (C).

**(G) Mitigating factors**

In determining the amount of any penalty imposed under subparagraph (A), (B), or (C), the appropriate agency shall take into account the appropriateness of the penalty with respect to--

**(i)** the size of financial resources and good faith of the insured depository institution or other person charged;

**(ii)** the gravity of the violation;

**(iii)** the history of previous violations; and

**(iv)** such other matters as justice may require.

**(H) Hearing**

The insured depository institution or other person against whom any penalty is assessed under this paragraph shall be afforded an agency hearing if such institution or person submits a request for such hearing within 20 days after the issuance of the notice of assessment.

**(I) Collection**

**(i) Referral**

# ADD-31

§ 1818. Termination of status as insured depository institution, 12 USCA § 1818

---

If any insured depository institution or other person fails to pay an assessment after any penalty assessed under this paragraph has become final, the agency that imposed the penalty shall recover the amount assessed by action in the appropriate United States district court.

**(ii) Appropriateness of penalty not reviewable**

In any civil action under clause (i), the validity and appropriateness of the penalty shall not be subject to review.

**(J) Disbursement**

All penalties collected under authority of this paragraph shall be deposited into the Treasury.

**(K) Regulations**

Each appropriate Federal banking agency shall prescribe regulations establishing such procedures as may be necessary to carry out this paragraph.

**(3) Notice under this section after separation from service**

The resignation, termination of employment or participation, or separation of an institution-affiliated party (including a separation caused by the closing of an insured depository institution) shall not affect the jurisdiction and authority of the appropriate Federal banking agency to issue any notice or order and proceed under this section against any such party, if such notice or order is served before the end of the 6-year period beginning on the date such party ceased to be such a party with respect to such depository institution (whether such date occurs before, on, or after August 9, 1989).

**(4) Prejudgment attachment**

**(A) In general**

In any action brought by an appropriate Federal banking agency (excluding the Corporation when acting in a manner described in section 1821(d)(18) of this title) pursuant to this section, or in actions brought in aid of, or to enforce an order in, any administrative or other civil action for money damages, restitution, or civil money penalties brought by such agency, the court may, upon application of the agency, issue a restraining order that--

**(i)** prohibits any person subject to the proceeding from withdrawing, transferring, removing, dissipating, or disposing of any funds, assets or other property; and

**(ii)** appoints a temporary receiver to administer the restraining order.

**(B) Standard**

**(i) Showing**

---

# ADD-32

§ 1818. Termination of status as insured depository institution, 12 USCA § 1818

Rule 65 of the Federal Rules of Civil Procedure shall apply with respect to any proceeding under subparagraph (A) without regard to the requirement of such rule that the applicant show that the injury, loss, or damage is irreparable and immediate.

**(ii) State proceeding**

If, in the case of any proceeding in a State court, the court determines that rules of civil procedure available under the laws of such State provide substantially similar protections to a party's right to due process as Rule 65 (as modified with respect to such proceeding by clause (i)), the relief sought under subparagraph (A) may be requested under the laws of such State.

**(j) Criminal penalty**

Whoever, being subject to an order in effect under subsection (e) or (g), without the prior written approval of the appropriate Federal financial institutions regulatory agency, knowingly participates, directly or indirectly, in any manner (including by engaging in an activity specifically prohibited in such an order or in subsection (e)(6)) in the conduct of the affairs of--

**(1)** any insured depository institution;

**(2)** any institution treated as an insured bank under subsection (b)(3) or (b)(4);

**(3)** any insured credit union (as defined in section 101(7) of the Federal Credit Union Act); or

**(4)** any institution chartered under the Farm Credit Act of 1971,

shall be fined not more than $1,000,000, imprisoned for not more than 5 years, or both.

**(k) Repealed. Pub.L. 101-73, Title IX, § 920(c), Aug. 9, 1989, 103 Stat. 488**

**(l) Notice of service**

Any service required or authorized to be made by the appropriate Federal banking agency under this section may be made by registered mail, or in such other manner reasonably calculated to give actual notice as the agency may by regulation or otherwise provide. Copies of any notice or order served by the agency upon any State depository institution or any institution-affiliated party, pursuant to the provisions of this section, shall also be sent to the appropriate State supervisory authority.

