No. 23-938

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

## LAURA AKAHOSHI

*Petitioner*,

v.

## OFFICE OF THE COMPTROLLER OF THE CURRENCY

*Respondent.*

_____

On Petition for Review of the Final Decision Terminating Enforcement Action
No. OCC AA-EC-2018-20
_____

## BRIEF OF RESPONDENT
## OFFICE OF THE COMPTROLLER OF THE CURRENCY
_____

THEODORE J. DOWD, Acting Senior
Deputy Comptroller and Chief Counsel

PATRICIA S. GRADY, Deputy Chief
Counsel

PETER C. KOCH, Director of Litigation

GABRIEL HINDIN, Special Counsel

HANNAH HICKS, Counsel

JASON FERNANDES, Attorney

Attorneys for Respondent Office of
the Comptroller of the Currency
400 7th Street S.W.
Washington, D.C. 20219

May 16, 2024

# TABLE OF CONTENTS

JURISDICTIONAL COUNTERSTATEMENT ......................................................1

COUNTERSTATEMENT OF ISSUES PRESENTED FOR REVIEW ..................2

STATUTES AND REGULATIONS INVOLVED ............................................2

COUNTERSTATEMENT OF THE CASE.........................................................3

I.      Nature of the Case ........................................................................3

II.     Procedural History and Counterstatement of Facts ..........................6

SUMMARY OF ARGUMENT ................................................................10

STANDARD OF REVIEW ....................................................................11

ARGUMENT ....................................................................................11

I.      This Court Lacks Jurisdiction to Hear Akahoshi's Appeal............................11

A.     Akahoshi Cannot Appeal from a Judgment in Her Favor ..............................13

B.     Akahoshi Lacks Standing Under Article III of the Constitution...................16

     1.     Akahoshi Has Not Suffered *Injury in Fact*............................................17

          a.    Akahoshi Has Not Suffered a Concrete Injury from the Final Decision ....................................................................................17

          b.    Akahoshi Has Not Suffered Any Other Injury Sufficient to Establish Standing at this Stage in the Litigation ..........................21

     2.     This Court Cannot Redress Akahoshi's Alleged Injuries....................23

C.     Akahoshi Lacks Statutory Standing to Challenge the Final Decision .........26

D.     This Court Lacks Subject Matter Jurisdiction to Provide Akahoshi with Her Requested Relief..............................................................................27

II.     The Appointment of the Individual Who Signed the Notice of Charges Is Constitutionally and Statutorily Valid............................................................30

A.     Brickman's Authority to Issue Notices of Charges is Neither "Significant" Nor "Continuing"............................................................................31

B.     Brickman Does Not Hold the Office Established by 12 U.S.C. § 4.............35

i

C.   Akahoshi Has Not Shown Unconstitutional Insulation from Removal nor Actual Harm Arising Therefrom .................................................................36

III.  The Underlying Administrative Proceedings Did Not Violate Akahoshi's Seventh Amendment Rights ...........................................................................38

A.   OCC Enforcement Actions Arise from a Federal Regulatory Scheme to Which There is No Common Law Analog....................................................41

B.   Even if The Enforcement Action has a Common Law Analog, the Public Rights Doctrine Makes the Seventh Amendment Inapplicable....................42

C.   *Jarkesy* is Distinguishable from and Inapplicable to OCC Enforcement Actions ........................................................................................................46

IV.  Akahoshi's Due Process Claims Are Without Merit....................................47

A.   *Brady v. Maryland* Is Inapplicable to Civil Administrative Proceedings .....48

B.   Akahoshi Fails to Demonstrate that the Comptroller Was Biased...............49

C.   The ALJ's Use of the Settlement Agreement Did Not Violate Due Process 51

V.   The Notice Was Timely Issued ...................................................................53

A.   Claims Arising Under § 1818 Accrue When all Factual and Legal Prerequisites Have Been Met and Can be Pled ..........................................53

B.   As Pled, the Notice Was Timely, But If It Were Not, This Court Could Not Provide Redress .........................................................................................57

VI.  The Remaining Issues Raised by Akahoshi Are Meritless ..........................59

CONCLUSION .....................................................................................................60

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Action on Smoking & Health v. Civ. Aeronautics Bd.*,
  713 F.2d 795 (D.C. Cir. 1983)..................................................38

*Advanced Mgmt. Tech., Inc. v. Fed. Aviation Admin.*,
  211 F.3d 633 (D.C. Cir. 2000)....................................... 18, 20

*Aetna Life Ins. Co. v. Lavoie*,
  475 U.S. 813 (1986) ...............................................................51

*Affordable Hous. Dev. Corp. v. City of Fresno*,
  433 F.3d 1182 (9th Cir. 2006) ...............................................36

*Akin v. Off. of Thrift Supervision*,
  950 F.2d 1180 (5th Cir. 1992) ...............................................45

*Already, LLC v. Nike, Inc.*,
  568 U.S. 85 (2013) .................................................................16

*Am. Tel. & Tel. Co. v. Fed. Commc'n Comm'n*,
  602 F.2d 401 (D.C. Cir. 1979)....................................... 28, 29

*Arizonans for Off. Eng. v. Ariz.*,
  520 U.S. 43 (1997) .................................................................17

*ASARCO, Inc. v. Sec'y of Labor*,
  206 F.3d 720 (6th Cir. 2000) ........................................ 19, 20

*Atlas Roofing Co., Inc. v. Occupational Safety & Health Rev. Comm'n*,
  430 U.S. 442 (1977) ........................................................ 39, 43

*Auffmordt v. Hedden*,
  137 U.S. 310 (1890) ...............................................................31

*Axon Enter., Inc. v. Fed. Trade Comm'n*,
  598 U.S. 175 (2023) ........................................................ 21, 22

*Bay Area Laundry & Dry Cleaning Pension Tr. Fund v. Ferbar Corp. of Cal.*,
  522 U.S. 192 (1997) ...............................................................56

*Bd. of Governors of Fed. Rsrv. Sys. v. MCorp Fin., Inc.*,
  502 U.S. 32 (1991) .................................................................26

*Biodiversity Legal Found. v. Badgley*,
  309 F.3d 1166 (9th Cir. 2002) ...............................................22

*Blanton v. OCC*,
  909 F.3d 1162 (D.C. Cir. 2018)...................................... 4, 54, 57

*Brady v. Maryland*,
  373 U.S. 83 (1963) ......................................................... 47, 48

*Brodie v. Dep't of Health & Hum. Servs.*,
951 F. Supp. 2d 108 (D.D.C. 2013) ...................................................48

*Buckley v. Valeo*,
424 U.S. 1 (1976) ......................................................... 31, 32, 34

*Burgess v. Fed. Deposit Ins. Corp.*,
2022 WL 17549785 (N.D. Tex. Dec. 1, 2022)...................................22

*Bush v. Lucas*,
462 U.S. 367 (1983) ...................................................................26

*California v. Rooney*,
483 U.S. 307 (1987) ...................................................................12

*Carbon Sequestration Council v. Env't Prot. Agency*,
787 F.3d 1129 (D.C. Cir. 2015)...................................................18

*Cavallari v. OCC*,
57 F.3d 137 (2d Cir. 1995) .........................................................45

*Cent. Nat. Bank of Mattoon v. U.S. Dep't of Treasury*,
912 F.2d 897 (7th Cir. 1990) ......................................................42

*Clapp v. Comm'r of Internal Revenue*,
875 F.2d 1396 (9th Cir. 1989) ....................................................13

*Collins v. Yellen*,
141 S.Ct. 1761 (2021) ................................................................37

*Shell Oil Co. v. Fed. Energy Regul. Comm'n*,
47 F.3d 1186 (D.C. Cir. 1995).....................................................21

*Corning v. Troy Iron & Nail Factory*,
56 U.S. 451 (1853) ....................................................................13

*Crowell v. Benson*,
285 U.S. 22 (1932) ....................................................................43

*Ctr. for Food Safety v. Regan*,
56 F.4th 648 (9th Cir. 2022).......................................................38

*Curtis v. Loether*,
415 U.S. 189 (1974) ..................................................................39

*Dargis v. Sheahan*,
526 F.3d 981 (7th Cir. 2008) ......................................................48

*de la Fuente v. Fed. Deposit Ins. Co.*,
332 F.3d 1208 (9th Cir. 2003) .......................................... 11, 12, 56

*Decker Coal Co. v. Pehringer*,
8 F.4th 1123 (9th Cir. 2021)................................................. 36, 37

*Deposit Guar. Nat'l Bank v. Roper*,
445 U.S. 326 (1990) ........................................................... 16, 27

iv

*Elec. Fittings Corp. v. Thomas & Betts Co.*,
  307 U.S. 241 (1939) .................................................................13
*English v. Trump*,
  279 F. Supp. 3d 307 (D.D.C. 2018) .......................................34
*Env't Prot. Info. Ctr., Inc. v. Pac. Lumber Co.*,
  257 F.3d 1071 (9th Cir. 2001) ...............................................12
*Exch. Comm'n v. Chenery Corp.*,
  332 U.S. 194 (1947) .................................................................25
*Ezzell Trucking, Inc. v. Fed. Motor Carrier Safety Admin.*,
  309 F.3d 24 (D.C. Cir. 2002) .................................................18
*Fed. Energy Reg. Comm'n v. Powhatan Energy Fund*,
  949 F.3d 891 (4th Cir. 2020) ..................................... 54, 55
*First Nat'l Bank of Lamarque v. Smith*,
  610 F.2d 1258 (5th Cir. 1980) ...............................................42
*Forney v. Apfel*,
  524 U.S. 266 (1998) .................................................................15
*Freire v. Ashcroft*,
  122 F. App'x 333 (9th Cir. 2005)...........................................47
*Freytag v. Comm'r*,
  501 U.S. 868 (1991) ................................................... 30, 31
*Gabelli v. SEC*,
  568 U.S. 442 (2013) ........................................... 53, 54, 55
*Garcia v. Beck*,
  No. 22-15594, 2023 WL 1960665 (9th Cir. Feb. 13, 2023)........................ 13, 23
*Gator.com Corp. v. L.L. Bean, Inc.*,
  398 F.3d 1125 (9th Cir. 2005) ..................................... 22, 23
*Granfinanciera, S.A. v. Nordberg*,
  492 U.S. 33 (1989) ................................... 39, 40, 43, 46
*Groos Nat'l Bank v. OCC*,
  573 F.2d 889 (5th Cir. 1978) ....................................... 42, 45
*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982) .................................................................20
*Henderson v. Shinseki*,
  562 U.S. 428 (2011) .................................................................11
*Hollingsworth v. Perry*,
  570 U.S. 693 (2013) .................................................................16
*In the Matter of Blanton*,
  2017 WL 4510840 (OCC July 10, 2017) ................................5

v

*In re Franklin Nat'l Bank Sec. Litig.*,
   445 F. Supp. 723 (E.D.N.Y. 1978) ...................................................44

*In re TJ Plaza, LLC*,
   689 F. App'x 553 (9th Cir. 2017) ..................................................13

*Jarkesy v. Sec. & Exch. Comm'n*,
   34 F.4th 446 (5th Cir. 2022) ........................................ 38, 40, 45, 46

*Kaufmann v. Kijakazi*,
   32 F.4th 843 (9th Cir. 2022) ..........................................................37

*Kenneally v. Lungren*,
   967 F.2d 329 (9th Cir. 1992) .........................................................49

*Kim v. Off. of Thrift Supervision*,
   40 F.3d 1050 (9th Cir. 1994) ...........................................................3

*Loumiet v. U.S.*,
   948 F.3d 376 (2020) ......................................................................26

*Lucia v. Sec. & Exch. Comm'n*,
   585 U.S. 237 (2018) .............................................. 7, 8, 9, 24, 30, 31

*Lujan v. Def. of Wildlife*,
   504 U.S. 555 (1992) ................................................................ 16, 17

*Lujan v. Nat'l Wildlife Fed'n*,
   497 U.S. 871 (1990) ......................................................................26

*Maciel v. City of Los Angeles*,
   336 F. App'x 678 (9th Cir. 2009) ..................................................13

*Mathias v. WorldCom Techs., Inc.*,
   535 U.S. 682 (2002) ................................................................ 14, 15

*Montana v. United States*,
   440 U.S. 147 (1979) ......................................................................15

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ........................................................................25

*Munns v. Kerry*,
   782 F.3d 402 (9th Cir. 2015) .........................................................23

*Nat. Res. Def. Council v. Gutierrez*,
   457 F.3d 904 (9th Cir. 2006) .........................................................25

*Newby v. Enron Corp.*,
   491 F.Supp.2d 690 (S.D. Tex. 2007) .............................................52

*Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*,
   584 U.S. 325 (2018) ................................................................ 40, 43

*Paul v. Off. of Thrift Supervision*,
   763 F. Supp. 568 (S.D. Fla. 1990) .................................................46

*Perez-Lastor v. INS*,
    208 F.3d 773 (9th Cir. 2000) ............................................................47

*Proffitt v. Fed. Deposit Ins. Corp.*,
    200 F.3d 855 (D.C. Cir. 2000)............................... 54, 56, 57, 58

*R.M. Inv. Co. v. U.S. Forest Serv.*,
    511 F.3d 1103 (10th Cir. 2007) ......................................................21

*Randolph v. People of the State of Cal.*,
    380 F.3d 1133 (9th Cir. 2004) ........................................................50

*Robertson v. Colvin*,
    564 Fed. App'x 931 (10th Cir. 2014) ............................................21

*RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.*,
    49 F.3d 399 (8th Cir. 1995) ............................................................52

*Safer Chem., Healthy Families v. U.S. Env't Prot. Agency*,
    943 F.3d 397 (9th Cir. 2019) ..........................................................17

*Sea-Land Serv., Inc. v. Dep't of Transp.*,
    137 F.3d 640 (D.C. Cir. 1998) ........................................................29

*Seila Law LLC v. Consumer Fin. Prot. Bureau*,
    591 U.S. 197 (2020) ........................................................................22

*Simpson v. Off. of Thrift Supervision*,
    29 F.3d 1418 (9th Cir. 1994) ..........................................................45

*Smith v. IRS*,
    235 F. App'x 420 (9th Cir. 2007) ..................................................13

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) ........................................................................16

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (1998) ..........................................................................24

*Stern v. Marshall*,
    564 U.S. 462 (2011) ................................................................ 43, 45

*Stivers v. Pierce*,
    71 F.3d 732 (9th Cir. 1995) ..................................................... 49, 50

*Tidwell v. JPMorgan Chase Bank, N.A.*,
    2013 WL 5539414 (N.D. Cal. Oct. 8, 2013) ................................42

*Tull v. U.S.*,
    481 U.S. 412 (1987) ........................................................................40

*U.S. v. Accra Pac, Inc.*,
    173 F.3d 630 (7th Cir. 1999) ................................................ 20, 29, 30

*U.S. v. Al-Nouri*,
    983 F.3d 1096 (9th Cir. 2020) ........................................................27

*U.S. v. Baras*,
  2013 WL 6502846 (N.D. Cal. Dec. 11, 2013) .................................................... 50
*U.S. v. Germaine*,
  99 U.S. 508 (1878) ................................................................................ 31, 34
*U.S. v. Good Samaritan Church*,
  29 F.3d 487 (9th Cir. 1994) ............................................................. 13, 14, 15
*U.S. v. Hartwell*,
  73 U.S. 385 (1867) ..................................................................................... 31
*U.S. v. Kohring*,
  637 F.3d 895 (9th Cir. 2011) ...................................................................... 49
*U.S. v. Project on Gov't Oversight*,
  839 F.Supp.2d 330 (D.D.C. 2012) ............................................................. 49
*United States v. Silver*,
  103 F. Supp. 3d 370 (S.D.N.Y. 2015) ....................................................... 50
*United States v. Ullah*,
  976 F.2d 509 (9th Cir. 1992) ...................................................................... 36
*Ward v. Santa Fe Indep. Sch. Dist.*,
  393 F.3d 599 (5th Cir. 2004) ...................................................................... 21
*Withrow v. Larkin*,
  421 U.S. 35 (1975) ..................................................................................... 49
*Young Properties Corp. v. United Equity Corp.*,
  534 F.2d 847 (9th Cir. 1976) ...................................................................... 27
*Zolotukhin v. Gonzales*,
  417 F.3d 1073 (9th Cir. 2005) .............................................................. 25, 47

## U.S. Constitution

U.S. CONST. art. II, § 2, cl. 2 ........................................................................ 30
U.S. CONST. amend. VII ............................................................................. 2, 39

## Statutes

5 U.S.C. § 701 .............................................................................................. 28
5 U.S.C. § 702 .......................................................................................... 27, 28
5 U.S.C. § 706 .............................................................................................. 11
12 U.S.C. § 1 ............................................................................................. 3, 41
12 U.S.C. § 2 ................................................................................................ 37
12 U.S.C. § 4 ...................................................................................... 30, 34, 35
12 U.S.C. § 4a .................................................................................... 31, 33, 34
12 U.S.C. § 9 ................................................................................................ 35

viii

12 U.S.C. § 481 ................................................................ 6, 14, 58, 59

12 U.S.C. § 482 ................................................................................36

12 U.S.C. § 1813 ................................................................................3

12 U.S.C. § 1818..... 3, 4, 5, 6, 20, 26, 27, 28, 29, 32, 41, 42, 44, 45, 51, 53, 54, 56, 57, 58

18 U.S.C. § 1001 ..........................................................................6, 58

28 U.S.C. § 2342 ..............................................................................29

28 U.S.C. § 2462 ................................................................ 53, 55, 58

## Regulations

12 C.F.R. § 19.4 ................................................................................37

12 C.F.R. § 19.19 ..............................................................................5

12 C.F.R. § 19.23 ..............................................................................5

12 C.F.R. § 19.24 ..............................................................................5

12 C.F.R. § 19.25 ..............................................................................5

12 C.F.R. § 19.26 ..............................................................................5

12 C.F.R. § 19.27 ..............................................................................5

12 C.F.R. § 19.28 ..............................................................................5

12 C.F.R. § 19.29 ................................................................ 5, 6, 9

12 C.F.R. § 19.30 ..............................................................................6

12 C.F.R. § 19.36 ............................................................................52

12 C.F.R. § 19.40 ........................................................................6, 37

## JURISDICTIONAL COUNTERSTATEMENT

This Court lacks jurisdiction to review the petition, and Petitioner Laura Akahoshi ("Akahoshi") does not have standing to challenge the Final Decision Terminating the Enforcement Action ("Final Decision"). In the proceedings below, Akahoshi repeatedly urged the Comptroller of the Currency ("Comptroller")[1] to dismiss the enforcement action. *See, e.g.,* 1-SER-14, 145. The Final Decision did just that—based on one of the multiple grounds presented by Akahoshi, no less. *See infra* Argument Part I. Akahoshi now seeks review of the Final Decision, claiming the Comptroller committed legal error in his exercise of discretion to not decide in her favor *every* ground for dismissal pressed in a 132-page brief submitted to him. *See generally* 1-SER-3-145. She effectively asks this Court to issue an advisory opinion on propositions of law and fact that were never taken up by the agency decisionmaker and have no bearing on her legal rights. This Court is without authority to issue such an opinion. There is nothing about this appeal that warrants departure from the general rule prohibiting appeals from favorable judgments. Even if such a departure were warranted, Akahoshi lacks standing to appeal an order that provided her the relief she requested. Finally, because the charges against Akahoshi were dismissed at the administrative level, this Court cannot provide redress.