**(m) Notice to State authorities**

In connection with any proceeding under subsection (b), (c)(1), or (e) of this section involving an insured State bank or any institution-affiliated party, the appropriate Federal banking agency shall provide the appropriate State supervisory authority with notice of the agency's intent to institute such a proceeding and the grounds therefor. Unless within such time as the Federal banking agency deems appropriate in the light of the circumstances of the case (which time must be specified in the notice prescribed in the preceding sentence) satisfactory corrective action is effectuated by action of the State supervisory authority, the agency may proceed as provided in this section. No bank or other party who is the subject of any notice or order issued

# ADD-33

### § 1818. Termination of status as insured depository institution, 12 USCA § 1818

by the agency under this section shall have standing to raise the requirements of this subsection as ground for attacking the validity of any such notice or order.

**(n) Ancillary provisions; subpena power, etc.**

In the course of or in connection with any proceeding under this section, or in connection with any claim for insured deposits or any examination or investigation under section 1820(c) of this title, the agency conducting the proceeding, examination, or investigation or considering the claim for insured deposits, or any member or designated representative thereof, including any person designated to conduct any hearing under this section, shall have the power to administer oaths and affirmations, to take or cause to be taken depositions, and to issue, revoke, quash, or modify subpenas and subpenas duces tecum; and such agency is empowered to make rules and regulations with respect to any such proceedings, claims, examinations, or investigations. The attendance of witnesses and the production of documents provided for in this subsection may be required from any place in any State or in any territory or other place subject to the jurisdiction of the United States at any designated place where such proceeding is being conducted. Any such agency or any party to proceedings under this section may apply to the United States District Court for the District of Columbia, or the United States district court for the judicial district or the United States court in any territory in which such proceeding is being conducted, or where the witness resides or carries on business, for enforcement of any subpena or subpena duces tecum issued pursuant to this subsection, and such courts shall have jurisdiction and power to order and require compliance therewith. Witnesses subpenaed under this subsection shall be paid the same fees and mileage that are paid witnesses in the district courts of the United States. Any court having jurisdiction of any proceeding instituted under this section by an insured depository institution or a director or officer thereof, may allow to any such party such reasonable expenses and attorneys' fees as it deems just and proper; and such expenses and fees shall be paid by the depository institution or from its assets. Any person who willfully shall fail or refuse to attend and testify or to answer any lawful inquiry or to produce books, papers, correspondence, memoranda, contracts, agreements, or other records, if in such person's power so to do, in obedience to the subpoena of the appropriate Federal banking agency, shall be guilty of a misdemeanor and, upon conviction, shall be subject to a fine of not more than $1,000 or to imprisonment for a term of not more than one year or both.

**(o) Termination of membership of State bank in Federal Reserve System**

Whenever the insured status of a State member bank shall be terminated by action of the Board of Directors, the Board of Governors of the Federal Reserve System shall terminate its membership in the Federal Reserve System in accordance with the provisions of subchapter VIII of chapter 3 of this title, and whenever the insured status of a national member bank shall be so terminated the Comptroller of the Currency shall appoint a receiver for the bank, which shall be the Corporation. Except as provided in subsection (c) or (d) of section 1814 of this title, whenever a member bank shall cease to be a member of the Federal Reserve System, its status as an insured depository institution shall, without notice or other action by the Board of Directors, terminate on the date the bank shall cease to be a member of the Federal Reserve System, with like effect as if its insured status had been terminated on said date by the Board of Directors after proceedings under subsection (a) of this section. Whenever the insured status of an insured Federal savings bank shall be terminated by action of the Board of Directors, the Comptroller of the Currency shall appoint a receiver for the bank, which shall be the Corporation.