---

[1] This Brief refers to the Acting Comptroller of the Currency and Comptroller of the Currency as "Comptroller."

## COUNTERSTATEMENT OF ISSUES PRESENTED FOR REVIEW

1. Whether Akahoshi has established that this Court has jurisdiction to review the Petition.

2. Whether Akahoshi has established that she has standing to challenge the Final Decision.

3. Assuming this Court has jurisdiction and Akahoshi has standing, whether the manner of appointment of the individual who signed the Notice of Charges is constitutionally and statutorily valid.

4. Assuming this Court has jurisdiction and Akahoshi has standing, whether U.S. Const. art. III, amend. VII applies to OCC administrative enforcement proceedings.

5. Assuming this Court has jurisdiction and Akahoshi has standing, whether Akahoshi has established a violation of her due process rights in connection with the underlying administrative enforcement proceedings.

6. Assuming this Court has jurisdiction and Akahoshi has standing, whether the Notice of Charges initiating the underlying administrative enforcement proceedings against Akahoshi was timely issued.

## STATUTES AND REGULATIONS INVOLVED

Relevant statutory provisions and applicable regulations are contained in the Statutory Addendum.

2

# COUNTERSTATEMENT OF THE CASE

## I.    Nature of the Case

The Office of the Comptroller of the Currency ("OCC" or "Agency") is a bureau of the U.S. Department of the Treasury charged with assuring the safety and soundness of the national banking system.  12 U.S.C. § 1.  Congress has granted federal banking agencies, including the OCC, authority to undertake a variety of enforcement actions against bank institution-affiliated parties.[2]  *See, e.g.*, *id.* § 1818(e) (providing for suspension or removal from participation in the banking industry), (i) (providing for imposition of civil money penalties).  This case involves an appeal from a decision terminating an OCC administrative enforcement action against Akahoshi, former Chief Compliance Officer of Rabobank, N.A.   For the Comptroller to enter an order of prohibition against an institution-affiliated party pursuant to 12 U.S.C. § 1818(e), OCC Enforcement Counsel must establish each of three elements: misconduct, effect, and culpability.  *See* 12 U.S.C. § 1818(e)(1)(A), (B), & (C); *Kim v. Off. of Thrift Supervision*, 40 F.3d 1050, 1054 (9th Cir. 1994) (labeling the three elements).  The misconduct element is satisfied, among other ways, by determination that an institution-affiliated party: "directly or indirectly"

---

[2] An institution-affiliated party is defined as "[a] director, officer, employee, or controlling stockholder . . . of, or agent for, an insured depository institution."  12 U.S.C. § 1813(u).

violated any law or regulation; "engaged or participated in any unsafe or unsound practice in connection with any insured depository institution"; or "committed or engaged in any act, omission, or practice which constitutes a breach of such party's fiduciary duty." *See* 12 U.S.C. § 1818(e)(1)(A). The effect element is satisfied by determination that, "by reason of" the misconduct, the institution at issue "has suffered or will probably suffer financial loss or other damage," that the institution's depositors' interests "have been or could be prejudiced," or that the institution-affiliated party "has received financial gain or other benefit." *Id.* § 1818(e)(1)(B). The culpability element is satisfied when the alleged misconduct "involves personal dishonesty" or "demonstrates willful or continuing disregard by such party for the safety or soundness" of the institution. *Id.* § 1818(e)(1)(C).

Pursuant to 12 U.S.C. § 1818(i)(2), upon a proper determination, the Comptroller may assess against an institution-affiliated party civil money penalties, categorized by escalating "tiers." As relevant to the instant appeal, for the Comptroller to assess a second-tier civil money penalty, OCC Enforcement Counsel must establish two elements: misconduct and effect. *See Blanton v. OCC*, 909 F.3d 1162, 1171 (D.C. Cir. 2018). Actionable misconduct is defined as a violation of, *inter alia*, law or regulation; a breach of fiduciary duty; or reckless engagement in an unsafe or unsound practice in conducting the affairs of the institution in question. *See* 12 U.S.C. § 1818(i)(2)(B)(i). To satisfy the "effect" element, Enforcement

4

Counsel must also establish that the misconduct "is part of a pattern of misconduct;" that it "causes or is likely to cause more than a minimal loss to such depository institution"; or that it "results in pecuniary gain or other benefit to such party." *Id.* § 1818(i)(2)(B)(ii); *see also In the Matter of Blanton*, OCC-AA-EC-2015-24, 2017 WL 4510840, at *16 (OCC July 10, 2017).

If the OCC should find evidence that an institution-affiliated party has engaged in conduct coming within the scope of § 1818(e) or (i), the OCC may issue such party a notice of charges detailing the alleged violations. A party against whom the OCC seeks to assess a penalty or proposes an order of prohibition shall file an answer to the notice of charges and may contest the action through an administrative hearing presided over by an administrative law judge ("ALJ"). *See* 12 U.S.C. § 1818(e)(4), (i)(2)(H); 12 C.F.R. § 19.19. Motions may be filed with the ALJ, and document discovery and depositions are permitted, subject to certain limitations. *See* 12 C.F.R. §§ 19.23-19.29. The ALJ "will recommend that the Comptroller issue a final order granting a motion for summary disposition if the undisputed pleaded facts, admissions, affidavits, stipulations, documentary evidence, matter as to which official notice may be taken, and any other evidentiary materials properly submitted in connection with a motion for summary disposition show" that "[t]here is no genuine issue as to any material fact" and "[t]he moving party is entitled to a decision in its favor as a matter of law." 12 C.F.R. § 19.29. If the case is not decided on

summary disposition nor terminated by consent of the parties, the case shall proceed to an evidentiary hearing. *Id.* §§ 19.29-19.30.

After the ALJ issues a recommended decision, the parties may file exceptions to the recommended decision with the Comptroller. *Id.* § 19.39(a). Thereafter, the Comptroller shall issue a final decision or order. *See* 12 U.S.C. § 1818(h)(1); *see also* 12 C.F.R. § 19.40.

## II. Procedural History and Counterstatement of Facts[3]

The Notice of Charges for Order of Prohibition and Notice of Assessment of a Civil Money Penalty ("Notice") initiating the underlying administrative litigation against Akahoshi was signed on April 16, 2018 and served the following day. 1-ER-52; 2-ER-352. The Notice alleged that Akahoshi violated 12 U.S.C. § 481, 18 U.S.C. § 1001, or engaged in unsafe or unsound practices in her role as acting Chief Compliance Officer for the Bank. 2-ER-349-50. Pursuant to 12 U.S.C. § 1818(e)

---

[3] Akahoshi's opening brief includes a lengthy recitation of a series of events that occurred in 2013. Akahoshi Br. at 4-20. This series of events is not relevant to the issues before this Court because the Comptroller dismissed the charges against Akahoshi and did not reach any final findings of fact regarding such events. *See* 1-ER-20.

and (i), the Notice sought orders of removal and prohibition and a civil money penalty. 2-ER-352.

The administrative litigation spanned multiple years, during which the case was stayed in connection with an intervening criminal investigation by the U.S. Department of Justice and was then reassigned twice: first, following issuance of *Lucia v. Sec. & Exch. Comm'n*, 585 U.S. 237 (2018), and second, following retirement of the newly assigned ALJ and the subsequent appointment of his replacement. 1-ER-2, 10-11.

The parties filed cross-motions for summary disposition, each arguing that no material facts were in dispute and that each was entitled to judgment in their favor as a matter of law. In 2021, the ALJ issued an Order Regarding the Parties' Cross Motions for Summary Disposition, in which she concluded that at least one of the alternative predicates required to satisfy each of the statutory elements for a prohibition order and first- and second-tier civil money penalties had been met. 1-ER-98, 163. The parties thereafter submitted a joint status report in which they agreed that the only remaining issue that required resolution was determination of an appropriate civil money penalty amount and that this issue did not require an in-person hearing and could be resolved on the papers. Following submission of the parties' joint report, the ALJ cancelled the scheduled hearing. 1-ER-28.

7

In February 2022, the ALJ issued a recommended decision granting summary disposition in favor of Enforcement Counsel and recommending that the Comptroller enter a prohibition order against Akahoshi and assess a second-tier civil money penalty for $30,000. 1-ER-93-94. Thereafter, the parties filed with the Comptroller their respective exceptions to the recommended decision. Akahoshi's exceptions totaled 132 pages and raised numerous arguments in support of dismissal.[4] *See generally* 1-SER-3-145.

On April 5, 2023, the Comptroller issued the Final Decision, which declined to adopt the recommended decision and concluded that "the ALJ's recommended findings of fact and conclusions of law are predicated upon a misapplication of the summary disposition standard and do not form an adequate basis for the Comptroller to assess a [civil money penalty] or a prohibition order." 1-ER-4. The Comptroller recognized "that there are genuine factual disputes about what [Akahoshi] knew and whether, as a result, she acted in good faith based on her understanding at the time." *Id.* at ER-17-18. The Comptroller further noted that, rather than having evaluated the evidence in the light most favorable to Akahoshi or having drawn all justifiable

---

[4] In July 2022, the Comptroller ordered the parties to submit supplemental briefing on certain issues in response to contemporaneous caselaw developments. *See* 1-ER-22. Because the Comptroller ultimately dismissed the action on other grounds, he determined that those issues did not affect the disposition of the case. 1-ER-4.

inferences in her favor, the ALJ "offered a *sua sponte* observation that clearly drew a factual inference *against* the non-moving party on a key issue" related to the nature of Akahoshi's communications with the OCC. *Id.* at ER-19 (internal quotation marks omitted) (emphasis in original). The Comptroller emphasized that "the holding in this case is a narrow one: the Recommended Decision misapplied the summary disposition standard required by 12 C.F.R. § 19.29(a), and therefore entry of summary disposition against Respondent is inappropriate." *Id.* at ER-20. Finally, the Comptroller found it "appropriate to dismiss th[e] case in the interest of adjudicatory efficiency and economy given the substantial delay" related, largely, to the intervening criminal investigation and case reassignments following *Lucia*, and because "the factual disputes that would need to be resolved at a hearing predominantly relate to [Akahoshi's] state of mind."[5] *Id.* at ER-20-21. Having concluded that dismissal of the charges and termination of the proceedings against Akahoshi was appropriate for these reasons, the Comptroller determined that "the remaining issues raised in the [p]arties' exceptions and any pending motions are moot." *Id.* at ER-21.

---

[5] The Comptroller observed that "more than ten years have passed since the events that gave rise to this matter" and that it would likely be "difficult for witnesses to accurately recall the events in question and their attendant states of mind." 1-ER-21.

9

## SUMMARY OF ARGUMENT

Although the Comptroller already granted Akahoshi the relief she sought at the administrative level, she now asks this Court to grant precisely the same relief but on alternate or expanded grounds never considered or decided by the agency decisionmaker. This Court is without authority to grant such relief.

Nothing about this appeal warrants departure from the general rule prohibiting appeals from favorable judgments. The Final Decision terminated the enforcement action against Akahoshi and thereby afforded her the full measure of relief she sought. The Final Decision made no factual findings, and its only legal conclusions were that the ALJ misapplied the summary disposition standard and that dismissal of the charges was warranted. Thus, Akahoshi has suffered no injury sufficient to establish Article III standing. As repeatedly stated in her brief, Akahoshi requests that "the Notice, proceedings, and Final Decision be set aside," or that the Notice be "dismissed," *see, e.g.,* Akahoshi Br. at 2-3, 52, but the Comptroller has *already* dismissed the Notice and terminated the proceedings. Therefore, this Court cannot provide redress.

The Court should dismiss this case for lack of jurisdiction or lack of standing or, alternatively, affirm the Final Decision.

## STANDARD OF REVIEW

"[F]ederal courts have an independent obligation to ensure that they do not exceed the scope of their jurisdiction." *Henderson v. Shinseki*, 562 U.S. 428, 434 (2011). The OCC's findings of fact are entitled to deference so long as they are supported by substantial evidence in the record as a whole. *See* 5 U.S.C. § 706. The OCC's legal conclusions are entitled to deference unless they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *Id.*; *see also de la Fuente v. Fed. Deposit Ins. Co.*, 332 F.3d 1208, 1215 (9th Cir. 2003).

## ARGUMENT

### I. This Court Lacks Jurisdiction to Hear Akahoshi's Appeal

Akahoshi presents this Court with an unusual request: She has petitioned for review of an order that provided her with the very relief she sought. In the proceedings before the Comptroller, Akahoshi requested "dismissal of the action, summary disposition in [her] favor, or, at a minimum, remand for a hearing to determine disputed factual issues." 1-SER-14. The Comptroller effectively agreed with Akahoshi's argument on one of the issues she raised—that the ALJ misapplied the summary disposition standard—and confined his legal analysis solely to that issue. 1-ER-20. Then, in his plenary discretion over remedies, he dismissed the charges and terminated the enforcement proceeding, providing her with the full measure of relief she requested. 1-ER-21. The Comptroller declined to decide the

remaining issues raised by Akahoshi, because his dismissal of the charges rendered them moot. *Id.*

Dissatisfied with her victory, Akahoshi petitions this Court to issue an advisory opinion on the remaining issues, even though the Agency has not articulated its position on those issues and even though those issues have no bearing on her present legal rights. This violates basic principles of Article III and appellate jurisdiction. This Court "review[s] judgments, not statements in opinions." *Env't Prot. Info. Ctr., Inc. v. Pac. Lumber Co.*, 257 F.3d 1071, 1075 (9th Cir. 2001) (quoting *California v. Rooney*, 483 U.S. 307, 311 (1987)). Because the Final Decision has already provided Akahoshi complete relief, there is nothing left for the Court to decide on appeal.

Despite her burden of establishing this Court's jurisdiction, Akahoshi's opening brief devotes just two paragraphs to this question. Akahoshi Br. at 1, 32. She does not identify a single case—in the Ninth Circuit or elsewhere—in which a court has granted an appeal from a litigant who sought review of a favorable administrative judgment. To the contrary, as demonstrated below, courts routinely dismiss appeals like the one presented by Akahoshi, and this Court may choose from several clearly established doctrinal paths to dispose of the petition. Because Akahoshi has no legal basis to appeal the Final Decision, her petition must be dismissed.

12

### A. Akahoshi Cannot Appeal from a Judgment in Her Favor

This case is controlled by nearly two centuries of precedent establishing that "[a] party may not appeal from a judgement or decree in his own favor, for the purpose of obtaining a review of findings he deems erroneous which are not necessary to support the decree." *Elec. Fittings Corp. v. Thomas & Betts Co.*, 307 U.S. 241, 242 (1939); *see also Corning v. Troy Iron & Nail Factory*, 56 U.S. 451, 463 (1853) (explaining that "a party cannot appeal from a decree in his own favor"). The Ninth Circuit has repeatedly applied this rule to dismiss appeals like the one presented by Akahoshi, including appeals from non-Article III courts. *See, e.g.*, *Garcia v. Beck*, No. 22-15594, 2023 WL 1960665, at *1 (9th Cir. Feb. 13, 2023); *In re TJ Plaza, LLC*, 689 F. App'x 553 (9th Cir. 2017); *Maciel v. City of Los Angeles*, 336 F. App'x 678 (9th Cir. 2009); *Smith v. IRS*, 235 F. App'x 420 (9th Cir. 2007); *U.S. v. Good Samaritan Church*, 29 F.3d 487 (9th Cir. 1994); *Clapp v. Comm'r*, 875 F.2d 1396, 1398 (9th Cir. 1989) (dismissing an appeal from a favorable Tax Court judgment).

Akahoshi's petition falls squarely within the ambit of this longstanding rule. There is no question that the Final Decision was a judgment in her favor, as it terminated the enforcement action against her and dismissed all charges. 1-ER-21. And the issues Akahoshi presents in her brief are exactly the kind of issues "not necessary to support the decree" that this rule counsels courts against deciding. *Elec.*

*Fittings Corp.*, 307 U.S. at 242. The issues she identifies were not even decided in the Final Decision, let alone decided *against* her. *See* 1-ER-21 (deeming the issues "moot" because "this action is now dismissed"). Indeed, of the numerous issues raised in this appeal, the Final Decision references only one—whether § 481 imposes affirmative duties on behalf of bankers, and if so, what elements are required to demonstrate a violation of those duties—and it does so only in the context of the Comptroller expressly declining to rule on that issue. 1-ER-18 ("[B]ecause the Recommended Decision misapplied the summary disposition standard, it is unnecessary—and the Comptroller declines—to define § 481's elements with more precision here.").