**(p) Banks not receiving deposits**

Notwithstanding any other provision of law, whenever the Board of Directors shall determine that an insured depository institution is not engaged in the business of receiving deposits, other than trust funds as herein defined, the Corporation shall notify the depository institution that its insured status will terminate at the expiration of the first full assessment period following such notice. A finding by the Board of Directors that a depository institution is not engaged in the business of receiving deposits, other than such trust funds, shall be conclusive. The Board of Directors shall prescribe the notice to be given by the depository institution of such termination and the Corporation may publish notice thereof. Upon the termination of the insured status of

# ADD-34

§ 1818. Termination of status as insured depository institution, 12 USCA § 1818

any such depository institution, its deposits shall thereupon cease to be insured and the depository institution shall thereafter be relieved of all future obligations to the Corporation, including the obligation to pay future assessments.

**(q) Assumption of liabilities**

Whenever the liabilities of an insured depository institution for deposits shall have been assumed by another insured depository institution or depository institutions, whether by way of merger, consolidation, or other statutory assumption, or pursuant to contract (1) the insured status of the depository institution whose liabilities are so assumed shall terminate on the date of receipt by the Corporation of satisfactory evidence of such assumption; (2) the separate insurance of all deposits so assumed shall terminate at the end of six months from the date such assumption takes effect or, in the case of any time deposit, the earliest maturity date after the six-month period. Where the deposits of an insured depository institution are assumed by a newly insured depository institution, the depository institution whose deposits are assumed shall not be required to pay any assessment with respect to the deposits which have been so assumed after the assessment period in which the assumption takes effect.

**(r) Action or proceeding against foreign bank; basis; removal of officer or other person; venue; service of process**

**(1)** Except as otherwise specifically provided in this section, the provisions of this section shall be applied to foreign banks in accordance with this subsection.

**(2)** An act or practice outside the United States on the part of a foreign bank or any officer, director, employee, or agent thereof may not constitute the basis for any action by any officer or agency of the United States under this section, unless--

   **(A)** such officer or agency alleges a belief that such act or practice has been, is, or is likely to be a cause of or carried on in connection with or in furtherance of an act or practice within any one or more States which, in and of itself, would constitute an appropriate basis for action by a Federal officer or agency under this section; or

   **(B)** the alleged act or practice is one which, if proven, would, in the judgment of the Board of Directors, adversely affect the insurance risk assumed by the Corporation.

**(3)** In any case in which any action or proceeding is brought pursuant to an allegation under paragraph (2) of this subsection for the suspension or removal of any officer, director, or other person associated with a foreign bank, and such person fails to appear promptly as a party to such action or proceeding and to comply with any effective order or judgment therein, any failure by the foreign bank to secure his removal from any office he holds in such bank and from any further participation in its affairs shall, in and of itself, constitute grounds for termination of the insurance of the deposits in any branch of the bank.

**(4)** Where the venue of any judicial or administrative proceeding under this section is to be determined by reference to the location of the home office of a bank, the venue of such a proceeding with respect to a foreign bank having one or more branches or agencies in not more than one judicial district or other relevant jurisdiction shall be within such jurisdiction. Where such a bank has branches or agencies in more than one such jurisdiction, the venue shall be in the jurisdiction within which the branch or branches or agency or agencies involved in the proceeding are located, and if there is more than one such jurisdiction, the venue shall be proper in any such jurisdiction in which the proceeding is brought or to which it may appropriately be transferred.

# ADD-35

§ 1818. Termination of status as insured depository institution, 12 USCA § 1818

**(5)** Any service required or authorized to be made on a foreign bank may be made on any branch or agency located within any State, but if such service is in connection with an action or proceeding involving one or more branches or one or more agencies located in any State, service shall be made on at least one branch or agency so involved.

**(s) Compliance with monetary transaction recordkeeping and report requirements**

**(1) Compliance procedures required**

Each appropriate Federal banking agency shall prescribe regulations requiring insured depository institutions to establish and maintain procedures reasonably designed to assure and monitor the compliance of such depository institutions with the requirements of subchapter II of chapter 53 of Title 31.