Nothing about Akahoshi's appeal warrants departure from the general rule prohibiting appeals from favorable judgments. Courts have recognized limited exceptions in which parties may appeal decisions in their favor, but none of those exceptions apply here. For instance, courts occasionally grant appeals from favorable decisions when the lower court makes an adverse ruling on an issue "essential to the judgment" that is "binding upon them in future litigation." *Mathias v. WorldCom Techs., Inc.*, 535 U.S. 682, 684 (2002) (per curiam). The Ninth Circuit's decision in *Good Samaritan Church* illustrates how narrow this exception is. 29 F.3d 487. In that case, two taxpayers prevailed in the lower court by having an Internal Revenue Service action against them dismissed, but they appealed the

14

dismissal order because they wanted to overturn a ruling in the order that upheld a summary judgment determination that the church was the taxpayers' "alter ego." *Id.* at 488. This Court denied their appeal, reasoning that, in order for the alter-ego issue to bind them in subsequent litigation, the issue "would have to have been 'necessarily determined' in the district court decision." *Id.* at 489 (quoting *Montana v. United States*, 440 U.S. 147, 153 (1979)). The portions of the lower court decision that were not favorable to the taxpayers "did not bind them in subsequent litigation," so the court had "no jurisdiction over the appeal." *Id.* Therefore, to appeal the Final Decision pursuant to this exception, Akahoshi would need to show (1) that the order contains affirmative, adverse rulings on the issues she identifies, (2) that those rulings were essential to the judgment, and (3) that those rulings bind her in subsequent litigation. *See WorldCom*, 535 U.S. at 684. She has not and cannot make any of these showings. As discussed above, none of the issues she raises were decided in the order, let alone decided *against* her in a way that would affect her future rights.

   None of the other exceptions to the general rule permit Akahoshi to appeal the Final Decision. Although parties may appeal a judgment that provides only a partial victory in order to seek a full remedy, *Forney v. Apfel*, 524 U.S. 266, 271 (1998), the Final Decision provided complete relief. Courts also occasionally grant appeals from favorable judgments if those judgments contain adverse collateral rulings on

issues that cause significant economic harm, such as the denial of class certification. *See, e.g.*, *Deposit Guaranty Nat. Bank v. Roper*, 445 U.S. 326, 336 (1990). But here, there is nothing in the order that could sufficiently harm Akahoshi to give rise to a right to appeal. *See infra* Argument Part I.B.1. This case calls for a straightforward application of the longstanding rule prohibiting appeals from favorable judgments.

### B. Akahoshi Lacks Standing Under Article III of the Constitution

In addition to the longstanding rule of appellate practice, Article III of the Constitution presents a second jurisdictional hurdle that Akahoshi cannot clear. Akahoshi cannot establish Article III standing on review of an order that has provided her the relief she requested.

The "irreducible constitutional minimum" of standing consists of three elements: "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citing *Lujan v. Def. of Wildlife*, 504 U.S. 555, 560-61 (1992)). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan*, 504 U.S. at 561. This applies equally to appellate cases, as "Article III demands that an 'actual controversy' persist throughout all stages of litigation." *Hollingsworth v. Perry*, 570 U.S. 693, 705 (2013) (quoting *Already, LLC v. Nike,*

*Inc.*, 568 U.S. 85, 90 (2013)). Accordingly, standing "must be met by persons seeking appellate review, just as it must be met by persons appearing in courts of first instance." *Arizonans for Off. Eng. v. Ariz.*, 520 U.S. 43, 64 (1997). Because Akahoshi cannot establish all three elements of the Article III standing test, her petition must be dismissed.

### 1.    Akahoshi Has Not Suffered *Injury in Fact*

Akahoshi has not suffered *injury in fact* sufficient to establish standing under Article III. Injury in fact requires an "invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Safer Chem., Healthy Families v. U.S. Env't Prot. Agency*, 943 F.3d 397, 410-11 (9th Cir. 2019) (quoting *Lujan*, 504 U.S. at 560). Akahoshi's alleged injuries fall into two categories—injury flowing from the Final Decision and injury related to the administrative proceedings—neither of which satisfies her burden of establishing Article III standing.

### a.  Akahoshi Has Not Suffered a Concrete Injury from the Final Decision

The Final Decision did not injure Akahoshi, because it dismissed the charges against her and provided her the relief she requested. Akahoshi attempts to establish standing by making the conclusory assertion that the order made "factual and legal findings against her." Akahoshi Br. at 1. But the Comptroller expressly declined to

make factual findings. 1-ER-20 ("The Comptroller . . . will not reach final findings of fact . . ."). And the only legal conclusions in the Final Decision from which any consequences flow—that the ALJ misapplied the summary disposition standard and that termination of the action and dismissal of the charges was appropriate—were categorically in Akahoshi's favor. The Comptroller repeatedly emphasized that the "holding in this case is a narrow one" and that all the "remaining issues raised" by the Parties "are moot." 1-ER-20-21.

More importantly, even assuming that the Final Decision made findings against Akahoshi, that would not be the end of the Article III inquiry. "Standing cannot be 'inferred argumentatively' based on a party's '(mis)characterization' and 'exaggeration of [an agency's] findings.'" *Carbon Sequestration Council v. Env't Prot. Agency*, 787 F.3d 1129, 1141 (D.C. Cir. 2015) (quoting *Advanced Mgmt. Tech., Inc. v. Fed. Aviation Admin.*, 211 F.3d 633, 636 (D.C. Cir. 2000)). Akahoshi would need to demonstrate with particularity that the supposedly adverse findings in the otherwise favorable judgment injure her in a concrete way. Article III requires that courts reject standing from parties who cannot make this showing. *See, e.g.*, *Ezzell Trucking, Inc. v. Fed. Motor Carrier Safety Admin.*, 309 F.3d 24, 25-26 (D.C. Cir. 2002) (holding that appellant motor carrier who challenged a favorable agency order lacked standing); *Advanced Mgmt.*, 211 F.3d 633 (D.C. Cir. 2000) (dismissing petition for lack of standing where company had won "lucrative" government

18

contract but sought review of unfavorable finding that it had made misrepresentations during an earlier bidding process).

In *ASARCO, Inc. v. Secretary of Labor*, 206 F.3d 720 (6th Cir. 2000), the Sixth Circuit articulated the high bar that litigants face when attempting to assert that adverse findings in an otherwise favorable order cause sufficiently concrete "injury in fact" for the purposes of Article III. In that case, an ALJ with the Federal Mine Safety and Health Review Commission vacated a citation against ASARCO, a mine operator, while holding that a particular type of sampling that formed the basis for the citation may nevertheless be used in assessing future violations. 206 F.3d at 721. ASARCO petitioned for review before the full Commission, but the Commission denied on the basis that ASARCO "had prevailed before the ALJ and thus had no standing to file a review petition." *Id.* ASARCO then petitioned for review in the Sixth Circuit. ASARCO's posture thus mirrors that of Akahoshi: It was vindicated by the ultimate decision of the agency, but it sought appellate review of one of the underlying issues that it litigated in the proceeding below. The court dismissed ASARCO's petition for lack of standing, and its reasons for dismissal can be applied with even greater force here:

> The only damage to ASARCO is, perhaps, the cost it *may* incur in repeating the litigation of the single-sampling issue in the future, *if* it is cited for a violation, *if* the citation rests on a single-shift sample, and *if* the citation is upheld by an ALJ. This is a highly

> speculative injury, too much so to count as the "Article
> III minima of injury in fact" required for standing.

*Id.* at 723-24 (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372 (1982)) (emphasis in original).

Akahoshi has an even weaker claim to Article III injury than ASARCO. While ASARCO faced the possibility of future administrative sanctions based on the same underlying conduct, Akahoshi faces no such threat, because the OCC is barred by § 1818's statute of repose from initiating a new enforcement action against her based on her tenure at Rabobank. *See* 12 U.S.C. § 1818(i)(3); 1-ER-50 (noting that Akahoshi's "employment with the Bank was terminated for cause" in 2015).

Akahoshi lastly argues that she suffered reputational harm from the Final Decision. DE 14.1 at 24; Akahoshi Br. at 32, 34. But aside from this conclusory assertion, there is nothing concrete upon which this Court may establish Article III jurisdiction. *See Advanced Mgmt. Tech., Inc.*, 211 F.3d at 636 ("All that affirmatively appears here is AMTI's vast exaggeration of the [agency's] findings; we have no allegations, much less evidence, as to their present or future consequences."). "Unwelcome language in a substantively favorable decision is not the kind of adverse effect that meets the requirement of actual injury." *U.S. v. Accra Pac, Inc.*, 173 F.3d 630, 632 (7th Cir. 1999). Likewise, "the moral stigma of a

judgment which no longer affects legal rights does not present a case or controversy for appellate review." *Robertson v. Colvin*, 564 Fed. App'x 931, 934 (10th Cir. 2014) (quoting *R.M. Inv. Co. v. U.S. Forest Serv.*, 511 F.3d 1103, 1108 (10th Cir. 2007)). Because Akahoshi cannot show how the Final Decision has concretely injured her, she has no standing to appeal the order.

### b. Akahoshi Has Not Suffered Any Other Injury Sufficient to Establish Standing at this Stage in the Litigation

In the current stage of this litigation, Akahoshi may not simply assert any injury related to the proceeding below. She must demonstrate "an adverse effect *resulting from the judgment* in [her] favor" in order to establish standing to appeal. *Ward v. Santa Fe Indep. Sch. Dist.*, 393 F.3d 599, 603 (5th Cir. 2004) (emphasis added). Because she "has not suffered any cognizable injury that is linked to the agency's substantive adjudication," this Court must dismiss her petition for lack of standing. *Shell Oil Co. v. Fed. Energy Regul. Comm'n*, 47 F.3d 1186, 1202 (D.C. Cir. 1995).

While Akahoshi argued in her opposition that she was injured by being forced to litigate in the OCC's administrative forum, that kind of injury cannot confer standing because it is not tied to the judgment she seeks to review. It is true that courts have found that subjection to an allegedly unconstitutional proceeding is a cognizable legal injury. *See Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175,

21

191 (2023). But that is only in the context of the threat of *continued* litigation. Indeed, every case Akahoshi cited for this proposition is one in which a litigant is seeking to enjoin an ongoing administrative proceeding or penalty. *See id.* at 182 (parties seeking to enjoin ongoing Federal Trade Commission and Securities and Exchange Commission proceedings); *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 211-12 (2020) (seeking to invalidate existing civil investigative demand); *Burgess v. Fed. Deposit Ins. Corp.*, 2022 WL 17549785 (N.D. Tex. Dec. 1, 2022), *appeal docketed*, No. 22-11172 (5th Cir. Dec. 5, 2022) (seeking to enjoin ongoing Federal Deposit Insurance Corporation proceedings). The difference here, of course, is that the proceeding is over. *Axon*, 598 U.S. at 191 ("A proceeding that has already happened cannot be undone."). Absent a present controversy "of sufficient immediacy and reality," all this Court can do is issue an advisory opinion that would have no bearing on Akahoshi's current legal rights. *Gator.com Corp. v. L.L. Bean, Inc.*, 398 F.3d 1125, 1129-32 (9th Cir. 2005) (en banc) (quoting *Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1174-75 (9th Cir. 2002)).[6]

---

[6] *Gator.com* was decided on mootness grounds, rather than standing. The OCC argues lack of standing (rather than mootness) because mootness becomes the proper jurisdictional inquiry if the parties had standing at the time of filing, and Akahoshi did not have standing to file a petition for review in this Court. *Badgley*, 309 F.3d at 1171 n.6. However, both doctrines are grounded in Article III's *case-or-*

Akahoshi likewise cannot circumvent the boundaries of Article III by asserting vague injuries related to the OCC's system of administrative enforcement. In both her opposition to the OCC's motion and her opening brief, she argues the OCC has adopted a "regulation-by-dismissal" practice, in which the agency purportedly adopts legal rulings in dismissal orders and then cites those rulings later as authoritative precedent in future enforcement actions. DE 14.1 at 12; Akahoshi Br. at 29. Again, Akahoshi has merely described a basic feature of administrative litigation and attempted to frame it as specifically injurious to her. If the OCC cites its own decisions as precedent to support the imposition of administrative penalties against respondents in future enforcement actions, *those* litigants could seek judicial review to challenge those penalties and the legal findings that underlie them. In the meantime, any assertion by Akahoshi that the Final Decision could be used against her in the future is "so speculative that it would not confer Article III standing here." *See Garcia*, 2023 WL 1960665, at *2 (citing *Munns v. Kerry*, 782 F.3d 402, 410 (9th Cir. 2015)).

### 2.     This Court Cannot Redress Akahoshi's Alleged Injuries

Akahoshi also fails to satisfy the "redressability" prong of the Article III standing test. An injury is redressable only if the requested relief will address the

---

*controversy* requirement, and as they are jurisdictional, this Court must assess whether the case is moot as well. *Gator.com.*, 398 F.3d at 1129.

harm giving rise to the complaint. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998). "Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement." *Id.* at 107.

Akahoshi's desired remedy, as she repeatedly states in her brief, is that the "the Notice, proceedings, and Final Decision be set aside." Akahoshi Br. at 2-3. This request fails on its own terms. The final form of relief would undo the first two: The only binding judgment in the Final Decision is the dismissal of the charges and termination of the enforcement proceeding, so it is perplexing to want to "set aside" the order that has already provided all the substantive relief she requests.

Moreover, the issues that Akahoshi claims are before this Court merely serve to illustrate how far outside the boundaries of Article III her petition lies. Even if Akahoshi could prevail on the merits of one of the issues she raises, there is no relief the Court could offer beyond what is already provided by the Final Decision. The typical remedy for many of these issues involves a remand to the agency for additional proceedings consistent with the court's ruling—certainly a less attractive remedy than the one Akahoshi has already received, which dismissed the proceedings entirely. *See, e.g.*, *Lucia*, 585 U.S. at 251 ("[T]he 'appropriate' remedy for an adjudication tainted with an appointments violation is a new 'hearing before a properly appointed' official (quoting *Ryder v. United States,* 515 U.S. 177, 182-

24

183, (1995))); *Zolotukhin v. Gonzales*, 417 F.3d 1073, 1077 (9th Cir. 2005) (proper remedy for a due process violation involves "remand for a hearing that comports with due process."). Article III does not permit rulings on these issues in the abstract, divorced from any relief a court might provide. *See Nat. Res. Def. Council v. Gutierrez*, 457 F.3d 904, 906 (9th Cir. 2006) ("Essentially they want us to line-edit the district court's ruling. But they have no standing to challenge the district court's legal rulings in the abstract; they must seek a reversal or a modification of the relief granted by the district court."). Since the Final Decision already provided the maximum relief by dismissing the charges and terminating the enforcement action, any ruling on the merits would amount to an unconstitutional advisory opinion. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) ("It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself."); *Sec. & Exch. Comm'n v. Chenery Corp.,* 332 U.S. 194, 196 (1947) (explaining that a reviewing court "is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis").

This does not mean that no court or tribunal could decide the issues Akahoshi raises; it simply means that *this* Court cannot decide those issues at this stage in the litigation. There are still additional remedies that Akahoshi can seek for the alleged injury of litigating her claims against the Agency. She has already filed an

25

application for fees and expenses under the Equal Access to Justice Act, which provides litigants with "meaningful remedies" against the United States. *Loumiet v. U.S.*, 948 F.3d 376, 383 (2020) (quoting *Bush v. Lucas*, 462 U.S. 367, 368 (1983)). Here, however, there is no present case or controversy upon which this Court may rule.

## C. Akahoshi Lacks Statutory Standing to Challenge the Final Decision

In addition to establishing standing under Article III of the Constitution, Akahoshi must prove that she has standing under the Administrative Procedure Act ("APA") to seek review of the Final Decision. *See* 12 U.S.C. § 1818(h)(2) (incorporating the APA's judicial review provisions); *Bd. of Governors of Fed. Rsrv. Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 38 (1991) (interpreting § 1818 to provide judicial review to an "aggrieved party"). To establish standing under the APA, Akahoshi must demonstrate that she suffered a "legal wrong" or was "adversely affected or aggrieved" by the order. 5 U.S.C. § 702; *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 882 (1990).

Akahoshi is aware that she must make this showing, as she argues that the Final Decision "adversely affected and aggrieved" her. Akahoshi Br. at 4. But "aggrievement" in the context of a challenge to agency proceedings requires a far more specific showing than she can offer here. Akahoshi must demonstrate that she

is aggrieved "within the meaning of [the] relevant statute." 5 U.S.C. § 702. In this case, the relevant statute is 12 U.S.C. § 1818. A challenge to proceedings under § 1818 requires a showing that Akahoshi suffered an injury of the kind contemplated by the statute, such as a civil money penalty or prohibition order. 12 U.S.C. § 1818(e) (prohibition order), 1818(i) (civil money penalties). But the Final Decision did the complete opposite—instead of aggrieving her within the meaning of § 1818, it removed the threat of any sanctions contemplated by the statute. The Final Decision imposed no penalty upon her, left her legal rights undisturbed, and dismissed the case against her in full, leaving her without standing to seek review of the order. *See Deposit Guar. Nat'l Bank*, 445 U.S. at 333 ("A party who receives all that he has sought generally is not aggrieved by the judgment affording the relief and cannot appeal from it.").