**(2) Examinations of depository institution to include review of compliance procedures**

**(A) In general**

Each examination of an insured depository institution by the appropriate Federal banking agency shall include a review of the procedures required to be established and maintained under paragraph (1).

**(B) Exam report requirement**

The report of examination shall describe any problem with the procedures maintained by the insured depository institution.

**(3) Order to comply with requirements**

If the appropriate Federal banking agency determines that an insured depository institution--

**(A)** has failed to establish and maintain the procedures described in paragraph (1); or

**(B)** has failed to correct any problem with the procedures maintained by such depository institution which was previously reported to the depository institution by such agency,

the agency shall issue an order in the manner prescribed in subsection (b) or (c) requiring such depository institution to cease and desist from its violation of this subsection or regulations prescribed under this subsection.

**(t) Authority of FDIC to take enforcement action against insured depository institutions and institution-affiliated parties**

**(1) Recommending action by appropriate Federal banking agency**

The Corporation, based on an examination of an insured depository institution by the Corporation or by the appropriate Federal banking agency or on other information, may recommend in writing to the appropriate Federal banking agency that

# ADD-36

§ 1818. Termination of status as insured depository institution, 12 USCA § 1818

the agency take any enforcement action authorized under section 1817(j) of this title, this section, or section 1828(j) of this title with respect to any insured depository institution, any depository institution holding company, or any institution-affiliated party. The recommendation shall be accompanied by a written explanation of the concerns giving rise to the recommendation.

**(2) FDIC's authority to act if appropriate Federal banking agency fails to follow recommendation**

If the appropriate Federal banking agency does not, before the end of the 60-day period beginning on the date on which the agency receives the recommendation under paragraph (1), take the enforcement action recommended by the Corporation or provide a plan acceptable to the Corporation for responding to the Corporation's concerns, the Corporation may take the recommended enforcement action if the Board of Directors determines, upon a vote of its members, that--

**(A)** the insured depository institution is in an unsafe or unsound condition;

**(B)** the institution or institution-affiliated party is engaging in unsafe or unsound practices, and the recommended enforcement action will prevent the institution or institution-affiliated party from continuing such practices;

**(C)** the conduct or threatened conduct (including any acts or omissions) poses a risk to the Deposit Insurance Fund, or may prejudice the interests of the institution's depositors or [3]

**(D)** the conduct or threatened conduct (including any acts or omissions) of the depository institution holding company poses a risk to the Deposit Insurance Fund, provided that such authority may not be used with respect to a depository institution holding company that is in generally sound condition and whose conduct does not pose a foreseeable and material risk of loss to the Deposit Insurance Fund; [4]

**(3) Effect of exigent circumstances**

**(A) Authority to act**

The Corporation may, upon a vote of the Board of Directors, and after notice to the appropriate Federal banking agency, exercise its authority under paragraph (2) in exigent circumstances without regard to the time period set forth in paragraph (2).

**(B) Agreement on exigent circumstances**

The Corporation shall, by agreement with the appropriate Federal banking agency, set forth those exigent circumstances in which the Corporation may act under subparagraph (A).

**(4) Corporation's powers; institution's duties**

For purposes of this subsection--

# ADD-37

§ 1818. Termination of status as insured depository institution, 12 USCA § 1818

**(A)** the Corporation shall have the same powers with respect to any insured depository institution and its affiliates as the appropriate Federal banking agency has with respect to the institution and its affiliates; and

**(B)** the institution and its affiliates shall have the same duties and obligations with respect to the Corporation as the institution and its affiliates have with respect to the appropriate Federal banking agency.

**(5) Requests for formal actions and investigations**

**(A) Submission of requests**

A regional office of an appropriate Federal banking agency (including a Federal Reserve bank) that requests a formal investigation of or civil enforcement action against an insured depository institution or institution-affiliated party shall submit the request concurrently to the chief officer of the appropriate Federal banking agency and to the Corporation.