### D. This Court Lacks Subject Matter Jurisdiction to Provide Akahoshi with Her Requested Relief

The statutes that demarcate this Court's jurisdiction provide yet another barrier that Akahoshi cannot circumvent. "The court of appeals is a court of limited jurisdiction, and its jurisdiction is expressly provided for by statute." *U.S. v. Al-Nouri*, 983 F.3d 1096, 1098 (9th Cir. 2020) (quoting *Young Properties Corp. v. United Equity Corp.*, 534 F.2d 847, 849 (9th Cir. 1976)). This Court's jurisdiction is limited by 12 U.S.C. § 1818, which grants the Court exclusive jurisdiction to

"affirm, modify, terminate, or set aside, in whole or in part, the order of the agency," and the APA, which provides review to parties "aggrieved" by final agency action. 12 U.S.C. § 1818(h)(2); 5 U.S.C. § 702.

In her opposition to the OCC's motion to dismiss, Akahoshi conceded that this Court lacks jurisdiction to review the Final Decision because it was "agency action . . . committed to agency discretion by law." DE 14.1 at 26 n.7 ("Acting Comptroller Hsu's discretionary act dismissing the proceeding is beyond this Court's APA review power.") (citing 5 U.S.C. § 701(a)(2)). The Court can dismiss her petition on this basis alone.

The Final Decision is the only final agency action that falls within § 1818's ambit. And § 1818 allows this Court only to "affirm, modify, terminate, or set aside, in whole or in part," the OCC's order. 12 U.S.C. § 1818(h)(2). For the reasons discussed above, Akahoshi lacks standing to petition the Court to "terminate" or "set aside" an order that has provided her with complete relief from the administrative enforcement proceeding. But the Court is equally without jurisdiction to "modify" the order to strike any language that Akahoshi deems objectionable. Multiple circuit courts have rejected similar appeals from parties who prevailed against an agency and nevertheless sought review of the favorable orders because they wanted to challenge the reasoning or findings underlying the order. The D.C. Circuit has rejected such challenges to orders from the Federal Communications Commission

28

and Federal Maritime Commission. *See e.g., Am. Tel. & Tel. Co. v. Fed. Commc'n Comm'n*, 602 F.2d 401, 407 (D.C. Cir. 1979); *Sea-Land Serv., Inc. v. Dep't of Transp.*, 137 F.3d 640, 647-48 (D.C. Cir. 1998). The statute that provided jurisdiction in both of those cases mirrors § 1818 in that it provides the court of appeals "exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of" final agency orders. *Compare* 28 U.S.C. § 2342, *with* 12 U.S.C. § 1818. The D.C. Circuit determined that this statute only conferred upon the court the jurisdiction to review "final orders"—not "reports, reasoning, or findings" that underlie the final orders. *Sea-Land*, 137 F.3d at 647; *Am. Tel. & Tel.*, 602 F.2d at 407 ("AT&T asks this court selectively to excise from the order's foundation certain portions it finds objectionable. . . . We do not think that Sections 402(a) and 2342 authorize this court to embark on architectural revisions of this sort."). The Seventh Circuit likewise held that a reviewing court lacked jurisdiction to entertain a prevailing litigant's request to alter the language the Environmental Protection Agency used in its consent decree. *Accra Pac*, 173 F.3d at 632. As Judge Easterbrook explained:

> Few victors in litigation or the administrative process are thrilled with the opinion; almost everyone perceives that different language could have produced benefits—perhaps ammunition for some future dispute . . . perhaps psychic gratification. It is work enough to resolve claims made by losers; review of claims made by *winners* could double the caseload, and to what end? Judicial time devoted to what

29

> may be a litigant's will-o'-the-wisp is time unavailable to
> resolve other, more concrete, disputes.

*Id.* Judge Easterbrook's reasoning applies forcefully here. This Court lacks jurisdiction to consider Akahoshi's petition for review of an agency order that granted her the relief she sought.

## II. The Appointment of the Individual Who Signed the Notice of Charges Is Constitutionally and Statutorily Valid

Akahoshi asserts that the administrative proceeding is "void *ab initio*" because the appointment of Michael Brickman ("Brickman"), the individual who signed the Notice, was not in conformity either with the Appointments Clause, U.S. Const. art. II, § 2, cl. 2, or with 12 U.S.C. § 4. *See* Akahoshi Br. at 33-34, 39. Contrary to Akahoshi's arguments, Brickman does not hold a position that is subject to the requirements of the Appointments Clause, nor does he hold the office established by § 4. The authority under which Brickman signed the Notice is neither "significant" nor "continuing"—both indispensable requirements of offices subject to the Appointments Clause. *Lucia*, 585 U.S. at 245. Brickman's authority to issue

notices of charges is limited by numerous conditions, is exercised occasionally, and is subject to the direction and control of the Comptroller.

### A. Brickman's Authority to Issue Notices of Charges is Neither "Significant" Nor "Continuing"

The Appointments Clause applies only to "Officers of the United States." *See Freytag v. Comm'r,* 501 U.S. 868, 880-81 (1991). "Employees" of the United States are "lesser functionaries" who are subordinate to officers and need not be appointed pursuant to the requirements of the Appointments Clause. *Buckley v. Valeo*, 424 U.S. 1, 126 n.162 (1976). To qualify as an "Officer of the United States," an individual must occupy a continuing position established by law and exercise significant authority pursuant to the laws of the United States. *Lucia*, 585 U.S. at 245. The term "Officer" "embraces the ideas of tenure, duration, emolument, and duties," the latter being "continuing and permanent, not occasional or temporary." *U.S. v. Germaine*, 99 U.S. 508, 511-12 (1878); *see also Auffmordt v. Hedden,* 137 U.S. 310, 326-28 (1890); *U.S. v. Hartwell*, 73 U.S. 385, 393 (1867). A position is not "continuing and permanent" if the associated "duties" are "occasional," "intermittent," *Germaine*, 99 U.S. 508, 512, or "episodic," *Freytag,* 501 U.S. at 881.

Congress has expressly authorized the Comptroller to "delegate to *any duly authorized employee*, representative, or agent *any power* vested in the office by law."

31

12 U.S.C. § 4a (emphases added). Pursuant to this authority, in a 2016 memorandum ("2016 Delegation Memorandum"), the Comptroller delegated limited and specifically defined enforcement authority to certain Senior Deputy Comptrollers.[7] *See* DE 39.2 at 96-102. This delegation of authority included the authority to issue notices of charges pursuant to § 1818(e) or (i) to banking institution-affiliated parties, subject to various restrictions, including that the Comptroller did not delegate and expressly reserved for consideration by a committee, known as the Major Matters Supervision Review Committee ("MMSRC"), authority related to matters involving institutions designated as large banks or Federal savings associations; certain enforcement actions involving the Bank Secrecy Act; certain provisions of the Federal Trade Commission Act, the Equal Credit Opportunity Act, and the Fair Housing Act; "other cases referred to MMSRC by a Senior Deputy Comptroller or the Chief Counsel"; and "other cases where the appropriate Senior Deputy Comptroller does not concur with the majority vote of the members of [a separate committee]." *See id.* at 96-97, 101-02; *see also id.* at 92-94 (Memorandum

---

[7] The 2016 Delegation Memorandum was not entered into evidence in the proceedings before the ALJ. On April 29, 2024, the OCC moved to supplement the record with, among other documents, the 2016 Delegation Memorandum. *See* DE 39.1. As explained more fully in the April 29 motion, the OCC submits that the 2016 Delegation Memorandum is necessary for effective judicial review of issues related to Brickman's appointment and that unusual circumstances justify supplementation of the record. This Court has not yet ruled on the April 29 motion.

from Thomas J. Curry, Comptroller of the Currency, to Senior Deputy Comptrollers (July 16, 2014) [hereinafter, "2014 Delegation Memorandum"]).[8]  The 2016 Delegation Memorandum also provided that the relevant Senior Deputy Comptrollers are authorized to redelegate authority provided by the Comptroller "under such terms as the Senior Deputy Comptroller determines to be appropriate"; that "[t]he authority delegated herein is subject to the Memorandum from the Comptroller to the Executive Committee regarding Delegation of Authority, dated May 10, 2012 ("2012 Delegation Memorandum");[9] and that "[e]ach Senior Deputy Comptroller shall provide regular reports to the Comptroller on all significant actions taken pursuant to this delegation." *Id.* at 102.

As relevant, the 2012 Delegation Memorandum provides that "[n]otwithstanding delegations that have been granted by the Comptroller [pursuant to 12 U.S.C. § 4a], the Comptroller retains the authority, where he deems appropriate, to consider and decide any matter within the scope of the powers of the Comptroller of the Currency." *See id.* at 104.  The 2012 Delegation Memorandum also provides the following:

---

[8] The 2014 Delegation Memorandum is among the documents with which the OCC has moved to supplement the record. *See supra* note 7; *see also* DE 39.2 at 92-94.

[9] The 2012 Delegation Memorandum is among the documents with which the OCC has moved to supplement the record. *See supra* note 7; *see also* DE 39.2 at 104.

> Each member of the Executive Committee, directly and through their subordinate managers, is responsible and accountable for promptly assuring that matters that would establish significant precedent, change significant policies of the Office of the Comptroller of the Currency, attract unusual attention or publicity, have a significant impact on external parties, or be of significant interest to other parts of the U.S. Government, are brought to the attention of the Comptroller such that the Comptroller may consider, and, if he so elects, decide the matter.

*Id.*

The 2016 Delegation Memorandum and 2012 Delegation Memorandum set forth a detailed framework wherein limited authority to issue notices of charges falling within the scope of various conditions is delegated to the relevant Senior Deputy Comptroller while the Comptroller retains authority to consider and decide all "significant" matters, including those that would "establish significant precedent," "change significant policies," have a "significant impact on external parties," or otherwise would be of "significant interest" to the U.S. Government. *Id.* Pursuant to this framework, Brickman (under authority redelegated by the relevant Senior Deputy Comptroller) did not exercise "significant" or "continuing" authority, but performed "occasional" duties, *Germaine*, 99 U.S. at 512, "subject to the control or direction" of the Comptroller, *Buckley*, 424 U.S. at 126, n.162. Brickman is thus a mere employee and is not subject to the Appointments Clause.

34

### B. Brickman Does Not Hold the Office Established by 12 U.S.C. § 4

Twelve U.S.C. § 4 establishes a specific order of succession involving up to four constitutionally appointed officers. *See English v. Trump*, 279 F. Supp. 3d 307, 312 (D.D.C. 2018) (describing § 4 as Congress providing "agency-specific rules for acting officers"). Akahoshi asserts that three dozen OCC employees holding some variation of the title "Deputy Comptroller" are "Deputy Comptrollers of the Currency" within the meaning of § 4 and must be appointed by the Secretary of the Treasury. *See* Akahoshi Br. at 33, 39.

Akahoshi is correct that the plain language of § 4 permits only four individuals to be appointed as "Deputy Comptrollers of the Currency" and to exercise the authority vested therein. However, Akahoshi offers no legal justification bridging the wide gap between observing that dozens of OCC employees hold titles containing some variation of the term "Deputy Comptroller" and declaring that the actions of those employees should be invalidated. Brickman—who, at the time of signing the Notice, was a "Deputy Comptroller of Special Supervision"—is not a "Deputy Comptroller of the Currency" within the meaning of 12 U.S.C. § 4. *See*

Declaration of Cassandra Cuffee-Graves, DE 39.2 at 89, ¶ 3 (explaining that the OCC typically has only two Deputy Comptrollers of the Currency).[10]

Congress has expressly vested the Comptroller with authority to determine appropriate OCC staffing, including by providing that the Comptroller is "authorized to employ such additional examiners, clerks, and other employees as he deems necessary . . . and to assign to duty . . . such examiners and assistant examiners as he shall deem necessary to assist in the performance of the work of that bureau," 12 U.S.C. § 9, and by providing that the Comptroller "shall . . . fix the compensation and *number of*, and *appoint and direct*, all employees of the [OCC]," 12 U.S.C. § 482 (emphasis added). Brickman was validly appointed by the Comptroller to the position of Deputy Comptroller of Special Supervision pursuant to this authority.

### C. Akahoshi Has Not Shown Unconstitutional Insulation from Removal nor Actual Harm Arising Therefrom

Finally, Akahoshi, in approximately two sentences, asserts that Brickman and the ALJs utilized by the OCC are "unconstitutionally insulated from removal by the President," and that the OCC "should concede on appeal that Brickman enjoys multiple levels of removal protection." *See* Akahoshi. Br. at 40. This Court need not consider such assertions. *See Affordable Hous. Dev. Corp. v. City of Fresno*,

---

[10] This Declaration is among the documents with which the OCC has moved to supplement the record. *See supra* note 7.

433 F.3d 1182, 1193 (9th Cir. 2006) ("This Court 'will not ordinarily consider matters on appeal that are not specifically and distinctly argued in appellant's opening brief.'" (quoting *United States v. Ullah,* 976 F.2d 509, 514 (9th Cir. 1992))).

Akahoshi cannot show that the individual with final authority over enforcement proceedings is unconstitutionally shielded from removal. ALJs have no authority to issue final or binding orders on respondents in administrative proceedings; they are simply "judges who make decisions that are subject to vacatur by people without tenure protection." *Decker Coal Co. v. Pehringer*, 8 F.4th 1123, 1135 (9th Cir. 2021). In OCC actions, it is the Comptroller—who may be "removed by the President, upon reasons to be communicated by him to the Senate," 12 U.S.C. § 2—who retains ultimate authority over enforcement proceedings. The OCC's regulations provide that the Comptroller may, "at any time during the pendency of a proceeding, perform . . . any act which could be done or ordered by the ALJ," 12 C.F.R. § 19.4; has sole authority to decide motions that result in a final determination of the merits of the proceeding, *id.* § 19.5(b)(7); and must render a final decision based on review of the entire record of the proceeding, *id.* § 19.40(c); *see also Decker*, 8 F.4th at 1135 ("[W]e think the [Benefits Review Board] has ample control over [Department of Labor] ALJs and the President, in turn, has direct control over [Benefits Review Board] members through the Secretary of Labor"). Moreover,

even if Akahoshi could show that any removal protections that might apply to Brickman or the ALJs utilized by the OCC are unconstitutional, she has not demonstrated "compensable harm." *See Collins v. Yellen*, 141 S.Ct. 1761, 1789 (2021) (identifying inquiry as whether "an unconstitutional provision . . . inflict[ed] compensable harm"); *see also Kaufmann v. Kijakazi*, 32 F.4th 843, 849 (9th Cir. 2022) ("A party challenging an agency's past actions must . . . show how the unconstitutional removal provision *actually harmed* the party . . . .").

### III. The Underlying Administrative Proceedings Did Not Violate Akahoshi's Seventh Amendment Rights

Akahoshi's argument that the administrative proceeding brought by the OCC under 12 U.S.C. § 1818 violated her Seventh Amendment right to a jury trial is without merit.

At the outset, it is worth noting that Akahoshi's arguments on this issue do not present a justiciable claim. The Comptroller's decision to dismiss the charges against Akahoshi makes her Seventh Amendment claim moot and beyond redress. The remedy for a violation of the Seventh Amendment by a federal agency is to set aside the agency action. *See Jarkesy v. Sec. & Exch. Comm'n*, 34 F.4th 446, 459 (5th Cir. 2022) (vacating Securities and Exchange Commission's decision as remedy for violation of petitioner's Seventh Amendment rights), *cert. granted,* 143 S. Ct. 2688, No. 22-859 (2023). To vacate means, *inter alia*, "to annul; to cancel or

rescind." *Ctr. for Food Safety v. Regan*, 56 F.4th 648, 660 (9th Cir. 2022) (citing *Action on Smoking & Health v. Civ. Aeronautics Bd.*, 713 F.2d 795, 797 (D.C. Cir. 1983)).  Here, the Final Decision canceled the charges against Akahoshi and dismissed the action in its entirety.  1-ER-4 (ordering "that the action be terminated and the outstanding Notice of Charges and Assessment be dismissed.").  Accordingly, there is no action left for this Court to set aside and there is no additional relief available to Akahoshi.

On the merits, Akahoshi's Seventh Amendment claim still fails because, as explained below, the Amendment is not applicable to OCC enforcement proceedings.

The Seventh Amendment provides that "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved . . . ."  U.S. CONST. amend. VII.  The Amendment preserves the right to jury trial as it existed in 1791 and it "also applies to actions brought to enforce statutory rights that are analogous to common-law causes of action ordinarily decided in English law courts in the late 18th century."  *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 42 (1989) (citing *Curtis v. Loether,* 415 U.S. 189, 193-94 (1974)).  However, "when Congress creates new statutory 'public rights,' it may assign their adjudication to an administrative agency with which a jury trial would be incompatible, without violating the Seventh Amendment's injunction that a jury

trial is to be 'preserved' in 'suits at common law.'" *Atlas Roofing Co., Inc. v. Occupational Safety & Health Rev. Comm'n*, 430 U.S. 442, 455 (1977). This is because "[t]he Seventh Amendment protects a litigant's right to a jury trial only if a cause of action is legal in nature and it involves a matter of 'private right.'" *Granfinanciera,* 492 U.S. at 42 n.4.

To determine whether the Amendment applies to a particular action, a court first will "compare the statutory action to 18th-century actions brought in the courts of England." *Granfinanciera,* 492 U.S. at 42 (quoting *Tull v. U.S.*, 481 U.S. 412, 417-418 (1987)). Second, a court will "examine the remedy sought and determine whether it is legal or equitable in nature." *Id.* If both factors weigh in favor of the applicability of the Amendment, the analysis is not complete. As a third step, a court must then ask "whether Congress may assign and has assigned resolution of the relevant claim to a non-Article III adjudicative body that does not use a jury as factfinder." *Id.* In other words, even where a cause of action is analogous to a common law claim and the remedy is legal in nature, if the action asserts a "public right" then "the Seventh Amendment does not entitle the parties to a jury trial if Congress assigns its adjudication to an administrative agency or specialized court of equity." *Id.* at 42 n.4. Thus, "when Congress properly assigns a matter to adjudication in a non-Article III tribunal, 'the Seventh Amendment poses no independent bar to the adjudication of that action by a nonjury factfinder.'" *Oil*

*States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 584 U.S. 325, 345 (2018) (citing *Granfinanciera*, 492 U.S. at 53-54); *accord Jarkesy*, 34 F.4th 446, 452-53.