**(B) Agencies required to report on requests**

Each appropriate Federal banking agency shall report semiannually to the Corporation on the status or disposition of all requests under subparagraph (A), including the reasons for any decision by the agency to approve or deny such requests.

**(6)** [5] **Powers and duties with respect to depository institution holding companies**

For purposes of exercising the backup authority provided in this subsection--

**(A)** the Corporation shall have the same powers with respect to a depository institution holding company and its affiliates as the appropriate Federal banking agency has with respect to the holding company and its affiliates; and

**(B)** the holding company and its affiliates shall have the same duties and obligations with respect to the Corporation as the holding company and its affiliates have with respect to the appropriate Federal banking agency.

**(6)** [5] **Referral to Bureau of Consumer Financial Protection**

Subject to subtitle B of the Consumer Financial Protection Act of 2010, each appropriate Federal banking agency shall make a referral to the Bureau of Consumer Financial Protection when the Federal banking agency has a reasonable belief that a violation of an enumerated consumer law, as defined in the Consumer Financial Protection Act of 2010, has been committed by any insured depository institution or institution-affiliated party within the jurisdiction of that appropriate Federal banking agency.

**(u) Public disclosures of final orders and agreements**

**(1) In general**

# ADD-38

§ 1818. Termination of status as insured depository institution, 12 USCA § 1818

The appropriate Federal banking agency shall publish and make available to the public on a monthly basis--

**(A)** any written agreement or other written statement for which a violation may be enforced by the appropriate Federal banking agency, unless the appropriate Federal banking agency, in its discretion, determines that publication would be contrary to the public interest;

**(B)** any final order issued with respect to any administrative enforcement proceeding initiated by such agency under this section or any other law; and

**(C)** any modification to or termination of any order or agreement made public pursuant to this paragraph.

**(2) Hearings**

All hearings on the record with respect to any notice of charges issued by a Federal banking agency shall be open to the public, unless the agency, in its discretion, determines that holding an open hearing would be contrary to the public interest.

**(3) Transcript of hearing**

A transcript that includes all testimony and other documentary evidence shall be prepared for all hearings commenced pursuant to subsection (i). A transcript of public hearings shall be made available to the public pursuant to section 552 of Title 5.

**(4) Delay of publication under exceptional circumstances**

If the appropriate Federal banking agency makes a determination in writing that the publication of a final order pursuant to paragraph (1)(B) would seriously threaten the safety and soundness of an insured depository institution, the agency may delay the publication of the document for a reasonable time.

**(5) Documents filed under seal in public enforcement hearings**

The appropriate Federal banking agency may file any document or part of a document under seal in any administrative enforcement hearing commenced by the agency if disclosure of the document would be contrary to the public interest. A written report shall be made part of any determination to withhold any part of a document from the transcript of the hearing required by paragraph (2).

**(6) Retention of documents**

Each Federal banking agency shall keep and maintain a record, for a period of at least 6 years, of all documents described in paragraph (1) and all informal enforcement agreements and other supervisory actions and supporting documents issued with respect to or in connection with any administrative enforcement proceeding initiated by such agency under this section or any other laws.

**(7) Disclosures to Congress**

# ADD-39

§ 1818. Termination of status as insured depository institution, 12 USCA § 1818

No provision of this subsection may be construed to authorize the withholding, or to prohibit the disclosure, of any information to the Congress or any committee or subcommittee of the Congress.

**(v) Foreign investigations**

**(1) Requesting assistance from foreign banking authorities**

In conducting any investigation, examination, or enforcement action under this chapter, the appropriate Federal banking agency may--

**(A)** request the assistance of any foreign banking authority; and

**(B)** maintain an office outside the United States.

**(2) Providing assistance to foreign banking authorities**

**(A) In general**

Any appropriate Federal banking agency may, at the request of any foreign banking authority, assist such authority if such authority states that the requesting authority is conducting an investigation to determine whether any person has violated, is violating, or is about to violate any law or regulation relating to banking matters or currency transactions administered or enforced by the requesting authority.