### A. OCC Enforcement Actions Arise from a Federal Regulatory Scheme to Which There Is No Common Law Analog

The OCC's enforcement action under 12 U.S.C. § 1818 is grounded in a federal regulatory scheme specifically designed to ensure the safety and soundness of the national banking system; there is no common law analog. Akahoshi nevertheless contends, without citation to any authority, that the OCC's enforcement action "is grounded in the common law of fraud." Akahoshi Br. at 41. Unlike common law fraud claims, however, the charges against Akahoshi were issued pursuant to 12 U.S.C. § 1818(e) and (i), which involve statutory violations specific to the regulation of the national banking system and are enforceable only by the federal banking regulators. The elements of these statutory causes of action are unlike anything sounding in common law.[11] Thus, Congress has explicitly created new causes of action through these statutes that are distinct from common law, arising from the federal regulatory framework created specifically to ensure the safety and soundness of the national banking industry. *See* 12 U.S.C. § 1 (charging the Comptroller with "assuring the safety and soundness of, and compliance with

---

[11] *See supra* Counterstatement of the Case, Part I (stating elements of actions arising under § 1818(e) and (i)).

laws and regulations, fair access to financial services, and fair treatment of customers by, the institutions and other persons subject to its jurisdiction"); *see also Cent. Nat. Bank of Mattoon v. U.S. Dep't of Treasury*, 912 F.2d 897, 905 (7th Cir. 1990) (explaining that the Comptroller "has comprehensive authority over national banks . . . [t]hose banks are his wards, and his only wards"); *First Nat. Bank of Lamarque v. Smith*, 610 F.2d 1258, 1264 (5th Cir. 1980) (explaining that the OCC is "charged with the supervision and regulation of national banking associations" and that "Congress has conferred broad statutory powers on the Comptroller to enable him to perform his supervisory and regulatory functions").

Moreover, only the relevant federal banking authorities can bring enforcement actions under § 1818 as the statute lacks a private right of action. *See*, *e.g.*, *Groos Nat. Bank v. OCC*, 573 F.2d 889, 897 (5th Cir. 1978); *Tidwell v. JPMorgan Chase Bank, N.A.*, No. C-13-2621 EMC, 2013 WL 5539414, at *8 (N.D. Cal. Oct. 8, 2013). This further demonstrates that enforcement actions under § 1818 are distinct from common law.

### B. Even if The Enforcement Action Has a Common Law Analog, the Public Rights Doctrine Makes the Seventh Amendment Inapplicable

Even assuming that the charges brought by the OCC do have common law analogues, enforcement actions under § 1818 nevertheless implicate public rights,

42

which permits Congress to assign the proceeding to agency adjudication without a jury.

"Public rights" are at issue in any cause of action where "the Government sues in its sovereign capacity to enforce public rights created by statutes." *Atlas Roofing*, 430 U.S. at 450. Thus, the public rights doctrine applies to actions "which arise between the Government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments." *Oil States*, 584 U.S. at 334 (quoting *Crowell v. Benson,* 285 U.S. 22, 50 (1932)); *cf. Granfinanciera,* 492 U.S. at 68 (Scalia, J., concurring) ("It is clear that what we meant by public rights were not rights important to the public, or rights created by the public, but rights *of the public*—that is, rights pertaining to claims brought by or against the United States"). Specifically, with regard to federal agencies, and as is relevant here, the Court has explained that the public rights exception applies to:

> cases in which the claim at issue derives from a federal regulatory scheme, or in which resolution of the claim by an expert Government agency is deemed essential to a limited regulatory objective within the agency's authority. In other words, it is still the case that what makes a right "public" rather than private is that the right is integrally related to particular Federal Government action.

*Stern v. Marshall*, 564 U.S. 462, 490-91 (2011).

43

As an initial matter, Akahoshi wrongly contends that the public rights doctrine is inapplicable to the OCC's enforcement proceedings against her *because* the charges are analogous to common law claims. Akahoshi Br. at 42. In making this assertion, Akahoshi erroneously conflates the first step of the Supreme Court's Seventh Amendment analysis—whether there are common law analogs—with the last step of the analysis—whether, *despite a common law analog*, the cause of action nevertheless vindicates a public right. The fact that a cause of action is analogous to a common law cause of action does not, on its own, preclude it from also vindicating a public right. As explained above, the public rights doctrine is a consideration independent from the question of whether the cause of action is analogous to a common law claim. The public rights doctrine can render the Seventh Amendment inapplicable to a proceeding even if the cause of action is analogous to a common law claim that seeks a legal remedy. Accordingly, Akahoshi's assertion is without merit.

Next, Akahoshi incorrectly frames the public rights inquiry by focusing on her personal rights to employment and property. Akahoshi Br. at 42. But, as explained above, that is irrelevant to the applicable analysis. OCC enforcement actions under § 1818 implicate public rights because they are between the Government and a person under its authority and relate integrally to the OCC's public purpose of safeguarding the national banking system by preventing unlawful

conduct by banks and their institution-affiliated parties. *Cf., In re Franklin Nat. Bank Sec. Litig.*, 445 F. Supp. 723, 731 (E.D.N.Y. 1978), *supplemented*, 449 F. Supp. 574 (E.D.N.Y. 1978) (explaining "the entire scheme of governmental regulation of banks. . . is intended primarily for the benefit of the public and the common weal, not for the benefit of banks and bank directors"). In this regard, and in contrast to the Securities and Exchange Commission ("SEC") enforcement regime addressed in *Jarkesy*, OCC enforcement claims are "uniquely suited for agency adjudication." *Jarkesy*, 34 F.4th at 455.

The OCC's resolution of its enforcement actions is a quintessential exercise of public rights as it is essential to the OCC's regulatory objectives and is within the OCC's unique expertise as a federal banking supervisory agency. *Cf. Stern*, 564 U.S. at 490-91. Indeed, as Congress has expressed and courts have recognized, "one of the purposes of the banking acts is clearly to commit the progressive definition and eradication of [unsafe or unsound banking] practices to the expertise of the appropriate regulatory agencies." *Groos Nat. Bank v. OCC*, 573 F.2d 889, 897 (5th Cir. 1978). Moreover, courts, including this one, have uniformly held that enforcement actions under § 1818 are within the banking agencies' unique expertise and the actions clearly invoke public rights. *See*, *e.g.*, *Cavallari v. OCC*, 57 F.3d 137, 145 (2d Cir. 1995) (explaining that the charges brought by the OCC "pursuant to its regulatory authority . . . clearly implicate public rights."); *see also Simpson v.*

*Off. of Thrift Supervision*, 29 F.3d 1418, 1423-24 (9th Cir. 1994) (holding Seventh Amendment inapplicable to Office of Thrift Supervision proceeding under § 1818 because it implicates public rights); *Akin v. Off. of Thrift Supervision*, 950 F.2d 1180, 1186 (5th Cir. 1992); *Paul v. Off. of Thrift Supervision*, 763 F. Supp. 568, 573-74 (S.D. Fla. 1990) (holding Seventh Amendment right does not attach to Office of Thrift Supervision proceeding because "Congress may delegate fact finding powers to an administrative agency in actions to enforce public rights"). Accordingly, the OCC's enforcement actions implicate public rights, rendering the Seventh Amendment inapplicable to those administrative proceedings.

### C. *Jarkesy* is Distinguishable from and Inapplicable to OCC Enforcement Actions

Even assuming *Jarkesy* were binding on this Court, it is distinguishable and inapposite. In *Jarkesy*, the Fifth Circuit found the public rights exception inapplicable to the SEC's securities fraud claims because, in the court's view, "jury trials would not 'go far to dismantle the statutory scheme' or 'impede swift resolution' of the statutory claims." *Jarkesy*, 34 F.4th at 455 (quoting *Granfinanciera*, 492 U.S. at 60-63). The court reached this conclusion primarily because the applicable statutory scheme "allows the SEC to bring enforcement actions either in-house or in Article III courts, where the jury-trial right would apply." *Id.* But the OCC's enforcement regime is wholly distinct from the regime

46

applicable to the SEC's actions.  In contrast to the SEC, Congress assigned OCC enforcement actions solely to administrative tribunals.  *Compare* § 1818(h)(2), (i)(1); *with Jarkesy*, 34 F.4th at 456 ("Congress could have purported to assign such proceedings *solely* to administrative tribunals, but it did not." (emphasis original)).  *Jarkesy*, therefore, is inapposite to the instant matter.

This Court should hold that the Seventh Amendment is not applicable to the OCC's enforcement actions and, consequently, that Akahoshi's Seventh Amendment rights were not violated.

## IV. Akahoshi's Due Process Claims Are Without Merit

Akahoshi raises three due process claims: that exculpatory material was wrongly withheld from her under *Brady v. Maryland*, 373 U.S. 83 (1963), that the OCC impermissibly prejudiced the proceedings, and that the OCC improperly relied on a separate Department of Justice plea agreement with Rabobank.  Each of these claims is without merit.

As an initial matter, the remedy for a due process violation is remand to the appropriate tribunal for a proper hearing.  *See*, *e.g.*, *Zolotukhin v. Gonzales*, 417 F.3d 1073, 1077 (9th Cir. 2005) (remanding for new hearing that comports with due process where immigration judge's rulings during hearing violated petitioner's due process rights); *Freire v. Ashcroft*, 122 F. App'x 333, 334 (9th Cir. 2005) (remanding to Board of Immigration Appeals to determine whether erroneous credibility

determination affected immigration judge's decision resulting in due process violation; noting that, if so, petitioner would be entitled to new hearing); *Perez-Lastor v. INS*, 208 F.3d 773, 783 (9th Cir. 2000) (remanding for a new hearing based on due process violation); *see also Dargis v. Sheahan*, 526 F.3d 981, 988-89 (7th Cir. 2008) (explaining that, where county corrections officer's due process rights were violated by employer's failure to hold hearing prior to placing employee on administrative leave without pay, proper remedy was to direct public employer to hold a hearing on the issue rather than proceed to trial on issue of damages). Assuming, *arguendo*, that Akahoshi's due process rights were violated, her due process claims are moot because the enforcement action against her was dismissed in its entirety and there is no other relief to which she would be entitled.

## A. *Brady v. Maryland* Is Inapplicable to Civil Administrative Proceedings

Akahoshi first contends the OCC violated her due process rights when it asserted, and the ALJ agreed, that the deliberative process privilege protected from production certain allegedly exculpatory evidence to which she was entitled under *Brady*.[12] Akahoshi Br. at 46-47. Akahoshi's *Brady* argument is meritless, however,

---

[12] The *Brady* doctrine holds that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87.

because *Brady* applies only in criminal proceedings; it is inapplicable in civil administrative actions. *See*, *e.g.*, *Brodie v. Dep't of Health & Hum. Servs.*, 951 F. Supp. 2d 108, 119 (D.D.C. 2013) (noting that many courts have found that "*Brady* does not apply 'in the context of administrative hearings'"); *U.S. v. Project on Gov't Oversight*, 839 F.Supp.2d 330, 343 (D.D.C. 2012) (accord) (collecting cases).

Even assuming *Brady* did apply to administrative proceedings, the issue is moot because the appropriate remedy for a *Brady* violation is a new trial. *U.S. v. Kohring*, 637 F.3d 895, 913 (9th Cir. 2011). As already explained, the Final Decision dismissed the charges and the action against Akahoshi in their entirety. Therefore, there is no other relief under *Brady* to which she would be entitled.

### B. Akahoshi Fails to Demonstrate that the Comptroller Was Biased

Akahoshi next contends that the OCC violated her due process rights because the Comptroller prejudged the proceedings against her, as was purportedly evidenced by language in Consent Orders and public statements in press releases related to Rabobank and other Rabobank employees. Akahoshi Br. at 47-51. This claim is without merit. As this Court has explained, "to make out a claim of unconstitutional bias, a plaintiff must 'overcome a presumption of honesty and integrity' on the part of decision-makers." *Stivers v. Pierce*, 71 F.3d 732, 741 (9th Cir. 1995) (quoting *Withrow v. Larkin*, 421 U.S. 35, 47 (1975)). Thus, Akahoshi

must show that the Comptroller "has prejudged, or reasonably appears to have prejudged, an issue." *Id.* (quoting *Kenneally v. Lungren*, 967 F.2d 329, 333 (9th Cir. 1992)). This can be established in two ways: (1) where "the proceedings and surrounding circumstances may demonstrate *actual bias* on the part of the adjudicator" or (2) where "the adjudicator's pecuniary or personal interest in the outcome of the proceedings may create an *appearance of partiality* that violates due process, even without any showing of actual bias." *Id.* (emphasis in original).

Akahoshi does not (and cannot) contend that the Comptroller has a pecuniary or personal interest in the outcome of the enforcement action. Accordingly, to overcome the presumption of honesty, Akahoshi must demonstrate actual bias, which she has not done (and cannot do).

Akahoshi's sole basis for her claim of "actual prejudice" is language in Consent Orders and public statements in press releases related to Rabobank and Rabobank employees other than Akahoshi. Akahoshi Br. at 47-51. Even in the context of a criminal indictment before a grand jury, however, established precedent makes clear that "the existence of negative pretrial publicity is generally not sufficient to show substantial influence or actual prejudice." *United States v. Silver*, 103 F. Supp. 3d 370, 379-80 (S.D.N.Y. 2015); *accord Randolph v. People of the State of Cal.*, 380 F.3d 1133, 1142 (9th Cir. 2004); *U.S. v. Baras*, 2013 WL 6502846, at *13 (N.D. Cal. Dec. 11, 2013). Moreover, it is evident that the Comptroller was

not prejudiced against Akahoshi, because he dismissed the action against her in its entirety.

Even assuming Akahoshi could show actual prejudice, her claim nevertheless is moot. To comport with due process, the remedy for a judgement rendered by a prejudiced decisionmaker is vacatur and a new hearing before an impartial tribunal. *See Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 827-28 (1986) (holding that where judge was disqualified from participation in case, "proper remedy" for a due process violation is "vacating the decision and remanding for further proceedings"). As already explained, the Comptroller dismissed the action against Akahoshi in its entirety. Therefore, there is no additional relief to which she would be entitled even if she could demonstrate actual prejudice.

## C. The ALJ's Use of the Settlement Agreement Did Not Violate Due Process

Finally, Akahoshi contends that her due process rights were violated when the OCC offered—and the ALJ admitted into evidence—a settlement agreement between the Department of Justice and Rabobank to satisfy the effects prongs of the prohibition order and second-tier civil money penalty. *See* 12 U.S.C. § 1818(e)(l)(B)(i) (showing that "by reason of" the misconduct the financial institution "has suffered or will probably suffer financial loss" sufficient to satisfy effects prong); *id.* § 1818(i)(2)(B)(ii)(II) (showing that the misconduct "causes or is

likely to cause more than a minimal loss to such depository institution" sufficient to satisfy effects prong). Akahoshi Br. at 51-52. Akahoshi's contention is meritless.

Firstly, Akahoshi wrongly asserts that the settlement was inadmissible as a matter of law. *Id.* at 51. In civil actions, non-parties' guilty pleas are admissible against civil defendants. *See*, *e.g.*, *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.*, 49 F.3d 399, 401, 403 (8th Cir. 1995) (finding that non-party employee's guilty plea and accompanying sworn statement were admissible against defendant employer in subsequent civil case); *Newby v. Enron Corp.*, 491 F.Supp.2d 690, 703 (S.D. Tex. 2007) (finding that non-party's guilty plea was admissible against defendants in subsequent civil case); *see also* 12 C.F.R. § 19.36 ("relevant, material, and reliable evidence that is not unduly repetitive is admissible to the fullest extent authorized by the Administrative Procedure Act and other applicable law"). But most importantly, even if Enforcement Counsel's proffer—and the ALJ's admission of— the settlement agreement at hearing did violate due process, the issue is now moot. As explained above, the remedy for such a due process violation is remand for a new hearing. But, as also explained, Akahoshi already received all the relief to which she is entitled because the Comptroller dismissed the action against her in its entirety. Accordingly, this Court should hold that Akahoshi's due process claims are without merit.

## V.    The Notice Was Timely Issued

Under 28 U.S.C. § 2462, the Agency has "five years from the date when the claim first accrued" in which to commence proceedings.[13]  Akahoshi argues that the Notice was untimely because the claims against her "first accrued" within the meaning of § 2462 at the time of the alleged misconduct, and the Notice was filed more than five years after that alleged misconduct.  Akahoshi Br. at 52-54.  This argument is premised on an overly expansive reading of case law and disregard for the statutory elements of claims arising under § 1818(e) (providing for orders of prohibition) and (i)(2)(B) (providing for orders assessing second-tier civil money penalties).