**(B) Investigation by Federal banking agency**

Any appropriate Federal banking agency may, in such agency's discretion, investigate and collect information and evidence pertinent to a request for assistance under subparagraph (A). Any such investigation shall comply with the laws of the United States and the policies and procedures of the appropriate Federal banking agency.

**(C) Factors to consider**

In deciding whether to provide assistance under this paragraph, the appropriate Federal banking agency shall consider--

**(i)** whether the requesting authority has agreed to provide reciprocal assistance with respect to banking matters within the jurisdiction of any appropriate Federal banking agency; and

**(ii)** whether compliance with the request would prejudice the public interest of the United States.

**(D) Treatment of foreign banking authority**

# ADD-40

§ 1818. Termination of status as insured depository institution, 12 USCA § 1818

For purposes of any Federal law or appropriate Federal banking agency regulation relating to the collection or transfer of information by any appropriate Federal banking agency, the foreign banking authority shall be treated as another appropriate Federal banking agency.

**(3) Rule of construction**

Paragraphs (1) and (2) shall not be construed to limit the authority of an appropriate Federal banking agency or any other Federal agency to provide or receive assistance or information to or from any foreign authority with respect to any matter.

**(w) Termination of insurance for money laundering or cash transaction reporting offenses**

**(1) In general**

**(A) Conviction of Title 18 offenses**

**(i) Duty to notify**

If an insured State depository institution has been convicted of any criminal offense under section 1956 or 1957 of Title 18, the Attorney General shall provide to the Corporation a written notification of the conviction and shall include a certified copy of the order of conviction from the court rendering the decision.

**(ii) Notice of termination; pretermination hearing**

After receipt of written notification from the Attorney General by the Corporation of such a conviction, the Board of Directors shall issue to the insured depository institution a notice of its intention to terminate the insured status of the insured depository institution and schedule a hearing on the matter, which shall be conducted in all respects as a termination hearing pursuant to paragraphs (3) through (5) of subsection (a).

**(B) Conviction of Title 31 offenses**

If an insured State depository institution is convicted of any criminal offense under section 5322 or 5324 of Title 31 after receipt of written notification from the Attorney General by the Corporation, the Board of Directors may initiate proceedings to terminate the insured status of the insured depository institution in the manner described in subparagraph (A).

**(C) Notice to State supervisor**

The Corporation shall simultaneously transmit a copy of any notice issued under this paragraph to the appropriate State financial institutions supervisor.

**(2) Factors to be considered**

# ADD-41

In determining whether to terminate insurance under paragraph (1), the Board of Directors shall take into account the following factors:

**(A)** The extent to which directors or senior executive officers of the depository institution knew of, or were involved in, the commission of the money laundering offense of which the institution was found guilty.

**(B)** The extent to which the offense occurred despite the existence of policies and procedures within the depository institution which were designed to prevent the occurrence of any such offense.

**(C)** The extent to which the depository institution has fully cooperated with law enforcement authorities with respect to the investigation of the money laundering offense of which the institution was found guilty.

**(D)** The extent to which the depository institution has implemented additional internal controls (since the commission of the offense of which the depository institution was found guilty) to prevent the occurrence of any other money laundering offense.

**(E)** The extent to which the interest of the local community in having adequate deposit and credit services available would be threatened by the termination of insurance.

**(3) Notice to State banking supervisor and public**

When the order to terminate insured status initiated pursuant to this subsection is final, the Board of Directors shall--

**(A)** notify the State banking supervisor of any State depository institution described in paragraph (1), where appropriate, at least 10 days prior to the effective date of the order of termination of the insured status of such depository institution, including a State branch of a foreign bank; and

**(B)** publish notice of the termination of the insured status of the depository institution in the Federal Register.

**(4) Temporary insurance of previously insured deposits**

Upon termination of the insured status of any State depository institution pursuant to paragraph (1), the deposits of such depository institution shall be treated in accordance with subsection (a)(7).