### A. Claims Arising Under § 1818 Accrue When All Factual and Legal Prerequisites Have Been Met and Can Be Pled

The standard rule is that a claim accrues when there exists a complete and present cause of action—that is, when all elements of an actionable claim have been met and can be pled.  *Gabelli v. SEC*, 568 U.S. 442, 448 (2013) ("[T]he 'standard rule' is that a claim accrues 'when the plaintiff has a complete and present cause of

---

[13] The relevant text of § 2462 is as follows: "Except as otherwise provided by Act of Congress, an action, suit, or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued . . . ." 28 U.S.C. § 2462.

action.'") (quoting *Wallace v. Kato,* 549 U.S. 384, 388 (2007)); *see also Blanton*, 909 F.3d at 1171 ("A claim generally accrues 'when the factual and legal prerequisites for filing suit are in place.'") (quoting *Proffitt v. Fed. Deposit Ins. Corp.*, 200 F.3d 855, 862 (D.C. Cir. 2000)).   Akahoshi argues that the Supreme Court's decision in *Gabelli v. SEC,* 568 U.S. 442 (2013), established a rule that the statute of limitations for administrative enforcement actions begins to run when the alleged misconduct occurs.   Akahoshi Br. at 52-54.   This is not so.   The *Gabelli* Court did not meaningfully analyze a statutory cause of action comprised of *multiple* elements that might not occur contemporaneously, such as § 1818(e) or (i)(2)(B). *Gabelli* concerned the application of the fraud discovery rule to § 2462 in the context of an SEC enforcement action.   *Gabelli,* 568 U.S. at 444-45. The elements of the cause of action set forth in the relevant provisions of the Investment Advisors Act (the authority for the SEC action at issue in *Gabelli*) were "complete and present" at the time of the misconduct.   *See Gabelli*, 568 U.S. at 445 (discussing the Investment Advisers Act and noting that the SEC "is authorized to bring enforcement actions against investment advisers who violate the Act, or individuals who aid and abet such violations"); *see also Fed. Energy Reg. Comm'n v. Powhatan Energy Fund*,

949 F.3d 891, 899 (4th Cir. 2020) (noting that in *Gabelli*, "the SEC had a complete and present cause of action at the time of the disputed conduct").

The Court rejected the SEC's argument that because the underlying violations sounded in fraud, the discovery rule should apply and the claim should "first accrue" at the time the agency became aware of the violations. *Gabelli*, 568 U.S. at 448-49, 454. Instead, the Court held that the rule was unavailable in the context of SEC actions for civil penalties. *Id.* *Gabelli* does not support the conclusion that, *as applied to all statutory schemes*, § 2462's five-year limitations period for administrative enforcement actions begins to run at the time of the alleged misconduct. *See Powhatan Energy Fund*, 949 F.3d at 898 (explaining that just because accrual may occur "at the moment of the violation does not imply that [it] invariably will or that every claim must accrue at that time."); *id.* at 897-98 (reasoning that application of § 2462 to the timeliness of a particular cause of action must take into account "any substantive prerequisites that Congress has placed on the right to file the underlying lawsuit . . . until a prospective plaintiff satisfies any such prerequisites and has a legal right to initiate an action to enforce a claim, that claim has not 'accrued.'").

As with her overly expansive reading of *Gabelli*, Akahoshi reads too much into this Court's decision in *de la Fuente v. Federal Deposit Insurance Co.*, 332 F.3d 1208 (9th Cir. 2003). Although the panel linked the beginning of the limitations

period to the date of the alleged misconduct, the question of claim accrual was not before the Court. *See* 332 F.3d at 1219. Additionally, it is unclear whether the charged effects—that de la Fuente received financial gain or other benefits, or that the bank's depositors were prejudiced as a result of de la Fuente's actions—occurred contemporaneously with the misconduct. *See de la Fuente*, 332 F.3d at 1223, 1225.

The occurrence of an alleged "effect" is a necessary condition to initiate an action pursuant to § 1818(e) or (i)(2)(B). An effect might not occur—rendering the cause of action not complete and present—until some time after the alleged misconduct. *Proffitt*, 200 F.3d at 863 ("Because misconduct and effect are separate prongs, the underlying conduct may not always immediately effect a [§ 1818(e)] violation and thus the accrual of the claim."). Thus, under Akahoshi's interpretation that the occurrence of misconduct alone triggers claim accrual, the statute of limitations would begin to run *before* OCC Enforcement Counsel could initiate an action pursuant to § 1818(e) or (i)(2)(B). The better interpretation—the one that is consistent with well-settled precedent—is that the statute of limitations does not begin to run until *all* factual and legal prerequisites for filing a notice of charges are in place. *Bay Area Laundry & Dry Cleaning Pension Tr. Fund v. Ferbar Corp. of Cal.*, 522 U.S. 192, 201 (1997) ("Unless Congress has told us otherwise in the legislation at issue, a cause of action does not become 'complete and present' for limitations purposes until the plaintiff can file suit and obtain relief."). It is

meaningless for statute of limitations purposes that OCC Enforcement Counsel could conceivably have initiated proceedings earlier based on an alternate statutory cause of action *that they did not plead*. *Blanton*, 909 F.3d at 1172 ("[E]ven though the OCC 'might well have brought an action earlier,' its 'failure to do so' does not make the claims it elected to bring 'untimely.'") (quoting *Proffitt*, 200 F.3d at 864)); *Proffitt*, 200 F.3d at 864 (noting that § 1818(e) "expressly authorizes [the agency] to take action 'whenever' it determines that the statutory prongs are satisfied"). A contrary conclusion would unnecessarily curtail supervisory and prosecutorial discretion while also seriously undermining the ability of Federal banking agencies to fully utilize the tools Congress provided to ensure the safety and soundness of the banking system.

### B. As Pled, the Notice Was Timely, But If It Were Not, This Court Could Not Provide Redress

Akahoshi also criticizes the Comptroller's interpretation that occurrences of alternative statutory "effects" trigger accruals of separate § 1818(e) or (i)(2)(B) claims.[14] Akahoshi Br. at 55-57. The Comptroller's interpretation is sound. It is consistent with the plain language of § 1818(e) and (i)(2)(B), Congressional intent,

---

[14] For example, a § 1818(e) prohibition charge predicated on the statutory effect of financial loss to a depository institution is a separate claim from (and may accrue at a different time than) a § 1818(e) prohibition charge predicated on the statutory effect of prejudice to depositors.

and with the D.C. Circuit's decision in *Proffitt*. *See* 200 F.3d at 863 ("The same misconduct can produce different effects at different times, resulting in separate [§ 1818] claims and separate accruals."); *id.* at 864 ("Separate accrual for each alternative effect gives meaning to all of the statutory language."); *id.* (examining relevant legislative history).

The Notice was signed on April 16, 2018, and served the following day. 1-ER-52; 2-ER-352. Any claim that "first accrued" on or after April 17, 2013, was therefore timely under § 2462. As relevant, the Notice alleged that Akahoshi violated 12 U.S.C. § 481, 18 U.S.C. § 1001, and engaged in unsafe or unsound practices in conducting the affairs of Rabobank. 2-ER-349-50. If established, these allegations would have satisfied the misconduct element of § 1818(e) and (i)(2)(B). *Id.* The Notice also alleged multiple "effects" occurring within the five-year limitations period, which, if established, would have been sufficient to satisfy this element of § 1818(e) and (i)(2)(B). *Id.* Thus, for the reasons stated in Argument Part V.A above, the Notice was timely as pled.

Akahoshi's arguments regarding the statute of limitations only highlight that she lacks standing and this Court lacks jurisdiction to hear her claims. Even if her interpretation of the statute of limitations were sound, this Court cannot provide redress: Akahoshi asks this Court to "dismiss the Notice," Akahoshi Br. at 52, which

is precisely the relief the Comptroller has already provided, 1-ER-21. There is nothing more this Court can offer on this or any other issue she raises.

## VI.    The Remaining Issues Raised by Akahoshi Are Meritless

The remaining issues raised by Akahoshi are meritless and only serve to illustrate that this Court has no jurisdiction to consider her petition.  She argues that the OCC cannot rely on a violation of § 481 to support an enforcement action pursuant to § 1818, Akahoshi Br. at 57, and she argues that she was entitled to summary disposition in the underlying proceeding, *id.* at 62.  Essentially, Akahoshi asks this Court to get deep in the weeds in this now-terminated enforcement action to decide moot issues that the Comptroller expressly declined to decide and that are completely irrelevant to the judgment.

In the proceeding below, Enforcement Counsel argued that Akahoshi violated § 481 and that that violation could form the basis of a civil money penalty and a prohibition order.  1-ER-56.  Enforcement Counsel also argued that Akahoshi was not entitled to summary disposition and that instead, Enforcement Counsel was entitled to summary disposition in its favor.  1-ER-26-27.  The ALJ agreed with Enforcement Counsel on both counts, and both issues were presented to the Comptroller on review of the ALJ's recommended decision.  1-ER-27, 62.  But the Comptroller expressly declined to decide either issue, because they were unnecessary to support his dismissal order.  1-ER-18, 21.

59

It would be inappropriate for the OCC to justify to this Court actions that it did not take. The Comptroller did not rule on these issues, because he dismissed the proceeding on other grounds. The issues are moot and do not warrant further briefing.

## CONCLUSION

The Agency respectfully requests that this Court dismiss this case for lack of jurisdiction or lack of standing. Alternatively, this Court should affirm the Final Decision because the Comptroller acted reasonably and within his discretion in dismissing the charges against Akahoshi and terminating the enforcement action.

Respectfully submitted,

*/s/ Jason Fernandes*

THEODORE J. DOWD
Acting Senior Deputy Comptroller and
Chief Counsel

PATRICIA S. GRADY
Deputy Chief Counsel

PETER C. KOCH
Director of Litigation

GABRIEL HINDIN
Special Counsel

HANNAH HICKS
Counsel

JASON FERNANDES
Attorney

Attorneys for Respondent Office
of the Comptroller of the Currency
400 7th Street SW
Washington, D.C. 20219
Telephone: (202) 649-6300
Fax: (202) 649-5709
jason.fernandes@occ.treas.gov

60

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 23-938

I am the attorney or self-represented party.

**This brief contains** 13,977 **words,** including [ ] words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

(●) complies with the word limit of Cir. R. 32-1.

( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

( ) is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

[ ] it is a joint brief submitted by separately represented parties.
[ ] a party or parties are filing a single brief in response to multiple briefs.
[ ] a party or parties are filing a single brief in response to a longer joint brief.

( ) complies with the length limit designated by court order dated [ ].

( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Jason Fernandes **Date** May 16, 2024
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** *Rev. 12/01/22*

## STATUTORY ADDENDUM

Except for the following, all applicable constitutional provisions, statutes, or regulations are contained in the addendum of Petitioner Akahoshi.

# STATUTORY ADDENDUM
## TABLE OF CONTENTS

5 U.S.C. § 702……………………………………………………………ADD-3

12 U.S.C. § 1……………………………………………………….........ADD-4

12 U.S.C. § 2……………………………………………………….........ADD-5

12 U.S.C. § 4a…………………………………………………………ADD-6

12 U.S.C. § 9……………………………………………………………ADD-7

12 U.S.C. § 482…………………………………………………………ADD-8

12 U.S.C. § 1813………………………………………………………ADD-9

28 U.S.C. § 2342…………………………………………………...ADD-21

12 C.F.R. § 19.4………………………………………...…………ADD-22

12 C.F.R. § 19.5………………………………………………………ADD-23

12 C.F.R. § 19.19………………………………………………………..ADD-24

12 C.F.R. § 19.23………………………………………………………..ADD-25

12 C.F.R. § 19.24………………………………………………………ADD-26

12 C.F.R. § 19.25………………………………………………………..ADD-27

12 C.F.R. § 19.26………………………………………………………..ADD-30

12 C.F.R. § 19.27………………………………………………………..ADD-32

12 C.F.R. § 19.28………………………………………………………..ADD-34

12 C.F.R. § 19.29………………………………………………………ADD-35

12 C.F.R. § 19.30………………………………………………………..ADD-37

12 C.F.R. § 19.39………………………………………………………ADD-38

12 C.F.R. § 19.40………………………………………………………..ADD-39

**5 U.S.C. § 702. Right of review.**

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: *Provided*, That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

## 12 U.S.C. § 1. Office of the Comptroller of the Currency.

(a) Office of the Comptroller of the Currency established
There is established in the Department of the Treasury a bureau to be known as the "Office of the Comptroller of the Currency" which is charged with assuring the safety and soundness of, and compliance with laws and regulations, fair access to financial services, and fair treatment of customers by, the institutions and other persons subject to its jurisdiction.

(b) Comptroller of the Currency

(1) In general
The chief officer of the Office of the Comptroller of the Currency shall be known as the Comptroller of the Currency. The Comptroller of the Currency shall perform the duties of the Comptroller of the Currency under the general direction of the Secretary of the Treasury. The Secretary of the Treasury may not delay or prevent the issuance of any rule or the promulgation of any regulation by the Comptroller of the Currency, and may not intervene in any matter or proceeding before the Comptroller of the Currency (including agency enforcement actions), unless otherwise specifically provided by law.

(2) Additional authority
The Comptroller of the Currency shall have the same authority with respect to functions transferred to the Comptroller of the Currency under the Enhancing Financial Institution Safety and Soundness Act of 2010 as was vested in the Director of the Office of Thrift Supervision on the transfer date, as defined in section 311 of that Act.

### 12 U.S.C. § 2. Comptroller of the Currency; appointment; term.

The Comptroller of the Currency shall be appointed by the President, by and with the advice and consent of the Senate, and shall hold his office for a term of five years unless sooner removed by the President, upon reasons to be communicated by him to the Senate.

**12 U.S.C. § 4a. Delegation of authority by Comptroller.**

The Comptroller of the Currency may delegate to any duly authorized employee, representative, or agent any power vested in the office by law.

### 12 U.S.C. § 9. Additional examiners, clerks, and other employees.

The Comptroller of the Currency is authorized to employ such additional examiners, clerks, and other employees as he deems necessary to carry out the provisions of sections 4, 6, 9, 10, 1151 to 1318, and 1322 of this title and to assign to duty in the office of his bureau in Washington such examiners and assistant examiners as he shall deem necessary to assist in the performance of the work of that bureau.

## 12 U.S.C. § 482. Employees of Office of Comptroller of the Currency; appointment; compensation and benefits.

Notwithstanding any of the provisions of section 481 of this title or section 301(f)(1) of Title 31 to the contrary, the Comptroller of the Currency shall, subject to chapter 71 of Title 5, fix the compensation and number of, and appoint and direct, all employees of the Office of the Comptroller of the Currency. Rates of basic pay for all employees of the Office may be set and adjusted by the Comptroller without regard to the provisions of chapter 51 or subchapter III of chapter 53 of Title 5. The Comptroller may provide additional compensation and benefits to employees of the Office if the same type of compensation or benefits are then being provided by any other Federal bank regulatory agency or, if not then being provided, could be provided by such an agency under applicable provisions of law, rule, or regulation. In setting and adjusting the total amount of compensation and benefits for employees of the Office, the Comptroller shall consult with, and seek to maintain comparability with, other Federal banking agencies.

The Comptroller of the Currency may impose and collect assessments, fees, or other charges as necessary or appropriate to carry out the responsibilities of the office1 of the Comptroller. Such assessments, fees, and other charges shall be set to meet the Comptroller's expenses in carrying out authorized activities.

# 12 U.S.C. § 1813. Definitions.

As used in this chapter--

(a) Definitions of bank and related terms

(1) Bank
The term "bank"--

(A) means any national bank and State bank, and any Federal branch and insured branch;

(B) includes any former savings association.

(2) State bank
The term "State bank" means any bank, banking association, trust company, savings bank, industrial bank (or similar depository institution which the Board of Directors finds to be operating substantially in the same manner as an industrial bank), or other banking institution which--

(A) is engaged in the business of receiving deposits, other than trust funds (as defined in this section); and

(B) is incorporated under the laws of any State or which is operating under the Code of Law for the District of Columbia, including any cooperative bank or other unincorporated bank the deposits of which were insured by the Corporation on the day before August 9, 1989.

(3) State
The term "State" means any State of the United States, the District of Columbia, any territory of the United States, Puerto Rico, Guam, American Samoa, the Trust Territory of the Pacific Islands, the Virgin Islands, and the Northern Mariana Islands.

(b) Definition of savings associations and related terms

(1) Savings association
The term "savings association" means--

(A) any Federal savings association;

(B) any State savings association; and

(C) any corporation (other than a bank) that the Board of Directors and the Comptroller of the Currency jointly determine to be operating in substantially the same manner as a savings association.

(2) Federal savings association
The term "Federal savings association" means any Federal savings association or Federal savings bank which is chartered under section 1464 of this title.

(3) State savings association
The term "State savings association" means--

(A) any building and loan association, savings and loan association, or homestead association; or

(B) any cooperative bank (other than a cooperative bank which is a State bank as defined in subsection (a)(2)),

which is organized and operating according to the laws of the State (as defined in subsection (a)(3)) in which it is chartered or organized.

(c) Definitions relating to depository institutions

(1) Depository institution
The term "depository institution" means any bank or savings association.

(2) Insured depository institution
The term "insured depository institution" means any bank or savings association the deposits of which are insured by the Corporation pursuant to this chapter.

(3) Institutions included for certain purposes
The term "insured depository institution" includes any uninsured branch or agency of a foreign bank or a commercial lending company owned or controlled by a foreign bank for purposes of section 1818 of this title.

(4) Federal depository institution
The term "Federal depository institution" means any national bank, any Federal savings association, and any Federal branch.

(5) State depository institution

The term "State depository institution" means any State bank, any State savings association, and any insured branch which is not a Federal branch.

(d) Definitions relating to member banks

(1) National member bank

The term "national member bank" means any national bank which is a member of the Federal Reserve System.

(2) State member bank

The term "State member bank" means any State bank which is a member of the Federal Reserve System.

(e) Definitions relating to nonmember banks

(1) National nonmember bank

The term "national nonmember bank" means any national bank which--

(A) is located in any territory of the United States, Puerto Rico, Guam, American Samoa, the Virgin Islands, or the Northern Mariana Islands; and

(B) is not a member of the Federal Reserve System.

(2) State nonmember bank

The term "State nonmember bank" means any State bank which is not a member of the Federal Reserve System.

(f) Mutual savings bank

The term "mutual savings bank" means a bank without capital stock transacting a savings bank business, the net earnings of which inure wholly to the benefit of its depositors after payment of obligations for any advances by its organizers.