**(5) Successor liability**

This subsection shall not apply to a successor to the interests of, or a person who acquires, an insured depository institution that violated a provision of law described in paragraph (1), if the successor succeeds to the interests of the violator, or the acquisition is made, in good faith and not for purposes of evading this subsection or regulations prescribed under this subsection.

# ADD-42

§ 1818. Termination of status as insured depository institution, 12 USCA § 1818

**(6) "Senior executive officer" defined**

The term "senior executive officer" has the same meaning as in regulations prescribed under section 1831i(f) of this title.

## CREDIT(S)

(Sept. 21, 1950, c. 967, § 2[8], 64 Stat. 879; Pub.L. 89-695, Title II, §§ 202, 204, Oct. 16, 1966, 80 Stat. 1046, 1054; Pub.L. 93-495, Title I, § 110, Oct. 28, 1974, 88 Stat. 1506; Pub.L. 95-369, §§ 6(c)(14), (15), 11, Sept. 17, 1978, 92 Stat. 618, 624; Pub.L. 95-630, Title I, §§ 107(a)(1), (b), (c)(1), (d)(1), (e)(1), 111(a), Title II, § 208(a), Title III, §§ 303, 304, Nov. 10, 1978, 92 Stat. 3649, 3653, 3654, 3656, 3660, 3665, 3674, 3676; Pub.L. 97-320, Title I, § 113(g), (h), Title IV, §§ 404(c), 424(c), (d)(6), (e), 425(b), (c), 427(d), 433(a), Oct. 15, 1982, 96 Stat. 1473, 1474, 1512, 1523 to 1527; Pub.L. 99-570, Title I, § 1359(a), Oct. 27, 1986, 100 Stat. 3207-27; Pub.L. 101-73, Title II, § 201(a)(1), (b), Title IX, §§ 901(b)(1), (d), 902(a), 903(a), 904(a), 905(a), 906(a), 907(a), 908(a), 912, 913(a), 920(a), (c), 926, Aug. 9, 1989, 103 Stat. 187, 188, 447, 450, 453, 457, 459, 462, 477, 482, 483, 488, 489; Pub.L. 101-647, Title XXV, §§ 2521(b)(1), 2532(a), 2547(a)(1), (2), 2596(a), (b), Nov. 29, 1990, 104 Stat. 4864, 4880, 4886, 4887, 4908; Pub.L. 102-233, Title III, § 302(a), Dec. 12, 1991, 105 Stat. 1767; Pub.L. 102-242, Title I, § 131(c)(1), (2), Title III, §§ 302(e)(5), 307, Dec. 19, 1991, 105 Stat. 2266, 2349, 2360; Pub.L. 102-550, Title XV, §§ 1503(a), 1504(a), Title XVI, §§ 1603(d)(2) to (4), 1605(a)(5)(A), (11), Oct. 28, 1992, 106 Stat. 4048, 4051, 4080, 4085, 4086; Pub.L. 102-558, Title III, §§ 303(b)(6)(A), 305(3), Oct. 28, 1992, 106 Stat. 4225, 4226; Pub.L. 103-204, § 25, Dec. 17, 1993, 107 Stat. 2408; Pub.L. 103-325, Title IV, § 411(c)(2)(A), Title VI, § 602(a)(11) to (18), Sept. 23, 1994, 108 Stat. 2253, 2289; Pub.L. 105-164, § 3(a) (2), Mar. 20, 1998, 112 Stat. 35; Pub.L. 105-362, Title X, § 1001(d), Nov. 10, 1998, 112 Stat. 3291; Pub.L. 106-569, Title XII, § 1232, Dec. 27, 2000, 114 Stat. 3037; Pub.L. 109-173, §§ 3(a)(6), (7), 8(a)(10), Feb. 15, 2006, 119 Stat. 3605, 3611; Pub.L. 109-351, Title III, § 303, Title VII, §§ 702(c), 708(a), 710(b), 715(a), 716(a), 717, Oct. 13, 2006, 120 Stat. 1970, 1985, 1988, 1991, 1995, 1996; Pub.L. 110-343, Div. A, Title I, § 126(b), Oct. 3, 2008, 122 Stat. 3795; Pub.L. 111-203, Title I, § 172(b), Title III, § 363(3), Title X, § 1090(1), July 21, 2010, 124 Stat. 1439, 1551, 2093.)