(g) Savings bank

The term "savings bank" means a bank (including a mutual savings bank) which transacts its ordinary banking business strictly as a savings bank under State laws imposing special requirements on such banks governing the manner of investing their funds and of conducting their business.

(h) Insured bank

The term "insured bank" means any bank (including a foreign bank having an insured branch) the deposits of which are insured in accordance with the provisions of this chapter; and the term "noninsured bank" means any bank the deposits of which are not so insured.

(i) New depository institution and bridge depository institution defined

(1) New depository institution
The term "new depository institution" means a new national bank or Federal savings association, other than a bridge depository institution, organized by the Corporation in accordance with section 1821(m) of this title.

(2) Bridge depository institution
The term "bridge depository institution" means a new national bank or Federal savings association organized by the Corporation in accordance with section 1821(n) of this title.

(j) Receiver
The term "receiver" includes a receiver, liquidating agent, conservator, commission, person, or other agency charged by law with the duty of winding up the affairs of a bank or savings association or of a branch of a foreign bank.

(k) Board of Directors
The term "Board of Directors" means the Board of Directors of the Corporation.

(l) Deposit
The term "deposit" means--

(1) the unpaid balance of money or its equivalent received or held by a bank or savings association in the usual course of business and for which it has given or is obligated to give credit, either conditionally or unconditionally, to a commercial, checking, savings, time, or thrift account, or which is evidenced by its certificate of deposit, thrift certificate, investment certificate, certificate of indebtedness, or other similar name, or a check or draft drawn against a deposit account and certified by the bank or savings association, or a letter of credit or a traveler's check on which the bank or savings association is primarily liable: *Provided*, That, without limiting the generality of the term "money or its equivalent", any such account or instrument must be regarded as evidencing the receipt of the equivalent of money when credited or issued in exchange for checks or drafts or for a promissory note upon which the person obtaining any such credit or instrument is primarily or secondarily liable, or

for a charge against a deposit account, or in settlement of checks, drafts, or other instruments forwarded to such bank or savings association for collection.

(2) trust funds as defined in this chapter received or held by such bank or savings association, whether held in the trust department or held or deposited in any other department of such bank or savings association.

(3) money received or held by a bank or savings association, or the credit given for money or its equivalent received or held by a bank or savings association, in the usual course of business for a special or specific purpose, regardless of the legal relationship thereby established, including without being limited to, escrow funds, funds held as security for an obligation due to the bank or savings association or others (including funds held as dealers reserves) or for securities loaned by the bank or savings association, funds deposited by a debtor to meet maturing obligations, funds deposited as advance payment on subscriptions to United States Government securities, funds held for distribution or purchase of securities, funds held to meet its acceptances or letters of credit, and withheld taxes: *Provided,* That there shall not be included funds which are received by the bank or savings association for immediate application to the reduction of an indebtedness to the receiving bank or savings association, or under condition that the receipt thereof immediately reduces or extinguishes such an indebtedness.

(4) outstanding draft (including advice or authorization to charge a bank's or a savings association's balance in another bank or savings association), cashier's check, money order, or other officer's check issued in the usual course of business for any purpose, including without being limited to those issued in payment for services, dividends, or purchases, and

(5) such other obligations of a bank or savings association as the Board of Directors, after consultation with the Comptroller of the Currency, and the Board of Governors of the Federal Reserve System, shall find and prescribe by regulation to be deposit liabilities by general usage, except that the following shall not be a deposit for any of the purposes of this chapter or be included as part of the total deposits or of an insured deposit:

(A) any obligation of a depository institution which is carried on the books and records of an office of such bank or savings association located outside of any State, unless--

(i) such obligation would be a deposit if it were carried on the books and records of the depository institution, and would be payable at, an office located in any State; and

(ii) the contract evidencing the obligation provides by express terms, and not by implication, for payment at an office of the depository institution located in any State;

(B) any international banking facility deposit, including an international banking facility time deposit, as such term is from time to time defined by the Board of Governors of the Federal Reserve System in regulation D or any successor regulation issued by the Board of Governors of the Federal Reserve System; and

(C) any liability of an insured depository institution that arises under an annuity contract, the income of which is tax deferred under section 72 of Title 26.

(m) Insured deposit

(1) In general
Subject to paragraph (2), the term "insured deposit" means the net amount due to any depositor for deposits in an insured depository institution as determined under sections 1817(i) and 1821(a) of this title.

(2) In the case of any deposit in a branch of a foreign bank, the term "insured deposit" means an insured deposit as defined in paragraph (1) of this subsection which--

(A) is payable in the United States to--

(i) an individual who is a citizen or resident of the United States,

(ii) a partnership, corporation, trust, or other legally cognizable entity created under the laws of the United States or any State and having its principal place of business within the United States or any State, or

(iii) an individual, partnership, corporation, trust, or other legally cognizable entity which is determined by the Board of Directors in accordance with its regulations to have such business or financial relationships in the United States as to make the insurance of such deposit consistent with the purposes of this chapter;

and

(B) meets any other criteria prescribed by the Board of Directors by regulation as necessary or appropriate in its judgment to carry out the purposes of this chapter or to facilitate the administration thereof.

(3) Uninsured deposits

The term "uninsured deposit" means the amount of any deposit of any depositor at any insured depository institution in excess of the amount of the insured deposits of such depositor (if any) at such depository institution.

(4) Preferred deposits

The term "preferred deposits" means deposits of any public unit (as defined in paragraph (1)) at any insured depository institution which are secured or collateralized as required under State law.

(n) Transferred deposit

The term "transferred deposit" means a deposit in a new bank or other insured depository institution made available to a depositor by the Corporation as payment of the insured deposit of such depositor in a closed bank, and assumed by such new bank or other insured depository institution.

(o) Domestic branch

The term "domestic branch" includes any branch bank, branch office, branch agency, additional office, or any branch place of business located in any State of the United States or in any Territory of the United States, Puerto Rico, Guam, American Samoa, the Trust Territory of the Pacific Islands, or the Virgin Islands at which deposits are received or checks paid or money lent. The term "domestic branch" does not include an automated teller machine or a remote service unit. The term "foreign branch" means any office or place of business located outside the United States, its territories, Puerto Rico, Guam, American Samoa, the Trust Territory of the Pacific Islands, or the Virgin Islands, at which banking operations are conducted.

(p) Trust funds

The term "trust funds" means funds held by an insured depository institution in a fiduciary capacity and includes, without being limited to, funds held as trustee, executor, administrator, guardian, or agent.

(q) Appropriate Federal banking agency

The term "appropriate Federal banking agency" means--

(1) the Office of the Comptroller of the Currency, in the case of--

(A) any national banking association;

(B) any Federal branch or agency of a foreign bank; and

(C) any Federal savings association;

(2) the Federal Deposit Insurance Corporation, in the case of--

(A) any State nonmember insured bank;

(B) any foreign bank having an insured branch; and

(C) any State savings association;[1]

(3) the Board of Governors of the Federal Reserve System, in the case of--

(A) any State member bank;

(B) any branch or agency of a foreign bank with respect to any provision of the Federal Reserve Act which is made applicable under the International Banking Act of 1978;

(C) any foreign bank which does not operate an insured branch;

(D) any agency or commercial lending company other than a Federal agency;

(E) supervisory or regulatory proceedings arising from the authority given to the Board of Governors under section 7(c)(1) of the International Banking Act of 1978, including such proceedings under the Financial Institutions Supervisory Act of 1966;

(F) any bank holding company and any subsidiary (other than a depository institution) of a bank holding company; and

(G) any savings and loan holding company and any subsidiary (other than a depository institution) of a savings and loan holding company.

Under the rule set forth in this subsection, more than one agency may be an appropriate Federal banking agency with respect to any given institution.

ADD-16

(r) State bank supervisor

(1) In general
The term "State bank supervisor" means any officer, agency, or other entity of any State which has primary regulatory authority over State banks or State savings associations in such State.

(2) Interstate application
The State bank supervisors of more than 1 State may be the appropriate State bank supervisor for any insured depository institution.

(s) Definitions relating to foreign banks and branches

(1) Foreign bank
The term "foreign bank" has the meaning given to such term by section 1(b)(7) of the International Banking Act of 1978.

(2) Federal branch
The term "Federal branch" has the meaning given to such term by section 1(b)(6) of the International Banking Act of 1978.

(3) Insured branch
The term "insured branch" means any branch (as defined in section 1(b)(3) of the International Banking Act of 1978 of a foreign bank any deposits in which are insured pursuant to this chapter.

(t) Includes, including

(1) In general
The terms "includes" and "including" shall not be construed more restrictively than the ordinary usage of such terms so as to exclude any other thing not referred to or described.

(2) Rule of construction
Paragraph (1) shall not be construed as creating any inference that the term "includes" or "including" in any other provision of Federal law may be deemed to exclude any other thing not referred to or described.

(u) Institution-affiliated party

The term "institution-affiliated party" means--

(1) any director, officer, employee, or controlling stockholder (other than a bank holding company or savings and loan holding company) of, or agent for, an insured depository institution;

(2) any other person who has filed or is required to file a change-in-control notice with the appropriate Federal banking agency under section 1817(j) of this title;

(3) any shareholder (other than a bank holding company or savings and loan holding company), consultant, joint venture partner, and any other person as determined by the appropriate Federal banking agency (by regulation or case-by-case) who participates in the conduct of the affairs of an insured depository institution; and

(4) any independent contractor (including any attorney, appraiser, or accountant) who knowingly or recklessly participates in--

(A) any violation of any law or regulation;

(B) any breach of fiduciary duty; or

(C) any unsafe or unsound practice, which caused or is likely to cause more than a minimal financial loss to, or a significant adverse effect on, the insured depository institution.

(v) Violation
The term "violation" includes any action (alone or with another or others) for or toward causing, bringing about, participating in, counseling, or aiding or abetting a violation.

(w) Definitions relating to affiliates of depository institutions

(1) Depository institution holding company
The term "depository institution holding company" means a bank holding company or a savings and loan holding company.

(2) Bank holding company
The term "bank holding company" has the meaning given to such term in section 1841 of this title.

(3) Savings and loan holding company

The term "savings and loan holding company" has the meaning given to such term in section 1467a of this title.

(4) Subsidiary

The term "subsidiary"--

(A) means any company which is owned or controlled directly or indirectly by another company; and

(B) includes any service corporation owned in whole or in part by an insured depository institution or any subsidiary of such a service corporation.

(5) Control

The term "control" has the meaning given to such term in section 1841 of this title.

(6) Affiliate

The term "affiliate" has the meaning given to such term in section 1841(k) of this title.

(7) Company

The term "company" has the same meaning as in section 1841(b) of this title.

(x) Definitions relating to default

(1) Default

The term "default" means, with respect to an insured depository institution, any adjudication or other official determination by any court of competent jurisdiction, the appropriate Federal banking agency, or other public authority pursuant to which a conservator, receiver, or other legal custodian is appointed for an insured depository institution or, in the case of a foreign bank having an insured branch, for such branch.

(2) In danger of default

The term "in danger of default" means an insured depository institution with respect to which (or in the case of a foreign bank having an insured branch, with respect to such insured branch) the appropriate Federal banking agency or State chartering authority has advised the Corporation (or, if the appropriate Federal banking agency is the Corporation, the Corporation has determined) that--

(A) in the opinion of such agency or authority--

(i) the depository institution or insured branch is not likely to be able to meet the demands of the institution's or branch's depositors or pay the institution's or branch's obligations in the normal course of business; and

(ii) there is no reasonable prospect that the depository institution or insured branch will be able to meet such demands or pay such obligations without Federal assistance; or

(B) in the opinion of such agency or authority--

(i) the depository institution or insured branch has incurred or is likely to incur losses that will deplete all or substantially all of its capital; and

(ii) there is no reasonable prospect that the capital of the depository institution or insured branch will be replenished without Federal assistance.

(y) Definitions relating to Deposit Insurance Fund

(1) Deposit Insurance Fund
The term "Deposit Insurance Fund" means the Deposit Insurance Fund established under section 1821(a)(4) of this title.

(2) Designated reserve ratio
The term "designated reserve ratio" means the reserve ratio designated by the Board of Directors in accordance with section 1817(b)(3) of this title.

(3) Reserve ratio
The term "reserve ratio", when used with regard to the Deposit Insurance Fund other than in connection with a reference to the designated reserve ratio, means the ratio of the net worth of the Deposit Insurance Fund to the value of the aggregate estimated insured deposits, or such comparable percentage of the assessment base set forth in section 1817(b)(2)(C) of this title.

(z) Federal banking agency
The term "Federal banking agency" means the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, or the Federal Deposit Insurance Corporation.

## 28 U.S.C. § 2342. Jurisdiction of court of appeals.

The court of appeals (other than the United States Court of Appeals for the Federal Circuit) has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of--

(1) all final orders of the Federal Communications Commission made reviewable by section 402(a) of title 47;

(2) all final orders of the Secretary of Agriculture made under chapters 9 and 20A of title 7, except orders issued under sections 210(e), 217a, and 499g(a) of title 7;

(3) all rules, regulations, or final orders of--

(A) the Secretary of Transportation issued pursuant to section 50501, 50502, 56101-56104, or 57109 of title 46 or pursuant to part B or C of subtitle IV, subchapter III of chapter 311, chapter 313, or chapter 315 of title 49; and

(B) the Federal Maritime Commission issued pursuant to section 305, 41304, 41308, or 41309 or chapter 421 or 441 of title 46;

(4) all final orders of the Atomic Energy Commission made reviewable by section 2239 of title 42;

(5) all rules, regulations, or final orders of the Surface Transportation Board made reviewable by section 2321 of this title;

(6) all final orders under section 812 of the Fair Housing Act; and

(7) all final agency actions described in section 20114(c) of title 49.

Jurisdiction is invoked by filing a petition as provided by section 2344 of this title.

## 12 C.F.R. § 19.4.  Authority of the Comptroller.

The Comptroller may, at any time during the pendency of a proceeding, perform, direct the performance of, or waive performance of, any act which could be done or ordered by the administrative law judge.

## 12 C.F.R. § 19.5. Authority of the administrative law judge (ALJ).

(a) General rule. All proceedings governed by this part shall be conducted in accordance with the provisions of chapter 5 of title 5 of the United States Code. The administrative law judge shall have all powers necessary to conduct a proceeding in a fair and impartial manner and to avoid unnecessary delay.

(b) Powers. The administrative law judge shall have all powers necessary to conduct the proceeding in accordance with paragraph (a) of this section, including the following powers:

(1) To administer oaths and affirmations;

(2) To issue subpoenas, subpoenas duces tecum, and protective orders, as authorized by this part, and to quash or modify any such subpoenas and orders;

(3) To receive relevant evidence and to rule upon the admission of evidence and offers of proof;

(4) To take or cause depositions to be taken as authorized by this subpart;

(5) To regulate the course of the hearing and the conduct of the parties and their counsel;

(6) To hold scheduling and/or pre-hearing conferences as set forth in § 19.31;

(7) To consider and rule upon all procedural and other motions appropriate in an adjudicatory proceeding, provided that only the Comptroller shall have the power to grant any motion to dismiss the proceeding or to decide any other motion that results in a final determination of the merits of the proceeding;

(8) To prepare and present to the Comptroller a recommended decision as provided herein;

(9) To recuse himself or herself by motion made by a party or on his or her own motion;

(10) To establish time, place and manner limitations on the attendance of the public and the media for any public hearing; and

(11) To do all other things necessary and appropriate to discharge the duties of a presiding officer.

## 12 C.F.R. § 19.19. Answer.

(a) When. Within 20 days of service of the notice, respondent shall file an answer as designated in the notice. In a civil money penalty proceeding, respondent shall also file a request for a hearing within 20 days of service of the notice.

(b) Content of answer. An answer must specifically respond to each paragraph or allegation of fact contained in the notice and must admit, deny, or state that the party lacks sufficient information to admit or deny each allegation of fact. A statement of lack of information has the effect of a denial. Denials must fairly meet the substance of each allegation of fact denied; general denials are not permitted. When a respondent denies part of an allegation, that part must be denied and the remainder specifically admitted. Any allegation of fact in the notice which is not denied in the answer must be deemed admitted for purposes of the proceeding. A respondent is not required to respond to the portion of a notice that constitutes the prayer for relief or proposed order. The answer must set forth affirmative defenses, if any, asserted by the respondent.

(c) Default—

(1) Effect of failure to answer. Failure of a respondent to file an answer required by this section within the time provided constitutes a waiver of his or her right to appear and contest the allegations in the notice. If no timely answer is filed, Enforcement Counsel may file a motion for entry of an order of default. Upon a finding that no good cause has been shown for the failure to file a timely answer, the administrative law judge shall file with the Comptroller a recommended decision containing the findings and the relief sought in the notice. Any final order issued by the Comptroller based upon a respondent's failure to answer is deemed to be an order issued upon consent.

(2) Effect of failure to request a hearing in civil money penalty proceedings. If respondent fails to request a hearing as required by law within the time provided, the notice of assessment constitutes a final and unappealable order.

# 12 C.F.R. § 19.23. Motions.

(a) In writing.

(1) Except as otherwise provided herein, an application or request for an order or ruling must be made by written motion.

(2) All written motions must state with particularity the relief sought and must be accompanied by a proposed order.

(3) No oral argument may be held on written motions except as otherwise directed by the administrative law judge. Written memoranda, briefs, affidavits or other relevant material or documents may be filed in support of or in opposition to a motion.

(b) Oral motions. A motion may be made orally on the record unless the administrative law judge directs that such motion be reduced to writing.

(c) Filing of motions. Motions must be filed with the administrative law judge, except that following the filing of the recommended decision, motions must be filed with the Comptroller.

(d) Responses.

(1) Except as otherwise provided herein, within ten days after service of any written motion, or within such other period of time as may be established by the administrative law judge or the Comptroller, any party may file a written response to a motion. The administrative law judge shall not rule on any oral or written motion before each party has had an opportunity to file a response.