## Footnotes

1     So in original. The second closing parenthesis probably should not appear.

2     So in original. Probably should be "depository institution's".

3     So in original. Probably should be "; or".

4     So in original. The semicolon probably should be a period.

5     So in original. Two pars. (6) have been enacted.

12 U.S.C.A. § 1818, 12 USCA § 1818
Current through P.L. 118-30. Some statute sections may be more current, see credits for details.

**End of Document**        © 2024 Thomson Reuters. No claim to original U.S. Government Works.

# ADD-43

§ 1001. Statements or entries generally, 18 USCA § 1001

---

United States Code Annotated
    Title 18. Crimes and Criminal Procedure (Refs & Annos)
        Part I. Crimes (Refs & Annos)
            Chapter 47. Fraud and False Statements (Refs & Annos)

18 U.S.C.A. § 1001

§ 1001. Statements or entries generally

Effective: July 27, 2006
Currentness

**(a)** Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully--

    **(1)** falsifies, conceals, or covers up by any trick, scheme, or device a material fact;

    **(2)** makes any materially false, fictitious, or fraudulent statement or representation; or

    **(3)** makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry;

shall be fined under this title, imprisoned not more than 5 years or, if the offense involves international or domestic terrorism (as defined in section 2331), imprisoned not more than 8 years, or both. If the matter relates to an offense under chapter 109A, 109B, 110, or 117, or section 1591, then the term of imprisonment imposed under this section shall be not more than 8 years.

**(b)** Subsection (a) does not apply to a party to a judicial proceeding, or that party's counsel, for statements, representations, writings or documents submitted by such party or counsel to a judge or magistrate in that proceeding.

**(c)** With respect to any matter within the jurisdiction of the legislative branch, subsection (a) shall apply only to--

    **(1)** administrative matters, including a claim for payment, a matter related to the procurement of property or services, personnel or employment practices, or support services, or a document required by law, rule, or regulation to be submitted to the Congress or any office or officer within the legislative branch; or

    **(2)** any investigation or review, conducted pursuant to the authority of any committee, subcommittee, commission or office of the Congress, consistent with applicable rules of the House or Senate.

**CREDIT(S)**

---

# ADD-44

**§ 1001. Statements or entries generally, 18 USCA § 1001**

(June 25, 1948, c. 645, 62 Stat. 749; Pub.L. 103-322, Title XXXIII, § 330016(1)(L), Sept. 13, 1994, 108 Stat. 2147; Pub.L. 104-292, § 2, Oct. 11, 1996, 110 Stat. 3459; Pub.L. 108-458, Title VI, § 6703(a), Dec. 17, 2004, 118 Stat. 3766; Pub.L. 109-248, Title I, § 141(c), July 27, 2006, 120 Stat. 603.)

18 U.S.C.A. § 1001, 18 USCA § 1001
Current through P.L. 118-30. Some statute sections may be more current, see credits for details.

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.

# ADD-45

§ 2462. Time for commencing proceedings, 28 USCA § 2462

United States Code Annotated
  Title 28. Judiciary and Judicial Procedure (Refs & Annos)
    Part VI. Particular Proceedings
      Chapter 163. Fines, Penalties and Forfeitures (Refs & Annos)

28 U.S.C.A. § 2462

§ 2462. Time for commencing proceedings

Currentness

Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued if, within the same period, the offender or the property is found within the United States in order that proper service may be made thereon.

**CREDIT(S)**

(June 25, 1948, c. 646, 62 Stat. 974.)

28 U.S.C.A. § 2462, 28 USCA § 2462
Current through P.L. 118-30. Some statute sections may be more current, see credits for details.

End of Document                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.