(2) The failure of a party to oppose a written motion or an oral motion made on the record is deemed a consent by that party to the entry of an order substantially in the form of the order accompanying the motion.

(e) Dilatory motions. Frivolous, dilatory or repetitive motions are prohibited. The filing of such motions may form the basis for sanctions.

(f) Dispositive motions. Dispositive motions are governed by §§ 19.29 and 19.30.

# 12 C.F.R. § 19.24. Scope of document discovery.

(a) Limits on discovery—
(1) Subject to the limitations set out in paragraphs (b) through (d) of this section, a party to a proceeding under this subpart may obtain document discovery by serving a written request to produce documents. For purposes of a request to produce documents, the term documents includes writings, drawings, graphs, charts, photographs, recordings, electronically stored information, and other data or data compilations stored in any medium from which information can be obtained either directly or, if necessary, after translation by the responding party, into a reasonably usable form.

(2) Discovery by use of deposition is governed by subpart I of this part.

(3) Discovery by use of either interrogatories or requests for admission is not permitted.

(4) Any request to produce documents that calls for irrelevant material; or that is unreasonable, oppressive, excessive in scope, unduly burdensome, or repetitive of previous requests, or that seeks to obtain privileged documents will be denied or modified. A request is unreasonable, oppressive, excessive in scope, or unduly burdensome if, among other things, it fails to include justifiable limitations on the time period covered and the geographic locations to be searched, or the time provided to respond in the request is inadequate.

(b) Relevance. A party may obtain document discovery regarding any non-privileged matter that has material relevance to the merits of the pending action.

(c) Privileged matter. Privileged documents are not discoverable. Privileges include the attorney-client privilege, attorney work-product doctrine, bank examination privilege, law enforcement privilege, any government's or government agency's deliberative process privilege, and any other privileges the Constitution, any applicable act of Congress, or the principles of common law provide.

(d) Time limits. All document discovery, including all responses to discovery requests, must be completed by the date set by the ALJ and no later than 30 days prior to the date scheduled for the commencement of the hearing, except as provided in the Local Rules. No exceptions to this time limit are permitted, unless the ALJ finds on the record that good cause exists for waiving the requirements of paragraph (d).

## 12 C.F.R. § 19.25. Request for document discovery from parties.

(a) General rule. Any party may serve on any other party a request to produce for inspection any discoverable documents that are in the possession, custody, or control of the party upon whom the request is served. The request must identify the documents to be produced either by individual item or by category, and must describe each item and category with reasonable particularity. Documents must be produced as they are kept in the usual course of business or must be organized to correspond with the categories in the request.

(b) Production or copying. The request must specify a reasonable time, place, and manner for production and performing any related acts. In lieu of inspecting the documents, the requesting party may specify that all or some of the responsive documents be copied and the copies delivered to the requesting party. If copying of fewer than 250 pages is requested, the party to whom the request is addressed shall bear the cost of copying and shipping charges. If a party requests 250 pages or more of copying, the requesting party shall pay for the copying and shipping charges. Copying charges are the current per-page copying rate imposed by 12 CFR part 4 implementing the Freedom of Information Act (5 U.S.C. 552). The party to whom the request is addressed may require payment in advance before producing the documents.

(c) Obligation to update responses. A party who has responded to a discovery request with a response that was complete when made is not required to supplement the response to include documents thereafter acquired, unless the responding party learns that:

(1) The response was materially incorrect when made; or

(2) The response, though correct when made, is no longer true and a failure to amend the response is, in substance, a knowing concealment.

(d) Motions to limit discovery.

(1) Any party that objects to a discovery request may, within ten days of being served with such request, file a motion in accordance with the provisions of § 19.23 to strike or otherwise limit the request. If an objection is made to only a portion of an item or category in a request, the portion objected to shall be specified. Any objections not made in accordance with this paragraph and § 19.23 are waived.

(2) The party who served the request that is the subject of a motion to strike or limit may file a written response within five days of service of the motion. No other party may file a response.

(e) Privilege. At the time other documents are produced, the producing party must reasonably identify all documents withheld on the grounds of privilege and must produce a statement of the basis for the assertion of privilege. When similar documents that are protected by deliberative process, attorney work-product, or attorney-client privilege are voluminous, these documents may be identified by category instead of by individual document. The administrative law judge retains discretion to determine when the identification by category is insufficient.

(f) Motions to compel production.

(1) If a party withholds any documents as privileged or fails to comply fully with a discovery request, the requesting party may, within ten days of the assertion of privilege or of the time the failure to comply becomes known to the requesting party, file a motion in accordance with the provisions of § 19.23 for the issuance of a subpoena compelling production.

(2) The party who asserted the privilege or failed to comply with the request may file a written response to a motion to compel within five days of service of the motion. No other party may file a response.

(g) Ruling on motions. After the time for filing responses pursuant to this section has expired, the administrative law judge shall rule promptly on all motions filed pursuant to this section. If the administrative law judge determines that a discovery request, or any of its terms, calls for irrelevant material, is unreasonable, oppressive, excessive in scope, unduly burdensome, or repetitive of previous requests, or seeks to obtain privileged documents, he or she may deny or modify the request, and may issue appropriate protective orders, upon such conditions as justice may require. The pendency of a motion to strike or limit discovery or to compel production is not a basis for staying or continuing the proceeding, unless otherwise ordered by the administrative law judge. Notwithstanding any other provision in this part, the administrative law judge may not release, or order a party to produce, documents withheld on grounds of privilege if the party has stated to the administrative law judge its intention to file a timely motion for interlocutory review of the administrative law judge's order to produce the documents, and until the motion for interlocutory review has been decided.

(h) Enforcing discovery subpoenas. If the administrative law judge issues a subpoena compelling production of documents by a party, the subpoenaing party may, in the event of noncompliance and to the extent authorized by applicable law, apply to any appropriate United States district court for an order requiring compliance with the subpoena. A party's right to seek court enforcement of a subpoena shall not in any manner limit the sanctions that may be imposed by the administrative law judge against a party who fails to produce subpoenaed documents.

## 12 C.F.R. § 19.26. Document subpoenas to nonparties.

(a) General rules.

(1) Any party may apply to the administrative law judge for the issuance of a document discovery subpoena addressed to any person who is not a party to the proceeding. The application must contain a proposed document subpoena and a brief statement showing the general relevance and reasonableness of the scope of documents sought. The subpoenaing party shall specify a reasonable time, place, and manner for making production in response to the document subpoena.

(2) A party shall only apply for a document subpoena under this section within the time period during which such party could serve a discovery request under § 19.24(d). The party obtaining the document subpoena is responsible for serving it on the subpoenaed person and for serving copies on all parties. Document subpoenas may be served in any state, territory, or possession of the United States, the District of Columbia, or as otherwise provided by law.

(3) The administrative law judge shall promptly issue any document subpoena requested pursuant to this section. If the administrative law judge determines that the application does not set forth a valid basis for the issuance of the subpoena, or that any of its terms are unreasonable, oppressive, excessive in scope, or unduly burdensome, he or she may refuse to issue the subpoena or may issue it in a modified form upon such conditions as may be consistent with the Uniform Rules.

(b) Motion to quash or modify.

(1) Any person to whom a document subpoena is directed may file a motion to quash or modify such subpoena, accompanied by a statement of the basis for quashing or modifying the subpoena. The movant shall serve the motion on all parties, and any party may respond to such motion within ten days of service of the motion.

(2) Any motion to quash or modify a document subpoena must be filed on the same basis, including the assertion of privilege, upon which a party could object to a discovery request under § 19.25(d), and during the same time limits during which such an objection could be filed.

(c) Enforcing document subpoenas. If a subpoenaed person fails to comply with any subpoena issued pursuant to this section or any order of the administrative law judge which directs compliance with all or any portion of a document subpoena, the subpoenaing party or any other aggrieved party may, to the extent authorized by

applicable law, apply to an appropriate United States district court for an order requiring compliance with so much of the document subpoena as the administrative law judge has not quashed or modified. A party's right to seek court enforcement of a document subpoena shall in no way limit the sanctions that may be imposed by the administrative law judge on a party who induces a failure to comply with subpoenas issued under this section.

## 12 C.F.R. § 19.27. Deposition of witness unavailable for hearing.

(a) General rules.

(1) If a witness will not be available for the hearing, a party desiring to preserve that witness' testimony for the record may apply in accordance with the procedures set forth in paragraph (a)(2) of this section, to the administrative law judge for the issuance of a subpoena, including a subpoena duces tecum, requiring the attendance of the witness at a deposition. The administrative law judge may issue a deposition subpoena under this section upon showing that:

(i) The witness will be unable to attend or may be prevented from attending the hearing because of age, sickness or infirmity, or will otherwise be unavailable;

(ii) The witness' unavailability was not procured or caused by the subpoenaing party;

(iii) The testimony is reasonably expected to be material; and

(iv) Taking the deposition will not result in any undue burden to any other party and will not cause undue delay of the proceeding.

(2) The application must contain a proposed deposition subpoena and a brief statement of the reasons for the issuance of the subpoena. The subpoena must name the witness whose deposition is to be taken and specify the time and place for taking the deposition. A deposition subpoena may require the witness to be deposed at any place within the country in which that witness resides or has a regular place of employment or such other convenient place as the administrative law judge shall fix.

(3) Any requested subpoena that sets forth a valid basis for its issuance must be promptly issued, unless the administrative law judge on his or her own motion, requires a written response or requires attendance at a conference concerning whether the requested subpoena should be issued.

(4) The party obtaining a deposition subpoena is responsible for serving it on the witness and for serving copies on all parties. Unless the administrative law judge orders otherwise, no deposition under this section shall be taken on fewer than ten days' notice to the witness and all parties. Deposition subpoenas may be served in any state, territory, possession of the United States, or the District of Columbia, on any person or company doing business in any state, territory, possession of the United States, or the District of Columbia, or as otherwise permitted by law.

(b) Objections to deposition subpoenas.

(1) The witness and any party who has not had an opportunity to oppose a deposition subpoena issued under this section may file a motion with the administrative law judge to quash or modify the subpoena prior to the time for compliance specified in the subpoena, but not more than ten days after service of the subpoena.

(2) A statement of the basis for the motion to quash or modify a subpoena issued under this section must accompany the motion. The motion must be served on all parties.

(c) Procedure upon deposition.

(1) Each witness testifying pursuant to a deposition subpoena must be duly sworn, and each party shall have the right to examine the witness. Objections to questions or documents must be in short form, stating the grounds for the objection. Failure to object to questions or documents is not deemed a waiver except where the ground for the objection might have been avoided if the objection had been timely presented. All questions, answers, and objections must be recorded.

(2) Any party may move before the administrative law judge for an order compelling the witness to answer any questions the witness has refused to answer or submit any evidence the witness has refused to submit during the deposition.

(3) The deposition must be subscribed by the witness, unless the parties and the witness, by stipulation, have waived the signing, or the witness is ill, cannot be found, or has refused to sign. If the deposition is not subscribed by the witness, the court reporter taking the deposition shall certify that the transcript is a true and complete transcript of the deposition.

(d) Enforcing subpoenas. If a subpoenaed person fails to comply with any order of the administrative law judge which directs compliance with all or any portion of a deposition subpoena under paragraph (b) or (c)(3) of this section, the subpoenaing party or other aggrieved party may, to the extent authorized by applicable law, apply to an appropriate United States district court for an order requiring compliance with the portions of the subpoena that the administrative law judge has ordered enforced. A party's right to seek court enforcement of a deposition subpoena in no way limits the sanctions that may be imposed by the administrative law judge on a party who fails to comply with, or procures a failure to comply with, a subpoena issued under this section.

## 12 C.F.R. § 19.28. Interlocutory review.

(a) General rule. The Comptroller may review a ruling of the administrative law judge prior to the certification of the record to the Comptroller only in accordance with the procedures set forth in this section and § 19.23.

(b) Scope of review. The Comptroller may exercise interlocutory review of a ruling of the administrative law judge if the Comptroller finds that:

(1) The ruling involves a controlling question of law or policy as to which substantial grounds exist for a difference of opinion;

(2) Immediate review of the ruling may materially advance the ultimate termination of the proceeding;

(3) Subsequent modification of the ruling at the conclusion of the proceeding would be an inadequate remedy; or

(4) Subsequent modification of the ruling would cause unusual delay or expense.

(c) Procedure. Any request for interlocutory review shall be filed by a party with the administrative law judge within ten days of his or her ruling and shall otherwise comply with § 19.23. Any party may file a response to a request for interlocutory review in accordance with § 19.23(d). Upon the expiration of the time for filing all responses, the administrative law judge shall refer the matter to the Comptroller for final disposition.

(d) Suspension of proceeding. Neither a request for interlocutory review nor any disposition of such a request by the Comptroller under this section suspends or stays the proceeding unless otherwise ordered by the administrative law judge or the Comptroller.

**12 C.F.R. § 19.29. Summary disposition.**

(a) In general. The administrative law judge shall recommend that the Comptroller issue a final order granting a motion for summary disposition if the undisputed pleaded facts, admissions, affidavits, stipulations, documentary evidence, matters as to which official notice may be taken, and any other evidentiary materials properly submitted in connection with a motion for summary disposition show that:
(1) There is no genuine issue as to any material fact; and

(2) The moving party is entitled to a decision in its favor as a matter of law.

(b) Filing of motions and responses.
(1) Any party who believes there is no genuine issue of material fact to be determined and that he or she is entitled to a decision as a matter of law may move at any time for summary disposition in its favor of all or any part of the proceeding. Any party, within 20 days after service of such a motion, or within such time period as allowed by the administrative law judge, may file a response to such motion.
(2) A motion for summary disposition must be accompanied by a statement of the material facts as to which the moving party contends there is no genuine issue. Such motion must be supported by documentary evidence, which may take the form of admissions in pleadings, stipulations, depositions, investigatory depositions, transcripts, affidavits and any other evidentiary materials that the moving party contends support his or her position. The motion must also be accompanied by a brief containing the points and authorities in support of the contention of the moving party. Any party opposing a motion for summary disposition must file a statement setting forth those material facts as to which he or she contends a genuine dispute exists. Such opposition must be supported by evidence of the same type as that submitted with the motion for summary disposition and a brief containing the points and authorities in support of the contention that summary disposition would be inappropriate.

(c) Hearing on motion. At the request of any party or on his or her own motion, the administrative law judge may hear oral argument on the motion for summary disposition.

(d) Decision on motion. Following receipt of a motion for summary disposition and all responses thereto, the administrative law judge shall determine whether the moving party is entitled to summary disposition. If the administrative law judge determines that summary disposition is warranted, the administrative law judge shall submit a recommended decision to that effect to the Comptroller. If the

administrative law judge finds that no party is entitled to summary disposition, he or she shall make a ruling denying the motion.

## 12 C.F.R. § 19.30. Partial summary disposition.

If the administrative law judge determines that a party is entitled to summary disposition as to certain claims only, he or she shall defer submitting a recommended decision as to those claims. A hearing on the remaining issues must be ordered. Those claims for which the administrative law judge has determined that summary disposition is warranted will be addressed in the recommended decision filed at the conclusion of the hearing.

## 12 C.F.R. § 19.39. Exceptions to recommended decision.

(a) Filing exceptions. Within 30 days after service of the recommended decision, findings, conclusions, and proposed order under § 19.38, a party may file with the Comptroller written exceptions to the administrative law judge's recommended decision, findings, conclusions or proposed order, to the admission or exclusion of evidence, or to the failure of the administrative law judge to make a ruling proposed by a party. A supporting brief may be filed at the time the exceptions are filed, either as part of the same document or in a separate document.

(b) Effect of failure to file or raise exceptions.

(1) Failure of a party to file exceptions to those matters specified in paragraph (a) of this section within the time prescribed is deemed a waiver of objection thereto.

(2) No exception need be considered by the Comptroller if the party taking exception had an opportunity to raise the same objection, issue, or argument before the administrative law judge and failed to do so.

(c) Contents.

(1) All exceptions and briefs in support of such exceptions must be confined to the particular matters in, or omissions from, the administrative law judge's recommendations to which that party takes exception.

(2) All exceptions and briefs in support of exceptions must set forth page or paragraph references to the specific parts of the administrative law judge's recommendations to which exception is taken, the page or paragraph references to those portions of the record relied upon to support each exception, and the legal authority relied upon to support each exception.

## 12 C.F.R. § 19.40. Review by the Comptroller.

(a) Notice of submission to the Comptroller. When the Comptroller determines that the record in the proceeding is complete, the Comptroller shall serve notice upon the parties that the proceeding has been submitted to the Comptroller for final decision.

(b) Oral argument before the Comptroller. Upon the initiative of the Comptroller or on the written request of any party filed with the Comptroller within the time for filing exceptions, the Comptroller may order and hear oral argument on the recommended findings, conclusions, decision, and order of the administrative law judge. A written request by a party must show good cause for oral argument and state reasons why arguments cannot be presented adequately in writing. A denial of a request for oral argument may be set forth in the Comptroller's final decision. Oral argument before the Comptroller must be on the record.

(c) Comptroller's final decision.
(1) Decisional employees may advise and assist the Comptroller in the consideration and disposition of the case. The final decision of the Comptroller will be based upon review of the entire record of the proceeding, except that the Comptroller may limit the issues to be reviewed to those findings and conclusions to which opposing arguments or exceptions have been filed by the parties.
(2) The Comptroller shall render a final decision within 90 days after notification of the parties that the case has been submitted for final decision, or 90 days after oral argument, whichever is later, unless the Comptroller orders that the action or any aspect thereof be remanded to the administrative law judge for further proceedings. Copies of the final decision and order of the Comptroller shall be served upon each party to the proceeding, upon other persons required by statute, and, if directed by the Comptroller or required by statute, upon any appropriate state or Federal supervisory authority.